# **EXHIBIT 73**

## **LETTER / CORRESPONDENCE TO JUDGE**

# O L S H A N

1325 AVENUE OF THE AMERICAS • NEW YORK, NEW YORK 10019
TELEPHONE: 212.451.2300 • FACSIMILE: 212.451.2222

February 16, 2024

**BY NYSCEF, FEDEX AND ELECTRONIC MAIL**

Honorable Emilio Colaiacovo
New York Supreme Court
Commercial Division
92 Franklin Street, Part 4
Buffalo, New York 14202
aegarcia@nycourts.gov

  Re: *Exyte U.S. Inc. v. Athenex, Inc. and ImmunityBio, Inc.*, Index No. 812016/2022

Dear Justice Colaiacovo:

  We are counsel for defendant ImmunityBio, Inc. ("ImmunityBio") in the above-referenced matter. We write pursuant to the Court's instruction at the January 17, 2024 conference in this matter to set forth ImmunityBio's position regarding the status of this action.  As set forth below, the bankruptcy proceedings of defendant Athenex, Inc. ("Athenex" and together with ImmunityBio, "Defendants") are ongoing, including the adjudication of claims filed by both ImmunityBio and plaintiff Exyte U.S., Inc. ("Plaintiff"). Thus, this matter should remain stayed.

<u>Background</u>

  In 2017, Athenex entered into a contract with Plaintiff pursuant to which Plaintiff agreed to provide services relating to the design and construction of a pharmaceutical manufacturing facility in Dunkirk, New York. Plaintiff substantially completed that work in 2020, and issued its final invoice to Athenex for its completed work in May 2021.

  Nearly a year later, in early 2022, ImmunityBio and Athenex entered into a purchase agreement (the "Purchase Agreement"), pursuant to which ImmunityBio acquired from Athenex certain rights and responsibilities relating to the Dunkirk facility. Plaintiff was not a party to that agreement. The Purchase Agreement provided, *inter alia*, that Athenex would retain all liabilities owed to contracting parties, such as Plaintiff, incurred or owed as of the closing of the Purchase Agreement (the "Retained Liabilities"), and that Athenex would indemnify ImmunityBio with respect to all damages and losses (including attorneys' fees), arising out of, *inter alia*, the Retained Liability, and any breaches by Athenex of the Purchase Agreement.  (Dkt. No 64, §§ 11.2, 11.4.)

  On October 5, 2022, Plaintiff commenced this action, seeking to hold both Athenex and ImmunityBio liable for approximately $8.478 million pursuant to the contract between Plaintiff and Athenex. On December 2, 2022, ImmunityBio moved to dismiss Plaintiff's claims against it. That motion remains *sub judice*.

February 16, 2024
Page 2

On May 14, 2023, Athenex filed a voluntary petition for relief under Title 11 of Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Action"). (Dkt. No. 60.) On May 25, 2023 ImmunityBio filed a claim in the Bankruptcy Action relating to the Purchase Agreement (the "ImmunityBio Claim").

On July 19, 2023, the Court extended the automatic stay that applied in light of Athenex's bankruptcy to ImmunityBio. (Dkt. Nos. 71, 72.) The Court held that since Athenex is obligated to ImmunityBio, and had in fact indemnified ImmunityBio and paid its attorneys' fees in connection with this action, the automatic stay extended to ImmunityBio. (Dkt. No. 71 at 18-19.) *See also Branham v. Loews Orpheum Theatre, Inc.*, 291 A.D.2d 356 (1st Dep't 2002) ("the bankruptcy filing by one defendant does not prevent a plaintiff from proceeding on causes of action against the non-bankrupt defendants, an exception is recognized where, as here, the bankrupt is obligated to indemnify a non-bankrupt defendant"); *Murnane Assocs., Inc. v. Harrison Garage Parking Corp.*, 217 A.D.2d 1003, 1003 (4th Dep't 1995) (while the automatic stay usually does not apply to non-debtors, "an exception has been recognized when the bankrupt is obligated to indemnify a non-debtor defendant"); *Cent. Buffalo Project Corp. v. Edison Bros. Stores*, 205 A.D.2d 295, 297 (4th Dep't 1994) (while the automatic stay provisions of the Bankruptcy Code generally "do not apply to nondebtor defendants . . . [a]n exception to that general rule has been recognized by some courts where unusual circumstances prevail, such as an obligation by the bankrupt to indemnify the nondebtor defendant"); *LG 2 Doe v. Jasinski*, 195 A.D.3d 1399, 1401 (4th Dep't 2021) ("Under certain limited circumstances, '[t]he automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate', such as 'when the bankrupt [defendant] is obligated to indemnify a non-debtor defendant.'" (citations omitted)).

On July 20, 2023, Plaintiff filed a claim in connection with the Bankruptcy Action (the "Exyte Claim"). The Exyte Claim attached Plaintiff's Complaint in this action as the purported basis for its claim. *See* Ex. 1 hereto.

On September 12, 2023, the Court in the Bankruptcy Action entered an Order confirming a plan of liquidation of Athenex. *See* Ex. 2 hereto. That plan expressly declined to release any claims of Plaintiff or ImmunityBio, and stated that those claims would be treated pursuant to the plan. *Id.* at p. 31. Presently, the liquidating trustee's deadline to file claim objections in the Bankruptcy Action is July 22, 2024. *See* Ex. 3 hereto. Neither the ImmunityBio Claim nor the Exyte Claim have been adjudicated or determined.

The Court held a status conference on January 17, 2024, and ordered the parties to submit letters regarding the status of this action and their positions on the stay by February 16, 2024, and appear at a further conference on March 21, 2024.

<u>This Action Should Remain Stayed</u>

Under 11 U.S.C. § 362(c)(2), the automatic stay that applies to Plaintiff's claims against Defendants "continues under the earliest of – (A) the time the case is closed; (B) the time the case is dismissed; or (C) . . . the time a discharge is granted or denied." Here, the Bankruptcy Action remains open and has not been dismissed. Nor has a discharge been granted or denied. *See* Ex. 2

February 16, 2024
Page 3

at p. 72 (liquidation plan shall not "be deemed to constitute a discharge of the Debtors"). Moreover, any determination of this action would risk inconsistent results with the determination of the parties' claims and defenses in the Bankruptcy Action.  Specifically, Exyte's claims in the bankruptcy are identical to the claims it has asserted here; indeed, the complaint was attached as the basis of the bankruptcy claims.  Likewise, ImmunityBio's claims in the bankruptcy both overlap with and are impacted by the state court action.

Accordingly, for the foregoing reasons as well as those set forth in the Court's decision at the July 19, 2023 hearing, the automatic stay remains in place, and this action should remain stayed against both Defendants.

Respectfully submitted,

*/s/ Kyle C. Bisceglie*

Kyle C. Bisceglie

Enclosures
cc:      All Counsel of Record (via NYSCEF)

**EXHIBIT 1**

| United States Bankruptcy Court for the Southern District of Texas | Your Mail ID is |
|---|---|
| **Name of Debtor:** Athenex, Inc. | **For Court Use Only** |
| **Case Number:** 23-90295 | Claim Number: 0000010317 |
| | File Date: 07/20/2023 20:07:19 |

# Proof of Claim (Official Form 410)

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

**04/22**

---

| **Part 1:** | **Identify the Claim** |
|---|---|

**1.    Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim): Exyte U.S., Inc.

Other names the creditor used with the debtor: M+W U.S., Inc.

**2.    Has this claim been acquired from someone else?**   ☑ No   ☐ Yes.   From whom? _____

**3.    Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|
| Name: Exyte U.S., Inc. | Name: Christopher Karpathy, General Counsel |
| Address: ATTN: Peter E. Moran, Esq. | Address: Exyte U.S., Inc. |
| PECKAR & ABRAMSON, P.C. | 1001 Klein Rd., Suite #400 |
| 70 Grand Avenue | |
| City: River Edge | City: Plano |
| State: NJ   ZIP Code: 07661 | State: TX   ZIP Code: 75074 |
| Country (if International): | Country (if International): |
| Phone: 201-343-3434 | Phone: 469-215-6502 |
| Email: pmoran@pecklaw.com | Email: chris.karpathy@exyte.net |

| **4. Does this claim amend one already filed?** | **5. Do you know if anyone else has filed a proof of claim for this claim?** |
|---|---|
| ☑ No | ☑ No |
| ☐ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _____ | Who made the earlier filing? |
| Filed on _____ | _____ |
| MM / DD / YYYY | |

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

___ ___ ___ ___

**7. How much is the claim?**

$ 8,478,048.88

**Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Other Basis _____

Goods sold/services, damages in lawsuit

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:

_____

**Basis for perfection:**

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed ☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of petition.**

$_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9):** $_____

**Part 3: Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Peter E. Moran*                                   07/20/2023 20:07:19
_____     _____
Signature                                          Date

Provide the name and contact information of the person completing and signing this claim:

Name        Peter E. Moran, Esq.

Address     PECKAR & ABRAMSON, P.C.

            70 Grand Avenue

City        River Edge

State       NJ                                                Zip    07661

Country (in international)    USA

Phone       201-343-3434

Email       pmoran@pecklaw.com

## ATTACHMENT TO EXYTE U.S. INC. PROOF OF CLAIM

The Proof of Claim filed by Exyte U.S. Inc. ("Exyte"), formerly known as M+W U.S., Inc., is based upon a Design Build Agreement ("DBA") that Exyte entered into with Athenex, Inc. ("Debtor") to design and construct the project located at 3805 Lake Shore Drive East, Dunkirk, NY 14048 (the "Project"), as summarized below and reflected in the attached Complaint at Exhibit A. The Complaint was filed on October 5, 2022 for the action entitled Exyte U.S., Inc. v. Athenex, Inc. and ImmunityBio, Inc., and is pending before the Supreme Court of New York, Erie County, Index No. 812016/2022 ("the Exyte Action"). The Exyte Action is stayed as to Debtor following the filing of this bankruptcy. The amount of Exyte's claim is currently $8,478,048.88 as of the date this Proof of Claim was submitted, exclusive of interest and attorneys' fees. Exyte reserves the right to amend and/or supplement the Proof of Claim and this attachment (collectively, "Proof of Claim").

The DBA was entered into by and between Debtor and Exyte and is dated December 29, 2017. Pursuant to the DBA, Exyte was to design and construct a new greenfield manufacturing plant and related improvements at the Project. The DBA was for design and construction services generally described as 'Design build *work*' (hereinafter "Services & Work"), which Services & Work were performed on the Project. The DBA is too voluminous to attach to this Proof of Claim but can be provided, in relevant part, upon request.

Per the DBA, Exyte submitted monthly Payment Applications to Debtor and Debtor was obligated to issue a Certificate of Payment and to render payment to Exyte in accordance with the terms of the DBA. In addition to periodic compensation for its work, which was regularly billed, Exyte was also entitled to Shared Savings, as defined by the DBA, if it completed its Services & Work for less than the $212,594,806 Guaranteed Maximum Price ("GMP") set forth in the DBA.

**The Debtor failed to perform all the terms of the DBA, including but not limited to, its failure to compensate Exyte for its Services and Work performed and for the Shared Savings Exyte generated on the Project.** Specifically, Debtor failed to pay Exyte for its Services and Work, as described in Exyte's Payment Application No. 38, dated April 30, 2021, for the sum of $1,075,138.29. This represented the final payment owed to Exyte for work performed under the DBA, including retainage, which is still outstanding. The Debtor also received Exyte's Payment Application No. 39 for Shared Savings, dated April 11, 2022, showing that Exyte had completed the Project for a sum at least $18,507,276.47 less than the GMP, entitling Exyte to Shared Savings in the amount of $7,402,910.59. Thus, there currently remains due and owing to Exyte a total of at least $8,478,048.88 under the DBA. The value of such Services & Work is stated in the Proof of Claim and is supported by documents that are too voluminous to attach to this Proof of Claim but will be provided upon request.

During the pendency of the DBA, Debtor undertook negotiations with ImmunityBio, Inc. ("IMB") for IMB to purchase or take assignment of some or all of Debtor's assets and corresponding obligations, including the Project and the DBA. Debtor and IMB dispute amongst themselves whether and to what extent obligations under the DBA have been assigned in connection with a Purchase Agreement between them dated January 7, 2022 (the "Purchase Agreement") or have been assumed by IMB pursuant to a separate arrangement. IMB alleges that

the obligation to pay Exyte for its work at the Project is a "Retained Liability" of Debtor, while Debtor alleges that it is an obligation of IMB. These claims are either part or alleged to be part of the Exyte Action. Nevertheless, the Purchase Agreement closed on or about February 14, 2022 and IMB took possession of the Project facility.

The Exyte Action is continuing against the non-debtor and unaffiliated co-defendant, IMB. As referenced in the *ad damnum* clauses of the Complaint, there are some claims for which the Debtor and IMB may be jointly and severally liable, while there are also other separate, direct claims against either the Debtor or IMB, respectively.

Exyte reserves all rights and waives none. This Proof of Claim is submitted without prejudice to its claims and defenses with respect to the Debtor and/or IMB, including those in or arising out of the Exyte Action. Moreover, the filing of this Proof of Claim is not intended and should not be construed to be an election of remedies, waiver of any past, present, or future defaults or events of default, or a limitation of any rights, remedies, claims, or defenses of Exyte.

Dated: River Edge, NJ
July 19, 2023

PECKAR & ABRAMSON, P.C.

By _____
Peter E. Moran, Esq.

70 Grand Avenue
River Edge, NJ 07661
Tel. 201-343-3434
pmoran@pecklaw.com
*Attorneys for Creditor Exyte U.S., Inc.*

#5010090v2

2

# EXHIBIT A

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 12 of 173

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE
------------------------------------------------------------ X

EXYTE U.S., INC.

                  Plaintiff,


        -against-


ATHENEX, INC. and IMMUNITYBIO,
INC.

             Defendants.
------------------------------------------------------------ X

Index No.
Date Purchased:  October 5, 2022

**SUMMONS**

Plaintiff designates
Erie County as the place of trial.

The basis of venue is:
The Project is located in Erie County
and this venue is designated pursuant to
a forum selection clause in the parties'
contract

**TO THE ABOVE NAMED DEFENDANTS**:

        **PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** to answer

the complaint of the Plaintiff in this action and to serve a copy of your answer, or, if the

complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's

attorneys, Peckar & Abramson P.C., within 20 days after the service of this Summons, exclusive

of the day of service (or within 30 days after the service is complete if this summons is not

personally delivered to you within the State of New York); and in case of your failure to appear

or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

  October 5, 2022
  New York, New York

                          Respectfully submitted,


                          _/s/Bruce D. Meller_____
                          Bruce D. Meller, Esq.
                          Peter E. Moran, Esq.
                          PECKAR & ABRAMSON, P.C.
                          1325 Avenue of the Americas,
                          10th Floor

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

#4816780v2

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 13 of 173

New York, New York 10019
Tel.  212.382.0909
Fax.  212.382.3456
Bmeller@pecklaw.com
Pmoran@pecklaw.com

Attorneys for Plaintiff,
Exyte U.S., Inc.

TO:

Athenex, Inc.
c/o New York Secretary of State
Office of the New York Department of State
One Commerce Plaza
99 Washington Avenue
Albany, New York 12231

ImmunityBio, Inc.
c/o New York Secretary of State
Office of the New York Department of State
One Commerce Plaza
99 Washington Avenue
Albany, New York 12231

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

2

#4816780v2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE
------------------------------------------------------------- X
EXYTE U.S., INC.

              Plaintiff,

       -against-

ATHENEX, INC. and  IMMUNITYBIO,
INC.

             Defendants.
------------------------------------------------------------- X

Index No.: _____

**COMPLAINT**

     Plaintiff, Exyte U.S., Inc. ("Exyte"), complaining of the defendants, by its attorneys,

Peckar & Abramson, P.C., alleges as follows:

     <u>**The Parties and Venue**</u>

     1.     At all times hereinafter mentioned Exyte was and is a corporation duly organized

and existing pursuant to the laws of the State of Delaware and is duly authorized to conduct

business in New York, having a place of business at 201 Fuller Road, Suite 401, Albany, NY

12203.  Exyte is engaged in the design, engineering, construction and delivery of facilities for

high-tech industries, such as those in the semiconductor, battery, pharmaceutical,

biotechnology, and data center fields.

     2.     Upon information and belief, at all times hereinafter mentioned, the defendant,

Athenex, Inc. ("Athenex"), was and is a corporation duly organized and existing pursuant to

the laws of the State of Delaware and is duly authorized to conduct business in New York,

having a place of business at Conventus Building, 1001 Main Street, Suite 600, Buffalo, NY

14203.  Athenex is or was engaged in the business of producing pharmaceuticals.

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

1

3.      Upon information and belief, at all times hereinafter mentioned, the defendant, ImmunityBio, Inc. ("ImmunityBio"), was and is a corporation duly organized and existing pursuant to the laws of the State of Delaware and is duly authorized to conduct business in New York, having a place of business at 3805 Lake Shore Drive East, Dunkirk, NY 14048. ImmunityBio is or was engaged in the business of producing pharmaceuticals.

4.      The agreement between Exyte and Athenex contains provisions requiring disputes to be decided by litigation in a court of competent jurisdiction located in Erie County, New York.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Dunkirk Plant Project

5.      Upon information and belief, in or about May 2015 and subsequent thereto, Athenex entered into a series of agreements wherein it obtained the rights to develop a project to construct a new greenfield manufacturing plant and related improvements at a site located at 3805 Lake Shore Drive East, Dunkirk, NY 14048 ("the Project" or "The Dunkirk Plant Project").

6.      In or about September 2017, Athenex entered into a Capital Grant Agreement with the New York State Urban Development Corporation d/b/a Empire State Development Corporation ("ESDC") wherein, among other things, ESDC agreed to fund the design and construction of the Project in an amount up to $200 million.

7.      Athenex previously received up to $25 million in grant money from ESDC to build its headquarters in Buffalo, with the understanding that any money remaining from the $25 million grant was to also be invested in the Dunkirk Plant Project.

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

2

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 16 of 173

8.      Pursuant to the Capital Grant Agreement, Athenex committed to spending $1.52 billion on operational expenses in its first 10-year lease term at the Project facility, an additional $1.5 billion on operational expenses if the term of the lease is extended for a second 10-year term, and to hire 450 new permanent employees within the first 5 years of the Project's operation.

9.      The Project is to include an approximately 320,000 square foot facility for manufacturing pharmaceuticals with warehousing, laboratories, office space, central utilities, and site improvements to be utilized as part of Athenex's business of producing oncological products.

**The Design-Build Agreement**

10.     In furtherance of the Project, by written agreement dated December 29, 2017, Athenex entered into a Design-Build Agreement ("D/B Agreement") with M+W U.S., Inc. ("M+W"), whereby, in exchange for compensation, M+W would be the "design-builder" of the Project, to design and construct the Project in accordance with certain Criteria and User Requirements Specifications developed by Athenex and as later modified.

11.     M+W and Athenex entered into performance of the D/B Agreement.

12.     Subsequent to the execution of the D/B Agreement, M+W underwent a name change and is now known as Exyte.

13.     Pursuant to the terms of D/B Agreement, among other things, Athenex is the Project Owner and bore all responsibilities of the Owner under that agreement for the Project.

14.     The D/B Agreement was later amended, which included the parties entering into a Guaranteed Maximum Price ("GMP") for the overall contract sum of $212,594,806, subject

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

3

to certain terms and conditions, and to change all references in the documents from M+W to Exyte.

15.     As to billing matters, the D/B Agreement states that Exyte is to issue progress invoices for its services on a monthly basis and that Exyte would be compensated for its work as payments come due.

16.     Among other terms, the D/B Agreement provides that Owner is to issue a Certificate of Payment to Exyte within seven days of its receipt of Exyte's monthly Applications for Payment, wherein the Owner is to indicate the amount it believes is properly due and to notify Exyte in writing of the Owner's reasons for withholding certification of all or part of the payment sought (if any).

17.     Final payment is to be made by the Owner not later than 30 days after Exyte has fully performed the contract and satisfied the conditions for final payment listed in the D/B Agreement.

18.     Under the D/B Agreement Exyte is also to be compensated for a portion of the savings it generated in completing the Project for less than the GMP, to wit, Section A.1.4.3.1 of the Third Amendment provides:

> Design-Builder is entitled to shared savings based on the final Contract cost including Fee ("Final Cost"), being delivered under $212,594,806. If the Final Cost of the Project is less than $212,594,806, then Design-Builder shall be entitled to the first $150,000 (one-hundred and fifty thousand dollars) of the total savings. Thereafter, Design-Builder shall be compensated in a shared savings value, which shall equal Forty Percent (40%) of the difference between the Final Cost and $ 212,444,806 (GMP - $150,000 = $212,444,806).

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

4

19.     Accordingly, if savings were realized, Exyte was entitled to a payment of $150,000 plus 40% of the remaining savings generated if it constructed the Project for less than the GMP of $212,594,806.

20.     The D/B Agreement provides, among other things, that the contract is binding upon the parties' partners, successors, assigns and legal representatives.

21.     It further states, in Section 15.2, that neither party is permitted to assign the contract without the written consent of the other and that if either party attempts to make an assignment without consent, that party shall nevertheless remain legally responsible for all obligations under the D/B Agreement.

22.     An exception to Section 15.2 exists in the D/B Agreement that permits Athenex to assign the contract without Exyte's consent, but only to Athenex's lender providing construction financing for the Project and only if the lender assumes all of Athenex's rights and obligations under the Design-Build Documents (a term defined in the D/B Agreement).

**Athenex's Sale to ImmunityBio and ImmunityBio's Assumption of its Payment Obligations**

23.     Unbeknownst and without notice to Exyte, in or about 2021, Athenex began discussions with ImmunityBio to purchase or take assignment of some or all of Athenex's assets, including the Project and the D/B Agreement.

24.     On or about January 7, 2022, Athenex and ImmunityBio entered into a Purchase Agreement ("Purchase Agreement"). Athenex is defined as the "Seller," ImmunityBio as the "Buyer," and the Project as "the Manufacturing Facility" in the Purchase Agreement, amongst other terms.

25.     The Purchase Agreement contains a broad assignment clause and states, in relevant part, that "Seller desires to sell, assign, and transfer to Buyer, and Buyer desires to

LAW OFFICES

**Peckar & Abramson**

A Professional Corporation

5

acquire from Seller, certain assets and rights of Seller, <u>and Buyer is willing to assume certain liabilities and obligations of Seller, relating to the Manufacturing Facility</u>, upon the terms and subject to the conditions hereinafter set forth." (emphasis added).

26.     As part of the transaction, Athenex was to "shall sell, transfer, assign, convey and deliver" to ImmunityBio certain delineated assets and properties (defined as the "Purchased Assets"), which include virtually all aspects of the Project, amongst other things, namely:

(a)     Athenex's leasehold interest and development rights in the Project;

(b)     All of Athenex's property, inventory, supplies, and fixtures located at the Manufacturing Facility;

(c)     All of Athenex's rights under certain contracts defined as  the "Assigned Contracts";

(d)      All of Athenex's rights relating to deposits and prepayments with respect to purchase orders or other contracts included in the Assigned Contracts; and

(e)     All warranties (express and implied) that continue in effect with respect to the Manufacturing Facility or any Purchased Asset (including, without limitation, warranties provided for under any Assigned Contract), to the extent assignable.

27.     That ImmunityBio was assuming all of Athenex's rights and responsibilities with respect to the Project, including Athenex's payment obligations to Exyte, is further underscored by a multitude of provisions transferring control of the Project and the Manufacturing Facility to ImmunityBio.

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

6

28.     Despite being indebted to Exyte, Athenex made a representation in the Purchase Agreement to ImmunityBio that all contracts at the Project had been paid in full, to wit: "All contractors who performed and completed work at the Leased Real Property pursuant to the AIA Agreement have been paid in full, except as set forth on Schedule 5.4(e)."

29.     Exyte neither has access to the final schedules and other attachments to the Purchase Agreement nor has Athenex or ImmunityBio disclosed same to Exyte.

30.     By express word and conduct, ImmunityBio has represented to Exyte that the D/B Agreement is among the "Assigned Contracts" that ImmunityBio received and assumed from Athenex.

31.     ImmunityBio is the tenant and owner of the Project.

32.     ImmunityBio is occupying the Manufacturing Facility and has commenced its business operations out of same.

33.     ImmunityBio has sent correspondence to Exyte demanding it correct certain alleged "deficiencies" in the Project, threatening to undertake alleged corrective work at Exyte's expense, and has otherwise conducted and represented itself as the Owner of the Project.

34.     Simultaneously, despite due demand, Athenex and ImmunityBio have refused to render payment to Exyte for amounts owed, including those amounts due for shared savings, retainage and Exyte's final payment.

35.     ImmunityBio has instead tried to "pass the buck" and evade its payment obligations by directing Exyte to look solely to Athenex for the amounts owed and has claimed that it did not assume Athenex's payment obligations and other responsibilities under the D/B Agreement, but only selectively purchased "the benefits" of the D/B Agreement.

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

7

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 21 of 173

36.     ImmunityBio's position is contrary to law, equity, and the terms of the Purchase Agreement.

37.     Notably, under the Purchase Agreement, ImmunityBio agreed to assume and perform the liabilities of Athenex under the Assigned Contracts that arose after the closing date of the transaction.

38.     More specifically, Section 2.4(a) of the Purchase Agreement provides:

> Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform, pursuant to the Bill of Sale and the Contract Assignments, as applicable, only the Liabilities of Seller under the Assigned Contracts arising, accruing, or required to be performed after the Closing Date (collectively, the "Assumed Liabilities").

39.     The closing contemplated by the Purchase Agreement occurred on or about February 14, 2022.

40.     At a minimum, Exyte invoiced Athenex for the shared savings it is owed in April 2022.

41.     Because Athenex and ImmunityBio concealed their discussions from Exyte until after the Purchase Agreement was executed, Exyte was unaware of the assignment to ImmunityBio.

42.     Regardless of whether Exyte consents to the assignment of the D/B Agreement, the Purchase Agreement nonetheless states that ImmunityBio is responsible for the costs associated with performing any of Athenex's rights and obligations under same.

43.     ImmunityBio's assumption of Athenex's obligations is further underscored in Section 2.3 of the Purchase Agreement where, if Athenex is unable to obtain a third party's consent to the assignment of a contract to ImmunityBio, then the parties are to negotiate an

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

8

arrangement whereby ImmunityBio obtains the contract rights and assumes the corresponding liabilities and obligations under such "Nonassignable Asset."

44.     Further, at law, assignments are impermissible if they materially change the duties of the non-assigning party (i.e., Exyte), increase the burdens or risks imposed on the non-assigning party, impair the non-assigning party's chance of obtaining return performance, and/or reduce the value of the contract to the non-assigning party.

45.     Delegations of contractual duties are generally permissible so long as the performance of those duties by the delegate (ImmunityBio) does not vary materially from the performance owed by the delegating party (Athenex).

46.     Where the delegate (ImmunityBio) fails to properly perform, the law imposes liability on the delegating party (Athenex) to ensure that performance is properly rendered to the non-assigning party (Exyte).

47.     The transaction consummated between Athenex and ImmunityBio under the Purchase Agreement, and particularly their subsequent acts and omissions in dealing with Exyte, have destroyed, diminished, hindered, and frustrated Exyte's contractual rights and its enjoyment of same.

48.     More specifically, Athenex and ImmunityBio have structured a transaction whereby performance is unilaterally demanded of Exyte under the D/B Agreement to a previously unknown party, but no return performance from Athenex and/or ImmunityBio will be given in accordance with the agreed upon terms of the D/B Agreement, most notably those concerning Exyte's right to payment of its final invoice, retainage, and shared savings.

49.     ImmunityBio has utterly refused to render payment and stated that it will not do so *even if* Exyte undertakes to correct the allegedly nonconforming work cited by ImmunityBio.

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

9

**The Payment Dispute**

50.     Exyte is owed, the sums of at least $ 1,075,138.29 under the D/B Agreement for its final payment including retainage which is being held by Athenex and/or ImmunityBio.

51.     Exyte fully performed all of its work and properly invoiced Athenex for these sums by virtue of periodic Payment Applications, including Payment Application No. 38 dated April 30, 2021 and submitted in May, 2021.

52.     Athenex and/or ImmunityBio failed to issue a Certificate of Payment in accordance with the D/B Agreement in response to these Payment Applications and invoiced sums.

53.     Athenex and/or ImmunityBio failed to issue a writing, in conformance with the D/B Agreement, setting forth any basis for them to withhold payments to Exyte for the amounts invoiced whether in whole or in part.

54.     Athenex and/or ImmunityBio failed to render payment in accordance with the provisions of the D/B Agreement for these sums, including those regarding the timing of payment, such that these sums remain due and owing.

55.     Exyte completed the Project for less than the GMP and, by its detailed accounting, brought the Project in at a savings of at least $18,507,276.47, after excluding the $150,000 bonus payment designated for Pike from its savings calculation:

| | |
|---|---|
| Available Project Savings | $18,190,877.47 |
| Additional Savings from Contingency Usage | $466,399.00 |
| Pike Bonus | ($150,000.00) |
| **TOTAL Project Cost Savings** | **$18,507,276.47** |

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

56.     On or about April 11, 2022, Exyte submitted a Payment Application No. 39 for the 40% portion of the shared savings Owner is obligated to pay it under the contract, namely $7,402,910.59 (i.e., $18,507,276.47 x .40 = $7,402,910.59).

57.     To date, despite due demand, Athenex and/or ImmunityBio has refused to certify the amount invoiced as shared savings or rendered payment to Exyte for same in contravention of the terms of the D/B Agreement, such that the sum of $7,402,910.59 for shared savings remains due and owing.

58.     Exyte has performed all of the terms and conditions of the D/B Agreement on its part to be performed, except insofar as any of those terms and conditions were prevented, waived or excused by Athenex and/or ImmunityBio.

59.     Thus, to date, despite due demand, Athenex and/or ImmunityBio has refused to certify or pay the amounts invoiced to Exyte in contravention of the terms of the D/B Agreement, such that sums in excess of $8,478,048.88 remain due and owing.

## <u>AS AND FOR A FIRST CAUSE OF ACTION</u>
### (Breach of Contract by Athenex)

60.     Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 59 of this Complaint with the same force and effect as if fully set forth at length herein.

61.     Athenex has a duty to abide by the terms of the D/B Agreement, including but not limited to those provisions regarding payment to Exyte and those placing limits upon how the D/B Agreement may be assigned.

62.     Athenex has materially breached the D/B Agreement in multiple instances which include, but are not limited to, the following:

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

11

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 25 of 173

      a)     Failing to timely and properly certify payments due to Exyte following receipt of Exyte's payment applications;

      b)     Failing to timely and properly set forth in writing the reasons why sums invoiced by Exyte are being withheld;

      c)     Failing to timely and properly render payment of invoices submitted by Exyte on the Project;

      d)     Failing to make payment to Exyte for its final payment, retainage, and shared savings which are due under the terms of the parties' contract;

      e)     Failing to disclose to Exyte its negotiations with ImmunityBio to assume the D/B Agreement and ownership/control of the Project;

      f)     Assigning the D/B Agreement to ImmunityBio without obtaining Exyte's consent;

      g)     Creating an assignment to ImmunityBio that materially changes Exyte's duties, increases the burdens or risks imposed upon Exyte, impairs Exyte's chances of obtaining return performance under the contract, and/or reduces the value of the contract to Exyte;

      h)     Delegating duties to ImmunityBio which materially vary from the duties required of Athenex to Exyte under the contract;

      i)     Failing to guarantee ImmunityBio's proper performance to Exyte of the duties Athenex assigned and/or transferred to ImmunityBio;

      j)     Failing to undertake its payment obligations once ImmunityBio repudiated its obligations to render payment to Exyte;

      k)     Ratifying and/or acquiescing in ImmunityBio's demands that Exyte perform alleged corrective work at the Project and in ImmunityBio's refusal to render payment to Exyte for moneys owed; and/or

      l)     Other breaches as supported by the facts alleged in and incorporated into this Complaint.

63.     Exyte has performed all of the terms and conditions of the D/B Agreement on its part to be performed, except insofar as any of those terms and conditions were prevented, waived or excused by Athenex and/or ImmunityBio.

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

64.     By reason of the foregoing breaches, Exyte has been damaged in sums equal to at least $ 8,478,048.88, for what it has invoiced for its final payment, retainage, and its portion of the shared savings, exclusive of interest and other sums due and owing.

65.     Despite due demand, Athenex and/or ImmunityBio have failed and refused to pay Exyte for the damages incurred and Athenex is liable therefor.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Anticipatory Breach and/or Breach of Contract by ImmunityBio)

66.     Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 65 of this Complaint with the same force and effect as if fully set forth at length herein.

67.     By virtue of the Purchase Agreement and by operation of law, ImmunityBio has been assigned the D/B Agreement and assumed all of Athenex's rights and obligations to Exyte under same.

68.     By virtue of its representations and subsequent acts, omissions, and conduct, ImmunityBio has held itself out as the Owner of the Project and conducted itself as if it has been assigned the D/B Agreement, most notably by occupying the Manufacturing Facility, demanding Exyte undertake alleged corrective work at the Project, and threatening to perform said work at Exyte's expense should Exyte fail to act.

69.     The D/B Agreement is a bilateral contract with mutual obligations existing between the parties, including but not limited to those requiring Exyte to accomplish the design and construction of the Project in exchange for Athenex/ImmunityBio compensating Exyte for its work and  other contractual rights and entitlements.

70.     ImmunityBio is equally responsible for each of the material breaches of the D/B Agreement set forth above, including those in the First Cause of Action, and is obligated to

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

13

render payment to Exyte for its final payment, retainage, and shared savings which are due under the terms of the parties' contract.

71. ImmunityBio has expressly refused to perform or render payment to Exyte for amounts owed, including those amounts due for shared savings, retainage and Exyte's final payment in amounts that exceed $8,478,048.88.

72. ImmunityBio has repudiated its payment obligations by directing Exyte to look solely to Athenex for the amounts owed and has claimed that it did not assume Athenex's payment obligations and other responsibilities under the D/B Agreement, but only selectively purchased "the benefits" of the D/B Agreement.

73. Exyte has not received all of the consideration due it under the contract, namely, the amounts invoiced for shared savings, retainage and final payment continue to be due and owing under the terms of the D/B Agreement, despite Exyte's demand for same from ImmunityBio.

74. Exyte has performed all of the terms and conditions of the D/B Agreement on its part to be performed, except insofar as any of those terms and conditions were prevented, waived or excused by Athenex and/or ImmunityBio.

75. By reason of the foregoing breaches, Exyte has been damaged in sums equal to at least $ 8,478,048.88, for what it has invoiced for its final payment, retainage, and its portion of the shared savings, exclusive of interest and other sums due and owing.

76. Despite due demand, Athenex and/or ImmunityBio have failed and refused to pay Exyte for the damages incurred and ImmunityBio is liable therefor.

LAW OFFICES

Peckar & Abramson

A Professional Corporation

### AS AND FOR A THIRD CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith by Athenex and ImmunityBio)**

77.     Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 76 of this Complaint with the same force and effect as if fully set forth at length herein.

78.     There is a covenant of good faith and fair dealing implied by law into every contract, including the D/B Agreement, such that one party cannot act to destroy or injure the rights of the other party to receive the fruits of the contract.

79.     Exyte, Athenex, and ImmunityBio (by virtue of, *inter alia*, the assignment and Purchase Agreement) are parties to the D/B Agreement.

80.     By virtue of the transaction consummated between Athenex and ImmunityBio under the Purchase Agreement, and particularly by their subsequent representations, acts and omissions in dealing with Exyte, Athenex and ImmunityBio have destroyed, diminished, hindered, and frustrated Exyte's contractual rights and its enjoyment of same.

81.     Athenex and ImmunityBio have structured a transaction whereby performance is unilaterally demanded of Exyte under the D/B Agreement to a previously unknown party, but no return performance from Athenex and/or ImmunityBio will be given in accordance with the agreed upon terms of the D/B Agreement, most notably those concerning Exyte's right to payment of its final invoice, retainage, and shared savings.

82.     Athenex and ImmunityBio have utterly refused to perform and render payment, with ImmunityBio stating that they will not do so *even if* Exyte undertakes to correct the allegedly nonconforming work they cite.

83.     Athenex and ImmunityBio have created an assignment that materially changes Exyte's duties, increases the burdens or risks imposed upon Exyte, impairs Exyte's chances of

LAW OFFICES

**Peckar &
Abramson**

A Professional Corporation

15

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 29 of 173

obtaining return performance under the contract, and/or reduces the value of the contract to Exyte.

84.    Their assignment has also delegated duties to ImmunityBio which materially vary from the duties required of Athenex to Exyte under the contract.

85.    The acts and omissions of Athenex and ImmunityBio, jointly and severally, are depriving Exyte of the fruits of its contract, preventing performance of the D/B Agreement, and are withholding Exyte's receipt of its contractual benefits, including payment.

86.    By virtue of its detailed transaction with Athenex and the express terms of the Purchase Agreement, ImmunityBio was aware of the existence of the D/B Agreement.

87.    By virtue of its detailed transaction with Athenex and the express terms of the Purchase Agreement, ImmunityBio was also aware of Athenex's and Exyte's rights and obligations toward each other under the D/B Agreement, including for payment.

88.    Due to this history and specific knowledge, defendants were aware of the affects their transaction would have on the performance of the D/B Agreement and Exyte's ability to receive payment for its work and, thus, they have acted deliberately, or in wanton disregard of Exyte's rights, in breach of the implied covenant of good faith and fair dealing.

89.    Exyte has performed all of the terms and conditions of the D/B Agreement on its part to be performed, except insofar as any of those terms and conditions were prevented, waived or excused by Athenex and/or ImmunityBio.

90.    By reason of the foregoing breaches, Exyte has been damaged in sums equal to at least $ 8,478,048.88, for what it has invoiced for its final payment, retainage, and its portion of the shared savings, exclusive of interest and other sums due and owing.

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

16

91.     Despite due demand, Athenex and/or ImmunityBio have failed and refused to pay Exyte for the damages incurred and Athenex and ImmunityBio are jointly and severally liable therefor.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Account Stated as to Athenex and ImmunityBio)

92.     Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 91 of this Complaint with the same force and effect as if fully set forth at length herein.

93.     Exyte has duly tendered invoices and requests for payment to Athenex and ImmunityBio for the work, labor, services and materials that it provided to the Project, and Athenex and ImmunityBio have not objected to said invoices and requests for payment.

94.     There exists an agreement between the parties that the amounts invoiced on the account for prior work performed will be paid.

95.     As a result, an account has been stated as between the parties for the sum of $8,478,048.88, of which no part has been paid.

96.     To date, Athenex and ImmunityBio have failed to pay the aforementioned sum despite due demand.

97.     As a result, Exyte seeks damages on its account with Athenex and ImmunityBio, jointly and severally, in the amount of at least $8,478,048.88, exclusive of interest and other sums due and owing, for which Athenex and ImmunityBio are liable.

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Violation Of Prompt Payment Act by Athenex and ImmunityBio)

98.     Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 97 of this Complaint with the same force and effect as if fully set forth at length herein.

99.     Under the D/B Agreement, Athenex bears the responsibilities of the Owner of the Project.

100.    By virtue of the Purchase Agreement and the acts further alleged above, ImmunityBio is the Project Owner, has assumed Athenex's payment obligations under the D/B Agreement, and is jointly and severally liable for same.

101.    Pursuant to Section 756-a of the New York General Business Law, the owner of the Project was obligated to review and approve Exyte's applications for payment within 12 business days of receipt, and unless a written rejection and detailed basis for withholding payment was provided to Exyte within that timeframe, the owner was obligated to pay Exyte's requisitions in full within seven (7) business days thereafter, unless modified by the parties' agreement.

102.    Exyte submitted to the owner itemized monthly applications for payment of the work it performed during that period, including monthly invoices for its final payment, retainage, and its portion of the shared savings.

103.    Exyte never received any notices of rejection or withholding from Athenex/ImmunityBio in response to its open requisitions, indicating that the amounts being invoiced were inaccurate or that there was any reason justifying withholding of any money sought in its requisitions.

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

18

104.     Nevertheless, Athenex and/or ImmunityBio have failed and/or refused to issue full payments to Exyte on a timely basis as provided by Section 756-a of the New York General Business Law and the parties' contract, for which the amount of at least $8,478,048.88, remains currently due, owing, and payable.

105.     By reason of the foregoing, Athenex and/or ImmunityBio are jointly and severally liable to Exyte in the amount of at least $8,478,048.88, plus interest at the statutory rate of 1% per month under Section 756-b(1)(b) of the New York General Business Law, or 1.5% per month or for any other applicable rate provided by the D/B Agreement, and/or for attorneys' fees and costs of suit.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(*In the Alternative*, Unjust Enrichment as to Athenex and ImmunityBio)**

106.     Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 105 of this Complaint with the same force and effect as if fully set forth at length herein.

107.     Exyte performed valuable design and construction services for the Project, with the expectation that payment would be received for those services.

108.     Defendants accepted those services, have benefitted and are enriched by the receipts of those goods and services from Exyte and their property has been improved.

109.     Athenex and ImmunityBio have received and unjustly retained the benefit of approximately $8,478,048.88, being the fair and reasonable value of the design and construction services provided to the Project for which they have not compensated Exyte.

110.     *In the alternative* and to the extent a valid contract does not exist between Exyte and one or more of the defendants, it is against equity and conscience to permit Athenex and

LAW OFFICES

**Peckar &
Abramson**

A Professional Corporation

19

ImmunityBio to be unjustly enriched if they were permitted to retain the value of said services without compensating Exyte.

111.    As a result of the foregoing, Exyte has suffered damages and Athenex and ImmunityBio are jointly and severally liable therefor.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (*In the Alternative*, Tortious Interference With Contract by ImmunityBio)

112.    Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 111 of this Complaint with the same force and effect as if fully set forth at length herein.

113.    The D/B Agreement is a contract to which Exyte has the legal right and ability to enforce.

114.    By virtue of its detailed transaction with Athenex and the express terms of the Purchase Agreement, ImmunityBio was aware of the existence of the D/B Agreement and of Athenex's and Exyte's rights and obligations toward each other under the D/B Agreement, including for payment.

115.    *In the alternative*, to the extent ImmunityBio is not a party to the D/B Agreement (by virtue of an assignment or otherwise) or found to be legally responsible for the performance of Athenex's obligations under same, then ImmunityBio, by virtue of its representations,  acts and omissions as alleged above, has interfered and intentionally procured, without justification or excuse, Athenex's breach of the D/B Agreement, including but not limited to its participation in an assignment obtained without consent which has denied Exyte's ability to receive payment for its services under said agreement.

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

20

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 34 of 173

116.     As a result of the foregoing, Exyte has suffered damages of at least $8,478,048.88 and ImmunityBio is liable therefor.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**(*In the Alternative*, Breach of Contract and Specific Performance)**

117.     Exyte repeats and re-alleges each and every allegation contained in Paragraphs 1 through 116 of this Complaint with the same force and effect as if fully set forth at length herein.

118.     The Purchase Agreement is a valid and binding contract.

119.     The Purchase Agreement contains specific, detailed provisions concerning how the D/B Agreement is to be handled by Athenex and ImmunityBio as a result of the transaction, particularly as to past and future obligations owed to Exyte under same after the closing occurs.

120.     Regardless of whether Exyte consents to the assignment of the D/B Agreement, the Purchase Agreement states, under Section 7.2 and elsewhere, that ImmunityBio is responsible for the costs associated with performing any of Athenex's rights and obligations under the D/B Agreement.

121.     The Purchase Agreement also contains general provisions addressing how any "Nonassignable Asset" is to be handled by Athenex and ImmunityBio, including as to how past and future obligations are to be addressed under contracts which are not assigned to ImmunityBio due to consent not being obtained by the non-assigning party.

122.     Under the Purchase Agreement, if Athenex is unable to obtain a third party's consent to the assignment of a contract to ImmunityBio, then the parties are to negotiate an arrangement whereby ImmunityBio obtains the contract rights and assumes the corresponding liabilities and obligations under such "Nonassignable Asset" or under which <u>ImmunityBio</u>

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

21

assumes and agrees to pay Athenex's obligations for contracts that are being enforced for its benefit.

123.    These provisions, among others, as expressly worded and/or as evident from the surrounding circumstances were intended for the direct and immediate benefit of Exyte, such that Exyte is an intended and direct beneficiary entitled to sue for damages due to the breach of these obligations and/or to seek specific performance to compel Athenex and ImmunityBio to fulfill the promised performance.

124.    In material breach of the provisions of the Purchase Agreement, Athenex and ImmunityBio have failed to assume the payment obligations under the D/B Agreement, to compensate Exyte for the sums invoiced, and/or to otherwise negotiate an arrangement whereby ImmunityBio obtains the contract rights and assumes the corresponding liabilities and obligations under the D/B Agreement or by which ImmunityBio assumes and agrees to pay Athenex's obligations under the D/B Agreement that Athenex is purportedly enforcing on its behalf.

125.    Given Athenex and ImmunityBio's recalcitrance, as the aggrieved party, Exyte is the only party that can meaningfully recover for breach of these provisions and/or it is otherwise clear from the express words of the Purchase Agreement and the surrounding circumstances that Athenex and ImmunityBio intended to permit Exyte to enforce same and recover for any benefits lost.

126.    Given the representations made by Athenex and ImmunityBio that ImmunityBio has only assumed rights under the D/B Agreement without any of the obligations, it is evident that neither intends to enforce these provisions of the Purchase Agreement and to protect Exyte's rights to receive the benefit of same.

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

22

127.    By reason of the foregoing breaches, Exyte has been damaged in sums equal to at least $ 8,478,048.88, for what it has invoiced for its final payment, retainage, and its portion of the shared savings, exclusive of interest and other sums due and owing.

128.    Despite due demand, Athenex and/or ImmunityBio have failed and refused to pay Exyte for the damages incurred and defendants are jointly and severally liable therefor.

**WHEREFORE**, Plaintiff, Exyte U.S., Inc. respectfully requests that judgment be entered in its favor and against Defendants Athenex, Inc. and  ImmunityBio, Inc., as follows:

(a)    on its First Cause of Action against Athenex, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon;

(b)    on its Second Cause of Action against ImmunityBio, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon;

(c)    on its Third Cause of Action as against the defendants jointly and severally, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon;

(d)    on its Fourth Cause of Action as against the defendants jointly and severally, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon;

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

23

Case 1:24-cv-00242-EAW   Document 1-73   Filed 03/20/24   Page 37 of 173

(e)     on its Fifth Cause of Action as against the defendants jointly and severally, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate statutory or contract interest thereon;

(f)     on its Sixth Cause of Action as against the defendants jointly and severally, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon;

(g)     on its Seventh Cause of Action as against ImmunityBio, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon, and for punitive damages in an amount to be established at trial, but which is currently estimated to be in excess of $10,000,000;

(h)     on its Eighth Cause of Action as against defendants, jointly and severally, in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon, and/or compelling defendants to specifically perform the Purchase Agreement and establish financial commitments to compensate Exyte for sums owed under the D/B Agreement in an amount to be established at trial, but which is currently estimated to be in excess of $8,478,048.88, with appropriate interest thereon;

LAW OFFICES

Peckar &
Abramson

A Professional Corporation

24

together with its costs, disbursements, punitive and statutory damages, and attorneys' fees related to this action and such other and further relief as this Court deems just and proper.

Ocotber 5, 2022
New York, New York

Respectfully submitted,

/s/Bruce D. Meller
Bruce D. Meller, Esq.
Peter E. Moran, Esq.
**PECKAR & ABRAMSON, P.C.**
1325 Avenue of the Americas, 10th Floor
New York, NY 10019
Telephone: (212) 382-0909
Facsimile: (212) 382-3456
Bmeller@pecklaw.com
Pmoran@pecklaw.com

Attorneys for Plaintiff,
Exyte U.S., Inc.

#4810490v5

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

25

**EXHIBIT 2**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re:<br><br>ATHENEX, INC., et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-90295 (DRJ)<br>(Jointly Administered)<br><br>**Re Docket Nos. 498, 501** |

### ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
### AND CONFIRMING PLAN OF LIQUIDATION OF ATHENEX, INC. AND ITS
### AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (the "Debtors") having:

a) commenced on May 14, 2023 (the "Petition Date") their respective chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code;

b) operated their businesses and managed their properties during the Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c) filed, on July 28, 2023, the *Debtor's Emergency Motion for Entry of an Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and (V) Granting Related Relief* [D.I. 470];

d) filed, on August 1, 2023, the *Notice of (I) Interim Approval of Disclosures; (II) Hearing to Consider Confirmation of the Combined Plan; (III) Deadline for Filing Objections to Confirmation of the Combined Plan and Final Approval of the Disclosures; (IV) Deadline for Voting on the Plan; and (V) Bar Date for Filing Administrative Claims Established By the Plan* [D.I. 500] (the "Combined Hearing Notice"), which contained notice of the date and time set for the hearing to consider Confirmation of the Plan and final approval of the Disclosure Statement

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/athenex. The location of Athenex, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 1001 Main Street, Suite 600, Buffalo, NY 14203.

(the "<u>Combined Hearing</u>") and the deadline for filing objections to Confirmation or final approval of Disclosure Statement;

e)    filed, on August 1, 2023, the *Combined Disclosure Statement and Plan of Liquidation of Athenex, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 501];[2]

f)    filed, on August 15, 2023, the *Certificate of Service of Solicitation Documents* of the solicitation package [D.I. 530] (the "<u>Affidavit</u>");

g)    filed, on August 25, 2023, the *Notice of Filing of Plan Supplement with Respect to the Plan of Liquidation of Athenex, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* and the *Notice of Filing of <u>Amended</u> Plan Supplement with Respect to the Plan of Liquidation of Athenex, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 561 and 573] (collectively, the "<u>Plan Supplement</u>");

h)    filed, on September 7, 2023, the *Certification of Epiq Regarding Tabulation of Votes in Connection With the Combined Plan of Liquidation of Athenex, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 578] (the "<u>Voting Declaration</u>");

i)    filed, on September 7, 2023, the *Declaration of Nicholas Campbell in Support of the Plan of Liquidation of Athenex, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 580] (the "<u>Campbell Declaration</u>") and collectively with the Voting Declaration, the "<u>Declarations</u>"); and

j)    filed, on September 8, 2023, the *Memorandum of Law in Support of Confirmation of Plan of Liquidation of Athenex, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 582] (the "<u>Confirmation Brief</u>");

The Court having:

a)    entered, on August 1, 2023, the *Order (I) Granting Interim Approval of Disclosures in the Combined Plan and Disclosure Statement; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and (V) Granting Related Relief* [D.I. 498] (the "<u>Solicitation Procedures Order</u>");

b)    reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Voting Declaration, and the Campbell Declaration, the Combined Hearing Notice, the Affidavit, and all filed pleadings filed with respect to final approval of the Disclosure Statement and Confirmation of the Plan, including all objections, statements, and reservations of rights with respect thereto,

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Plan.

if any, filed on the docket in these Chapter 11 Cases or voiced at the Combined Hearing;

c)       held the Combined Hearing on September 12, 2023 at 1:00 p.m. Central Time;

d)       considered the statements and arguments made by counsel in respect of Confirmation of the Plan and the objections thereto; and

e)       considered all oral representations, affidavits, testimony, documents, filing, and other evidence regarding Confirmation of the Plan and the objections thereto.

NOW, THEREFORE, it appearing to the Court that notice of the Combined Hearing and the opportunity for any party in interest to object to the final approval of the Disclosure Statement and Confirmation of the Plan have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation of the Plan and other evidence presented at the Combined Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, it hereby is DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

## FINDINGS OF FACT AND CONCLUSISON OF LAW

A.      <u>Findings and Conclusions</u>. The determinations, findings, judgments, decrees, and orders set forth and incorporated in this order (this "<u>Order</u>" or "<u>Confirmation Order</u>") constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

B.      <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a))</u>. The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334.

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Section III of the United States Constitution. The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

C.     <u>Judicial Notice</u>. The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed and orders entered thereon. The Court also takes judicial notice of all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of the Chapter 11 Cases.

D.     <u>Eligibility for Relief</u>. The Debtors are proper debtors under section 109 of the Bankruptcy Code and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

E.     <u>Solicitation and Notice</u>. As evidenced by the Affidavit, the Plan, Disclosure Statement, Solicitation Procedures Order, notice of the Combined Hearing, and an appropriate ballot (collectively, the "<u>Ballots</u>") for voting on the Plan with a return envelope or the applicable Notices of Non-Voting Status (in substantially the forms approved pursuant to the Solicitation Procedures Order) (collectively, the "<u>Solicitation Materials</u>") were transmitted and served in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order. The solicitation of votes on the Plan complied with the solicitation procedures in the Solicitation Procedures Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. As evidenced by the Affidavit, all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving

objections to final approval of the Disclosure Statement and Confirmation) have been provided due, proper, timely, and adequate notice and have had an opportunity to appear and be heard with respect thereto. No other or further notice is required.

       F.     <u>Disclosure Statement</u>. The Disclosure Statement provides Holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125 of the Bankruptcy Code. The Disclosure Statement also provides Holders of Claims and other entities with sufficient notice of the injunction, exculpation, and release provisions contained in Section XVI of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

       G.     <u>Voting</u>. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations. As evidenced by the Voting Declaration, Class 4 voted to accept the Plan.

       H.     <u>Burden of Proof</u>. The Debtors have met their burden of proving the elements of section 1129 of the Bankruptcy Code by a preponderance of the evidence.

       I.     <u>Notice of Plan Supplement Documents</u>. The documents identified in the Plan Supplement were filed as required and notice of such documents was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Plan, the Solicitation Procedures Order, the Bankruptcy Code, and the Bankruptcy Rules. All information and documents included in the Plan Supplement and any amendments thereto are integral to, part of, and incorporated by reference into the Plan. The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents provided due, adequate,

and sufficient notice in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local

Rules, and no other or further notice is necessary or shall be required.

J.      Bankruptcy Rule 3016.  The Plan is dated and identifies its proponents (*i.e.*, the

Debtors) in accordance with Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement on

the docket of the Chapter 11 Cases satisfied Bankruptcy Rule 3016(b).

**Compliance with Section 1129 of the Bankruptcy Code**

K.      Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).   The

evidentiary record at the Combined Hearing, the Declarations, the contents of the Plan and the

Disclosure Statement, the Affidavit, the Confirmation Brief, and the Court's judicial notice of the

complete record of the Chapter 11 Cases support the findings of fact and conclusions of law set

forth herein.

L.      Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1)).  Section IX of the Plan

designates Classes of Claims, other than Administrative Claims and Priority Tax Claims, which,

pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be designated.  As required by

section 1122(a) of the Bankruptcy Code, each Class of Claims contains only Claims that are

substantially similar to the other Claims within that Class.  Valid reasons exist for separately

classifying the various Classes of Claims created under the Plan.  The Plan, therefore, satisfies

sections 1122 and 1123(a)(1) of the Bankruptcy Code.

M.      Specified Unimpaired and Impaired Classes (11 U.S.C. §§ 1123(a)(2) and

1123(a)(3)).  Section IX of the Plan specifies that Claims in Classes 1 and 3 are Unimpaired.

Section IX of the Plan also specifies the treatment of each Impaired Classes under the Plan, which

are Classes 2, 4, 5, 6 and 7.  The Plan, therefore, satisfies sections 1123(a)(2) and 1123(a)(3) of

the Bankruptcy Code.

N.    <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  Section IX of the Plan provides the same treatment for each Claim or Interest within a particular Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. The Plan, therefore, satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

O.    <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>.  The Plan and the Liquidating Trust Agreement set forth in the Plan Supplement provide adequate and proper means for the Plan's implementation, including, without limitation: (a) the good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan; (b) establishment of the Post-Effective-Date Debtor Representative and vesting of the Distributable Assets in the Post-Effective Date Debtors; and (c) establishment and funding of the Liquidating Trust and vesting of the Liquidating Trust Assets in the Liquidating Trust.  Section XIII (Treatment of Executory Contracts and Unexpired Leases), Section XIV (Means for Implementation of the Plan), Section XV (Effects of Confirmation), and Section XVII (Conditions Precedent to Confirmation and Consummation of the Plan), among other provisions of the Plan, set forth the means for its implementation.  The Plan, therefore, satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

P.    <u>Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))</u>. Section XIX.O. of the Plan provides that if and to the extent applicable, the Debtors shall comply with section 1123(a)(6) of the Bankruptcy Code.

Q.    <u>Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.  The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.  Section XIV.B of the Plan describes the powers of the Post-Effective-Date Debtor Representative.  Samir Saleem of MERU Advisors, the Debtors' Assistant Chief Restructuring Officer, will be appointed the Post-Effective-Date

Debtor Representative. The Plan Supplement disclosed his identity. Section XIV.E, F, and G of the Plan describes the powers of the Liquidating Trustee. Emerald Capital Advisors will be appointed as the Liquidating Trustee for the Liquidating Trust and the Plan Supplement and Liquidating Trust Agreement attached to the Plan Supplement discloses his identity and compensation. The foregoing appointments of the Post-Effective-Date Debtor Representative and the Liquidating Trustee are consistent with the interests of Holders of Claims and with public policy. The foregoing provisions satisfy section 1123(a)(7) of the Bankruptcy Code.

R.    <u>Assumption and Rejection (11 U.S.C. § 1123(b)(2))</u>. Consistent with section 1123(b)(2) of the Bankruptcy Code, Section XIII of the Plan provides for the assumption or rejection of all of the executory contracts or unexpired leases of the Debtors that have not already been assumed or rejected in the Chapter 11 Cases.

S.    <u>The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Debtors have complied with the applicable provisions of the Bankruptcy Code. Specifically: (a) the Debtors are proper debtors under section 109 of the Bankruptcy Code; (b) the Debtors have complied with all applicable provisions of the Bankruptcy Code, including section 1125, except as otherwise provided or permitted by order of the Bankruptcy Court; and (c) the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order in transmitting the Solicitation Materials and in tabulating the votes with respect to the Plan. In compliance with the Solicitation Procedures Order, the Debtors caused copies of the following materials to be transmitted to the known Holders of Claims in Classes that were entitled to vote to accept or reject the Plan (*i.e.*, Claims in Classes 2 and 4) (collectively, the "<u>Voting Parties</u>"): (1) the Disclosure Statement; (2) the Plan; (3) the Combined Hearing Notice; and (4) an appropriate form of ballot and a pre-addressed postage prepaid return envelope. In

further compliance with the Solicitation Procedures Order and as evidenced by the Affidavit, the Debtors caused copies of the Combined Hearing Notice to be served on all parties in interest. In addition, copies of the Solicitation Procedures Order, the Plan, the Disclosure Statement, and the Combined Hearing Notice have been available free of charge, at https://dm.epiq11.com/case/athenex/info, and the foregoing was set forth in the Combined Hearing Notice. The Combined Hearing Notice provided due and proper notice of the Hearing and all relevant dates, deadlines, procedures, and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the Voting Deadline and the Objection Deadline (as such terms are defined in the Combined Hearing Notice), the time, date, and place of the Combined Hearing and the provisions in the Plan concerning certain of the third party releases provided for in the Plan. Based on the foregoing, all persons entitled to receive notice of the Disclosure Statement, the Plan, the Combined Hearing Notice, and Notices of Non-Voting Status have received proper, timely, and adequate notice in accordance with the Solicitation Procedures Order, the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto. As such, the Debtors are in compliance with section 1128 of the Bankruptcy Code and Bankruptcy Rules 2002(b) and 3017(d)–(f). No other or further notice is required.

T. <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Plan has been proposed by the Debtors in good faith and in the belief that the proposed liquidation and establishment of the Liquidating Trust will maximize value for the Debtors' creditors. The Plan accomplishes the goals promoted by section 1129(a)(3) of the Bankruptcy Code by enabling the Post-Effective-Date Debtor Representative and the Liquidating Trustee to make distributions to creditors on a fair and equitable basis, in accordance with the priorities established by the Bankruptcy Code, subject to

the terms of the Plan. The Plan has been proposed with the legitimate purpose of maximizing the value of the Estates to achieve the best interests of the Debtors' creditors and not by any means forbidden by applicable law. The Debtors, the Released Parties, and Exculpated Parties have acted diligently and in good faith as evident from the facts and record of these Chapter 11 Cases, the Solicitation Materials, the Declarations, the record of the Confirmation Hearing, and the other proceedings held before this Court in these Chapter 11 Cases. In so finding, the Court has considered the totality of the circumstances in the Chapter 11 Cases, including the support of the Committee for the Plan. The support for the Plan by Holders of Claims in Class 4 who voted to accept the Plan further demonstrates that the Plan was proposed in good faith. Finally, as described in greater detail below, the Plan's indemnification, exculpation, release, and injunction provisions are warranted, necessary, and appropriate, and are supported by sufficient consent and consideration under the circumstances of the Chapter 11 Cases as a whole and are consistent with sections 105, 1123(b)(6), and 1129 of the Bankruptcy Code and applicable law in this Circuit, and the Debtors, the Released Parties, and the Exculpated Parties will be acting in good faith if they proceed to consummate the Plan and the agreements, settlements, transactions, distributions, and other transfers contemplated therein and in this Confirmation Order and take any actions authorized by the Plan and this Confirmation Order.

U. _Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))_. No payment for services or costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be made by the Debtors other than payments that have been authorized by an order of the Court, including without limitation by the Confirmation of the Plan by this Order. The Court has previously authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Chapter 11 Cases. _See_

Interim Fee Order [D.I. 397]. Pursuant to Section VIII.C of the Plan, such Professionals'

applications for allowance of final compensation and reimbursement of expenses must be filed and

served **no later than forty-five (45) days after the Effective Date.** Such applications will be

subject to review and approval by the Court.

       V.     <u>Proper Disclosure of Officers (11 U.S.C. § 1129(a)(5))</u>. The Debtors have

complied with section 1129(a)(5) by providing such disclosures in the Plan Supplement. The Plan,

in conjunction with the Plan Supplement, satisfies the requirements of section 1129(a)(5) of the

Bankruptcy Code.

       W.     <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not contain any rate

changes subject to the jurisdiction of any governmental regulatory commission and will not require

governmental regulatory approval. Therefore, section 1129(a)(6) of the Bankruptcy Code does

not apply to the Plan.

       X.     <u>"Best Interest Test" 11 U.S.C. § 1129(a)(7)</u>. Each holder of an Impaired Claim or

Impaired Interest has either accepted the Plan or will receive or retain on account of such Claim

or Interest, property of a value on the Effective Date of the Plan that is not less than the amount

that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the

Bankruptcy Code. As set forth in Section VI.H and Exhibit B of the Combined Plan and Disclosure

Statement, the Liquidation Analysis and the other evidence related thereto, as supplemented by

any evidence proffered or adduced at or prior to the Combined Hearing, are persuasive and

credible. The Plan, therefore, satisfies the requirements of section 1129(a)(7) of the Bankruptcy

Code.

       Y. <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>. Section 1129(a)(8) of the

Bankruptcy Code requires that each class of claims or interests must either accept a plan or be

unimpaired under a plan. Classes 1 and 3 are Unimpaired Classes of Claims, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code. Classes 2 and 4 are the Impaired Classes entitled to vote on the Plan. Class 2 did not vote on the Plan. Class 4 voted to accept the Plan. Classes 5, 6 and 7 are conclusively presumed to reject the Plan because no distribution is anticipated to the Holders of such claims or equity security interests, in accordance with section 1126(g) of the Bankruptcy Code. The Plan, therefore, does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code because at least one Impaired Class has voted against the Plan. Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Z.     Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code (11 U.S.C. § 1129(a)(9)). The treatment of Administrative Claims and Priority Tax Claims as set forth in Section VIII of the Plan is in accordance with the requirements of section 1129(a)(9) of the Bankruptcy Code. The Plan, therefore, satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

AA.     Acceptance by at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10)). As set forth in the Voting Declaration, Classes 2 and 4 are impaired classes of Claims under the Plan, and Class 4 voted to accept the Plan. The Plan, therefore, satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

BB.     Confirmation is not likely to be followed by need for further reorganization (11 U.S.C. § 1129(a)(11)). The Plan provides for, among other things, the liquidation of the Debtors' remaining assets and, accordingly, no further reorganization of the Debtors is contemplated. Based on the evidence proffered or adduced at or prior to the Combined Hearing and in the Confirmation Brief and the Disclosure Statement, the Debtors will have sufficient funds available as of the

Effective Date to pay all claims and expenses that are required to be paid on the Effective Date under the Plan (including Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims), and to fund the Liquidating Trust to fulfill its obligations pursuant to the Liquidating Trust Agreement.   Accordingly, the Plan is the feasible.   The Plan, therefore, satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

CC.   Payment of Bankruptcy Fees (11 U.S.C. § 1129(a)(12)).  Section XIX.A of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).  The Plan, therefore, satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

DD.   Non-applicability of Certain Sections (11 U.S.C. §§ 1129(a)(13), (14), (15), and (16)).   The Debtors do not owe any retiree benefits, domestic support obligations, are not individuals, and are not nonprofit corporations.   Therefore, sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

EE.   "Cram Down" Requirements – Section 1129(b).  The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that Classes 5, 6 and 7 are deemed to reject the Plan (the "Rejecting Class"), the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code given that Class 4 voted to accept the Plan.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.  *Second*, the Plan is fair and equitable with respect to the Rejecting Classes.  The Plan has been proposed in good faith, is reasonable and meets the requirements that no Holder of a Claim or Interest that is junior to each of the Rejecting Classes will receive or retain any property under the Plan on account of such junior claim or interest.  Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Rejecting Classes.  *Third*, the Plan is consistent with the absolute priority rule and does not discriminate unfairly with respect to the

Rejecting Classes. The Plan may therefore be confirmed despite the fact that not all Impaired

Classes have voted to accept the Plan because the Plan does not discriminate unfairly, and is fair

and equitable with respect to the Rejecting Classes.

FF.     Only One Plan (11 U.S.C. § 1129(c)). The Plan (including previous versions

thereof), supersedes any other plan filed in the Chapter 11 Cases. The Debtors seek Confirmation

of the Plan. No party other than the Debtors has proposed a plan. The Plan, therefore, satisfies

the requirements of section 1129(c) of the Bankruptcy Code.

GG.     Principal Purpose of the Plan (11 U.S.C. § 1129(d)). The principal purpose of the

Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities

Act, 15 U.S.C. § 77e. The Plan, therefore, satisfies the requirements of section 1129(d) of the

Bankruptcy Code.

HH.     Good Faith Solicitation (11 U.S.C. § 1125(e)). Based on the record in the

Chapter 11 Cases, the Debtors, the Committee, and each of their officers, directors, shareholders,

managers, employees, members, agents, advisors, accountants, attorneys, and representatives (as

applicable), has acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy

Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules

in connection with all their respective activities relating to the formulation, preparation,

dissemination, negotiation, or Filing of the Disclosure Statement, the Disclosure Statement

Supplement, the Plan, the Plan Supplement, or any transaction related to the restructuring, any

contract, instrument, release, or other agreement or document created or entered into during the

Chapter 11 Cases in connection with the Chapter 11 Cases, the pursuit of Consummation, the

administration and implementation of the Plan, or the distribution of property under the Plan or

any other related agreement, or upon any other act or omission, transaction, agreement, event, or

other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, including, but not limited to, any action or inaction in connection with their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

II.    Implementation.  The various means for implementation of the Plan, as set forth in Section XIV and other provisions of the Plan (collectively, the "Implementation Activities"), have been designed and proposed in good faith.  The Implementation Activities are adequate and will promote the maximization of the value of the ultimate recoveries under the Plan in a fair and equitable manner in accordance with the priorities established by the Bankruptcy Code.  The Implementation Activities are not intended to hinder, delay, or defraud any entity to which the Debtors is indebted on the Effective Date.

JJ.    Exculpation.  The exculpation described in Section XVI.A of the Plan is essential to the plan, proposed in good faith, were formulated following extensive, good faith, arm's-length negotiations with key constituents, are appropriately limited in scope to achieve the overall purpose of the Plan, and consistent with applicable law.  Each Exculpated Party made significant contributions to the Chapter 11 Cases, including with respect to the negotiation and implementation of the Restructuring Transactions embodied in the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  The exculpation provisions do not relieve any party of liability for an act or omission to the

extent such act or omission is determined by a final order of a court of competent jurisdiction to

have constituted gross negligence, fraud or willful misconduct, is consistent with established

practice in this jurisdiction and others.  The record in the Chapter 11 Cases fully supports the

exculpation provisions, which are appropriately tailored to protect the Exculpated Parties from

inappropriate litigation arising from their participation in the Chapter 11 Cases and the Debtors'

restructuring and are consistent with the Bankruptcy Code and applicable law.

     KK.   <u>Injunction</u>. The injunction provision provided in Section XVI.C of the Plan is

necessary to implement, preserve, and enforce the Plan.

     LL.   <u>Plan Releases</u>.  Entry of this Confirmation Order shall constitute the Bankruptcy

Court's approval of the Debtor/Estate Release and the Third Party Release set forth in Section

XVI.B of the Plan, which includes by reference each of the related provisions and definitions

contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the

Debtor/Estate Release and the Third Party Releases are: (a) in exchange for the good and valuable

consideration provided by the Released Parties who played an extensive and integral role in the

Debtors' Chapter 11 Cases; (b) in the best interests of the Debtors and all Holders of Claims and

Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity

for hearing; (e) a necessary element to the Plan; (f) negotiated in good faith and critical to reaching

consensus to support the Plan; and (g) a bar to any of the Debtor/Estate Releasors or Releasing

Parties asserting any claim or cause of action released pursuant to the Debtor/Estate Release and

the Third Party Releases.  The Released Parties: (a) made substantial and valuable contributions

to the Debtors' Chapter 11 Cases and the Estates, including through extensive negotiations with

various stakeholders, and ensured the operation of the Debtors' business during the Chapter 11

Cases; (b) attended and, in certain instances, participated in Court hearings; (c) attended numerous

board meetings related to the Chapter 11 Cases and directed the negotiations that led to the Plan; (d) invested significant time and effort in the preparation of the Plan, all supporting analyses, and the numerous other pleadings filed in the Chapter 11 Cases, thereby ensuring the smooth administration of the Chapter 11 Cases.

MM.    <u>Preservation of Rights of Action</u>. Section XVI.F of the Plan appropriately provides that the Post-Effective-Date Debtors or Liquidating Trustee, as applicable, will retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action except for Causes of Action that have been expressly waived, settled, or otherwise released as provided under the Plan, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding the preservation of Causes of Action in the Plan are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

NN.    <u>Satisfaction of Confirmation Requirements</u>.  Based upon the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Confirmation</u>.  The Plan, attached hereto as **<u>Exhibit A</u>**, is **APPROVED** in its entirety and confirmed under section 1129 of the Bankruptcy Code.  The Plan is **CONFIRMED** in its entirety pursuant to section 1129 of the Bankruptcy Code.  The terms of the Plan, the Plan Supplement and each of the documents comprising the Plan Supplement, any amendments, modifications, or supplements thereto, and all documents and agreements thereto are incorporated by reference into and are an integral part of the Plan, and such terms and their implementation are hereby approved and authorized.  The Post-Effective-Date Debtors and/or the Liquidating Trust

(as applicable) are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan.

2.    <u>Final Approval of Disclosure Statement</u>. The Disclosure Statement is hereby **APPROVED**, on a final basis, pursuant to section 1125 of the Bankruptcy Code.

3.    <u>Objections</u>. To the extent that any objections have not been withdrawn or resolved prior to the entry of this Order, all objections are overruled in all respects for the reasons set forth in the record of the Combined Hearing, which record is incorporated herein, and all withdrawn informal comments, if any, are deemed withdrawn with prejudice.

4.    <u>Omission of Reference to Particular Plan Provisions</u>.  The failure to specifically describe or include any particular provision of the Plan in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be approved and confirmed in its entirety.

5.    <u>Implementation</u>.  The Debtors, the Post-Effective-Date Debtors, the Post-Effective-Date Debtor Representative, the Liquidating Trust, and the Liquidating Trustee are authorized to take all actions necessary, appropriate, or desirable to enter into, implement, and consummate the contracts, instruments, releases, leases, agreements, or other documents created or executed in connection with the Plan.  Without further order or authorization of this Court, the Post-Effective-Date Debtors, the Post-Effective-Date Debtor Representative, the Liquidating Trust, and the Liquidating Trustee, and their successors are authorized and empowered to make all modifications to all Plan documents that are consistent with the Plan.  Execution versions of the Plan and all related documents, where applicable, shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.

6.  <u>Classifications</u>.  The classification of Claims for purposes of distributions made under the Plan shall be governed solely by the terms of the Plan and the Solicitation Procedures Order.

7.  <u>Effective Date</u>.  The Effective Date of the Plan shall occur on the date determined by the Debtors when the conditions set forth in Section XVII of the Plan have been satisfied or, if applicable, waived in accordance with the Plan.

8.  <u>Resolution of Claims</u>.  As discussed in detail in the Disclosure Statement and Plan, and as otherwise provided herein, in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise of all Claims and controversies resolved pursuant to the Plan.  Subject to Section XI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

9.  <u>Post-Confirmation Governance</u>.  On and after the Effective Date, the Post-Effective-Date Debtor Representative shall serve in such capacity in accordance with the Plan. The Liquidating Trustee shall serve in such capacity through the earlier of the date the Liquidating Trust is dissolved in accordance with the Plan or the Liquidating Trust Agreement and the date the Liquidating Trustee resigns, is terminated or otherwise unable to serve; *provided, however*, that, any successor Liquidating Trustee shall serve in such capacity after the effective date of such person's appointment as the Liquidating Trustee.

10.  <u>Causes of Action</u>.  Unless any Causes of Action are expressly waived, relinquished, released, compromised, or settled in the Plan  or any final order entered by this Court including, without limitation, this Order (a "<u>Final Order</u>"), the Post-Effective-Date Debtors and the Liquidating Trust expressly reserve all such Causes of Action for later adjudication.  The

reservation shall include, without limitation, a reservation by the Post-Effective Date Debtors and the Liquidating Trust of any Causes of Action not specifically identified in the Plan or Disclosure Statement, or of which the Debtors may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to such Causes of Action upon or after the Confirmation of the Plan based on the Disclosure Statement, the Plan or this Order, except where such claims and/or defenses have been expressly waived, relinquished, released, compromised, or settled in the Plan or by Final Order. Following the Effective Date, the Post-Effective-Date Debtors or Liquidating Trust may assert, compromise or dispose of the Causes of Action without further notice to Creditors or Interest Holders or authorization of the Bankruptcy Court, except as otherwise expressly provided herein or in the Liquidating Trust Agreement in relation to the Liquidating Trust.

11. <u>Post-Effective-Date Debtor(s)</u>. On the Effective Date, the Post-Effective-Date Debtor Representative shall be deemed the sole manager, director, officer and representative of the Post-Effective-Date Debtors to exercise the rights, powers, and authority of the Debtors under applicable provisions of the Plan and bankruptcy and non-bankruptcy law. On or after the Effective Date, the Post-Effective-Date Debtor Representative will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan; (2) liquidate the Distributable Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action that the Debtors

holds or may hold against any Entity that do not constitute Liquidating Trust Assets; (4) make all Distributions to Creditors, other than Beneficiaries of the Liquidating Trust, in accordance with the Plan; (5) administer the Post-Effective-Date Debtor(s) and pursue viable Causes of Action that do not constitute Liquidating Trust Assets in accordance with the Plan; (6) establish and administer any necessary reserves for Disputed Claims (other than Unsecured Claims) that may be required; (7) object to the Disputed Claims (other than Unsecured Claims) and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (8) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to the Distributable Assets; and (9) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtors or the Committee, all in accordance with the applicable consent and/or consultation rights of the Liquidating Trustee pursuant to the Plan and Liquidating Trust Agreement.

12. <u>Liquidating Trust and Liquidating Trustee.</u> On the Effective Date, the Liquidating Trust shall be established and shall be authorized to implement and adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan or Liquidating Trust Agreement as necessary or desirable to consummate the Plan or to carry out the Liquidating Trust functions. On and after the Effective Date, the Liquidating Trustee shall carry out the Liquidating Trust functions on behalf of the Liquidating Trust as required by the Liquidating Trust Agreement.

13. <u>Liquidating Trust</u>. On the Effective Date, the Liquidating Trust shall become effective, in order to carry out the functions set forth in the Liquidating Trust Agreement. The Liquidating Trust shall be administered and controlled by the Liquidating Trustee as set forth in the Plan and the Liquidating Trust Agreement.

14. <u>Sources of Consideration for Plan Distributions</u>. The distributions to be made under the Plan and the money to pay Liquidating Trust Expenses shall be funded, as applicable, by Available Cash, other Distributable Assets and the proceeds thereof, the GUC Fund, other Liquidating Trust Assets and the proceeds thereof.

15. <u>Effectuating Documents; Further Transactions</u>. On and after the Effective Date, the Post-Effective-Date Debtor Representative and Liquidating Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Post-Effective-Date Debtors and Liquidating Trust, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan and the Liquidating Trust Agreement.

16. <u>Rejection of Executory Contracts and Unexpired Leases</u>. Except with respect to: (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, and (ii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject pursuant to Section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided however,* that nothing herein or in the Plan shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, managers and directors, the Post-Effective-Date Debtor(s), and/or the Liquidating Trust. Notwithstanding any provision of the Plan or the relief set forth in this Confirmation Order, the Debtors and the applicable counterparty to an

Executory Contract may agree in writing to extend the deadline to assume or reject such Executory Contract to a later date without further Order of this Court and when so agreed, nothing herein or in the Plan shall be deemed to effect the assumption or rejection of such Executory Contract.

17.     _Claims Based on Rejection of Executory Contracts or Unexpired Leases_.  All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent **within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection**.  Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection.  All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Unsecured Claims.

18.     _Reservation of Rights_.  Nothing contained in the Plan shall constitute an admission by the Debtors that any executory contract or unexpired lease is in fact an executory contract or unexpired lease or that the Post-Effective-Date Debtors or Liquidating Trust has any liability thereunder.

19.     _Distributions Under the Plan_.  On and after the Effective Date, the Distributions on account of Allowed Claims and the resolution and treatment of Disputed Claims pursuant to Section XI of the Plan are authorized to occur and, without limitation on the other provisions of the Plan and this Order concerning the powers, duties, and authority of the Post-Effective-Date Debtors and Liquidating Trustee, and the Post-Effective-Date Debtors and Liquidating Trustee shall be authorized to effectuate such Distributions, resolution, and treatment required by the Plan and Liquidating Trust Agreement.

20.    <u>Exculpation</u>.  The exculpation provision contained in Section XVI.A of the Plan is approved and incorporated herein in all respects.

21.    <u>Plan Releases</u>.  The releases contained in section XVI.B of the Plan are approved and incorporated herein in all respects.

22.    <u>Injunction.</u>  The injunction contained in Section XVI.C of the Plan is approved and incorporated herein in all respects.

23.    <u>Section 1146(a) Exemption</u>.  Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an  instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Post-Effective-Date Debtor(s) and the Liquidating Trustee, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Post-Effective-Date Debtor(s) or the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each taxing authority, recorder of deeds or similar official for any county, city or Governmental Unit or parish in which any instrument hereunder or related to the Plan or any transactions contemplated thereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

24.    <u>Release of Liens</u>.  Except as otherwise provided herein or in the Plan, the Liquidating Trust Agreement, and/or relevant documents, agreements, and instruments contained in the Plan Supplement, on the Effective Date and concurrently with the applicable Distributions

made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of

the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens,

pledges or other security interests against any property of the Estates shall be fully released,

without any further action of any party, including, but not limited to, further order of the

Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform

Commercial Code, and all of the right, title and interest of any holder of such mortgages, deeds of

trust, Liens, pledges or other security interests shall revert to the Debtors and their successors and

assigns. Following the Effective Date, the Post-Effective-Date Debtor(s), in consultation with the

Liquidating Trustee, and the Liquidating Trustee, as applicable, may transfer and dispose of any

such property, including, without limitation, the Cell Therapy assets, free of any restrictions

imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the

Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or

herein.

       25.   <u>Administrative Expense Bar Date Provisions</u>.  Unless previously filed or as

otherwise governed by a bar date order or in another order of the Court, requests for payment of

Administrative Claims arising on or after the Petition Date, through and including the Effective

Date, must be filed with the Court and served on the Post-Effective-Date Debtors and U.S. Trustee

**on or before thirty (30) days after the Effective Date** (the "<u>Administrative Expense Bar Date</u>").

Holders of Administrative Claims that are required to file and serve a request for payment of such

Administrative Claims and that do not file and serve such a request by the Administrative Expense

Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors,

the Estates, the Post-Effective-Date Debtors, the Liquidating Trust, or their respective property.

26.    <u>Cancellation of Notes, Instruments, Certificates, and Other Documents</u>.  On the Effective Date, except as otherwise provided herein or in the Plan, all notes, instruments, certificates, and other instruments or documents, directly or indirectly, evidencing any Claim or Interest shall be deemed cancelled and the obligations of the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trust shall be limited to those distributions proposed under the Plan, if any, with respect to such Claim or Interest.

27.    <u>Professional Fee Claims</u>.  Any Professional or other Entity asserting a Professional Fee Claim must file and serve on respective counsel for the Post-Effective-Date Debtors and the Liquidating Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Claim **no later than forty-five (45) days after the Effective Date.**  All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

28.    <u>Notices of Confirmation and Effective Date</u>.  The Debtors shall serve a combined notice of entry of this Confirmation Order and notice of the Effective Date in accordance with Bankruptcy Rules 2002 and 3020(c) on all creditors, equity holders and parties having requested notice in the Chapter 11 Cases.  Notwithstanding the above, no notice of Confirmation or Effective Date or service of any kind shall be required to be mailed or made upon any party to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  The above-referenced notices are adequate under the particular circumstances of the Chapter 11 Cases and no other or further notice is necessary.

29.     <u>Payment of Statutory Fees</u>.  On the Effective Date, and thereafter as may be and if
and to the extent required, the Post-Effective-Date Debtors or Liquidating Trust, as applicable,
shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States
Code.  On the Effective Date, consistent with Section XIX.A of the Plan, all of the Debtors' cases
other than Athenex, Inc. shall be automatically deemed closed.

30.     <u>Successors and Assigns</u>.  The rights, duties and obligations of any Person named or
referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and
assigns of such Person.

31.     <u>Plan Supplement</u>.  The documents contained in the Plan Supplement, and any
amendments, modifications, and supplements thereto, and all documents and agreements
introduced into evidence by the Debtors at the Combined Hearing (including all exhibits and
attachments thereto and documents referred to therein), and the execution, delivery, and
performance thereof by the Post-Effective-Date Debtors and the Liquidating Trust, are authorized
and approved when they are finalized, executed, and delivered.  Without further order or
authorization of this Court, the Post-Effective-Date Debtors, the Liquidating Trust, and their
successors are authorized and empowered to make all modifications to all documents included as
part of the Plan Supplement that are consistent with the Plan.

32.     <u>Binding Effect of the Plan</u>.  The provisions of the confirmed Plan shall bind the
Debtors, the Post-Effective-Date Debtors, the Liquidating Trust, the Liquidating Trustee, any
Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Interest Holder,
whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the
Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder
is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or

rejected the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan.  The Plan

shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or

Governmental Unit or parish in which any instrument related to under the Plan or related to any

transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind

specified in Bankruptcy Code Section 1146(a).

33.     <u>Binding Effect of Prior Orders and Agreements</u>.  Pursuant to section 1141 of the

Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the

Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders

entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as

authorized and directed thereunder, and all motions or requests for relief by the Debtors pending

before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of the

Post-Effective-Date Debtors, the Post-Effective-Date Debtor Representative, the Liquidating Trust

and the Liquidating Trustee.

34.     <u>Governmental Approvals Not Required</u>.  Except as otherwise specifically provided

herein, this Order shall constitute all approvals and consents required, if any, by the laws, rules, or

regulations of any state or other governmental authority with respect to the implementation or

consummation of the Plan and Disclosure Statement, any documents, instruments, or agreements,

and any amendments or modifications thereto, and any other acts referred to in, or contemplated

by, the Plan and the Disclosure Statement.

35.     <u>Effectiveness of All Actions</u>.  All actions authorized to be taken pursuant to the

Plan shall be effective on, prior to or after the Effective Date pursuant to this Order, without further

application to, or order of the Bankruptcy Court, or further action by the respective officers,

directors, members, managers, or employees of the Post-Effective-Date Debtors or the Liquidating

Case 23-90001 Document 561 Filed in TXSB on 03/13/23 Page 29 of 131

Trust and with the effect that such actions had been taken by unanimous action of such officers, directors, members, managers, or employees.

36. <u>Plan and Confirmation Order Mutually Dependent</u>.  This Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

37. <u>Reversal</u>.  If any of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under, or in connection with, the Plan prior to receipt of written notice of such order by the Debtors.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or obligations incurred undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Order, the Plan, all documents relating to the Plan, and any amendments or modifications to any of the foregoing.

38. <u>No Stay</u>.  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall not be stayed and shall be immediately effective and enforceable and deemed binding upon the Debtors, the Post-Effective-Date Debtors, the Liquidating Trust, and any and all Holders of Claims and Interests, all entities that are parties to or subject to the settlements, compromises, releases, and injunctions described in the Plan or in this Order, all state or local governments and governmental officials subject to the provisions of section 1146(a) of the Bankruptcy Code, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

39. <u>Confirmation Order Supersedes</u>.  This Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with this Order.

40. <u>Substantial Consummation</u>.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

41. <u>Recording</u>.  The Post-Effective-Date Debtors and the Liquidating Trust hereby are authorized to deliver a notice or short form of this Order, with the Plan attached, to any state or local recording officer, and such officer must accept for filing such documents or instruments without charging any stamp tax, recording tax, personal property transfer tax, mortgage, or other similar tax.  Such notice (a) shall have the effect of an order of this Court, (b) shall constitute sufficient notice of the entry of this Order to such filing and recording officers, and (c) shall be a reasonable instrument notwithstanding any contrary provision of non-bankruptcy law.  This Court specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

42. <u>Plan and Confirmation Order Govern</u>.  Without intending to modify any prior order of this Court (or any agreement, instrument, or document addressed by any prior order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in such agreement, instrument, or document); *provided, further,* that, for the avoidance of doubt, in the event of any inconsistency between the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern.

43. <u>Resolution of Concerns of Certain Parties</u>.

(a)  <u>Lead Plaintiff in Securities Litigation</u>. The *Stipulation and Agreed Order by and Between Securities Lead Plaintiff and the Debtors with Respect to Document Preservation in*

*Connection with Debtors' Sale of the Orascovery Business* [Docket No. 574] (the "<u>Document Preservation Order</u>") shall survive entry of the Confirmation Order.  The Debtors and the Lead Plaintiff in the Securities Litigation (as such terms are defined in the Document Preservation Order) agree that the claims held by the Lead Plaintiff and members of the class are Class 7 Interests under the Plan and are not Releasing Parties under the Plan.

   (b) <u>Exyte US, Inc</u>.  For the avoidance of doubt, "Released Parties" as used in the Plan does not include the non-debtor parties Exyte US, Inc. ("<u>Exyte</u>") or Immunity Bio, Inc. ("<u>Immunity Bio</u>").  Similarly, none of the claims or causes of action asserted or assertable by and between the non-debtor parties Exyte or Immunity Bio against each other in the action entitled EXYTE U.S., INC. v. ATHENEX, INC. and IMMUNITYBIO, INC. (NYS Supreme Court, Erie County, Index No. 812016/2022) (the "<u>Exyte Litigation</u>") are released under the Plan.  For the further avoidance of doubt, any Claims that Exyte or Immunity Bio hold against Athenex, Inc. shall be treated pursuant to the Plan.  Any Claims or Causes of Action that Athenex, Inc. holds relating to the Exyte Litigation, including against Exyte or Immunity Bio, are Estate-Retained Actions or Trust-Retained Actions, as applicable, under the Plan.

   (c) <u>Sagent Pharmaceutical</u>.  Nothing herein shall impair, limit, or otherwise foreclose Sagent Pharmaceuticals' ("Sagent") from timely filing a request for payment of administrative claim pursuant to the terms of the Plan seeking reimbursement of certain alleged chargebacks (i) arising from product allegedly sold by APD on or before June 30, 2023 and (ii) allegedly relating to the Debtors' accounts receivable existing and paid on or before July 28, 2023. All parties' rights are reserved, including the rights of the Debtors, the Post-Effective Date Debtors or Liquidating Trust, as applicable, to object thereto.  Nothing herein shall be deemed to grant Sagent any substantive rights.

(d)      C-MER/ Health Hope Pharma.  Nothing in this Order or the Combined Plan and Disclosure Statement confirmed by the Bankruptcy Court shall impair, limit or otherwise foreclose C-MER Specialty Group Limited and/or Health Hope Pharma Limited from enforcing their rights arising under or relating to the *Order (I) Authorizing (A) the Sale of Orascovery Assets Free and Clear of Liens, Claims, and Encumbrances and the Assumption and Assignment of the Assumed Contracts and (B) the Debtors to Enter into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 316] and the Purchase Agreement (as defined in the Orascovery Sale Order) or timely filing claims pursuant to the terms of the Plan, subject to any defenses and/or affirmative claims and/or rights of setoff and/or any other objection(s) that the Debtors, the Post-Effective Date Debtors or Liquidating Trust, as applicable, may have thereto.   For the avoidance of doubt, to the extent that C-MER Specialty Group Limited and Health Hope Pharma Limited are Releasing Parties as such term is defined in the Combined Plan and Disclosure Statement, they have validly opted out of the releases contained in Section XVI.B.1.(b) of the Combined Plan and Disclosure Statement.

(e)      Baylor.  Notwithstanding anything to the contrary in this Confirmation Order, the Combined Disclosure Statement Plan, the Plan Documents, or Ballots, Baylor College of Medicine shall be deemed to have opted out of the Third Party Releases contained in Section XVI.B.1(b) of the Plan, and Baylor College of Medicine and each of its respective Related Persons, shall not be deemed "Releasing Parties" as defined in the Combined Disclosure Statement and Plan.

(f)      Avir Pharma.   Notwithstanding anything to the contrary in this Confirmation Order, the Combined Disclosure Statement and Plan, the Plan Documents, or Ballots, Avir Pharma, Inc. shall be deemed to have opted out of the Third Party Releases contained

in Section XVI.B.1(b) of the Combined Plan and Disclosure Statement, and Avir Pharma, Inc.,

and each of its respective Related Persons, shall not be deemed "Releasing Parties" as defined in

the Combined Disclosure Statement and Plan.

44.     <u>Final Order</u>.  This Confirmation Order is a final order, and the period in which an

appeal must be filed shall commence immediately upon the entry hereof.

45.     <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of this Order of the occurrence

of the Effective Date, this Court shall retain jurisdiction over the Chapter 11 Cases and any of the

proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and

28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law,

including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent

of the Plan are carried out and as set forth in Section XVIII of the Plan.

**Signed:  September 12, 2023.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT A

THE BANKRUPTCY COURT HAS APPROVED SOLICITATION OF THIS PLAN AND HAS APPROVED THE DISCLOSURES HEREIN ON A CONDITIONAL BASIS [DOCKET NO. 498]. THIS PLAN HAS NOT YET BEEN CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ATHENEX, INC., et al., | Case No. 23-90295 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION OF ATHENEX, INC. AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PACHULSKI STANG ZIEHL & JONES LLP
Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com

Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
Shirley S. Cho (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
scho@pszjlaw.com

*Counsel for Debtors and Debtors in Possession*

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/athenex. The location of Athenex, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 1001 Main Street, Suite 600, Buffalo, NY 14203.

# TABLE OF CONTENTS

SECTION I. INTRODUCTION ....................................................................... 1

SECTION II. SUMMARY OF CLASSIFICATION AND TREATMENT OF
CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT
SOLICITATION AND CONFIRMATION DATES AND DEADLINES ...................... 3

    A.    Summary of Classification and Treatment of Claims and Interests. ..................... 3

    B.    Important Dates and Deadlines ................................................................. 6

SECTION III. DEFINED TERMS .................................................................... 7

SECTION IV. BACKGROUND ...................................................................... 19

    A.    General Background. ............................................................................. 19

    B.    Prepetition Asset Sales and Other Transactions ......................................... 25

    C.    Events Leading to the Bankruptcy Filings. ................................................. 26

    D.    Chapter 11 Goals ................................................................................. 27

SECTION V. THE CHAPTER 11 CASES ......................................................... 27

    A.    First Day and Other Early Relief. ............................................................. 27

    B.    Cash Collateral Relief. .......................................................................... 28

    C.    Key Employee Incentive Program & Key Employee Retention Plan. ................ 28

    D.    Global Settlement Relating to Debtor Athenex Pharma Solutions, LLC. ........... 29

    E.    Bidding/Auction Procedures for Sale of Debtors' Assets. ............................. 29

    F.    Foreign Non-Debtor Affiliates Wind-Down ............................................... 30

    G.    Rejection of Certain Premises Leases. ...................................................... 31

    H.    Formation of the Committee. ................................................................... 31

    I.    Retention of Professionals. ..................................................................... 31

    J.    Debtors' Schedules and Statements of Financial Affairs. ............................... 31

SECTION VI. CONFIRMATION AND VOTING PROCEDURES ............................. 31

    A.    Confirmation Hearing. ........................................................................... 31

    B.    Procedures for Objections. ...................................................................... 32

    C.    Requirements for Confirmation. ............................................................... 32

    D.    Classification of Claims and Interests. ...................................................... 32

    E.    Impaired Claims or Interests. .................................................................. 34

    F.    Confirmation without Necessary Acceptances; Cramdown. ............................ 35

    G.    Feasibility. .......................................................................................... 36

    H.    Best Interests Test and Liquidation Analysis. .............................................. 36

I.    Eligibility to Vote on the Combined Plan and Disclosure Statement. ................ 37

J.    Solicitation Package / Release Opt-Out. ............................................................ 37

K.    Voting Procedures, Voting Deadline, and Applicable Deadlines. ...................... 38

L.    Acceptance of the Combined Plan and Disclosure Statement. ........................... 39

SECTION VII. CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND
OTHER DISCLOSURES ............................................................................................ 39

A.    Certain Risk Factors to be Considered. .............................................................. 39

B.    The Combined Plan and Disclosure Statement May Not Be Accepted. ............. 39

C.    The Combined Plan and Disclosure Statement May Not Be Confirmed. ........... 39

D.    Distributions to Holders of Allowed Claims Under the Combined Plan and
      Disclosure Statement May be Inconsistent with Projections. ............................ 40

E.    Objections to Classification of Claims. .............................................................. 40

F.    Failure to Consummate the Combined Plan and Disclosure Statement. ............. 41

G.    The Releases May Not Be Approved. ................................................................. 41

H.    Reductions to Estimated Creditor Recoveries. ................................................... 41

I.    Certain U.S. Federal Income Tax Consequences. .............................................. 41

J.    Tax Consequences for U.S. Holders of Certain Claims. .................................... 43

K.    Tax Consequences in Relation to Liquidating Trust. ......................................... 43

L.    Information Reporting and Withholding. ............................................................ 46

M.    Releases, Exculpations, and Injunctions. ........................................................... 47

N.    Alternatives to the Combined Plan and Disclosure Statement. .......................... 47

SECTION VIII. UNCLASSIFIED CLAIMS ............................................................... 48

A.    Unclassified Claims. ........................................................................................... 48

B.    Administrative Claims. ........................................................................................ 48

C.    Professional Fees. ............................................................................................... 48

D.    Priority Tax Claims. ............................................................................................ 49

SECTION IX. CLASSIFICATION OF CLAIMS AND INTERESTS ......................... 49

A.    Summary of Classification. ................................................................................. 49

B.    Special Provision Governing Unimpaired Claims. ............................................. 50

C.    Vacant and Abstaining Classes. .......................................................................... 50

SECTION X. TREATMENT OF CLAIMS AND INTERESTS ................................... 50

A.    Class 1—Priority Non-Tax Claims. .................................................................... 50

B.    Class 2—Prepetition Lenders Secured Claims. ................................................... 51

C.    Class 3—Other Secured Claims. ......................................................................... 51

D.    Class 4—Unsecured Claims. ............................................................................... 52

ii

E.    Class 5—Intercompany Claims.................................................................. 52

F.    Class 6—Intercompany Interests.............................................................. 52

G.    Class 7—Interests...................................................................................... 53

SECTION XI. DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS ............... 53

A.    Distribution Dates..................................................................................... 53

B.    Subsequent Distributions.......................................................................... 53

C.    Distribution Record Date.......................................................................... 53

D.    Manner of Cash Payments Under the Plan or Liquidating Trust Agreement. .... 54

E.    Time Bar to Cash Payments by Check. .................................................... 54

F.    Liquidating Trust Assets Account. ........................................................... 54

G.    Tax Identification Numbers....................................................................... 54

SECTION XII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
REDISTRIBUTIONS ................................................................................................. 55

A.    No Distributions Pending Allowance. ...................................................... 55

B.    Resolution of Disputed Claims................................................................. 55

C.    Authority to Object to, Settle, and Resolve Claims. ............................... 55

D.    Objection Deadline.................................................................................... 56

E.    Estimation of Claims. ............................................................................... 56

F.    Disallowance of Claims............................................................................ 56

G.    Claims Register ......................................................................................... 57

H.    Reserve Provisions for Disputed Claims.................................................. 57

I.    *De minimis* Distributions, Rounding........................................................ 58

J.    Unclaimed and Undeliverable Distributions. ........................................... 58

K.    Books and Records and Vesting of Privileges. ........................................ 59

SECTION XIII. TREATMENT OF EXECUTORY CONTRACTS  AND
UNEXPIRED LEASES .............................................................................................. 59

A.    Rejection.................................................................................................... 59

B.    Rejection Claims. ...................................................................................... 60

C.    Insurance Policies...................................................................................... 60

SECTION XIV. MEANS FOR IMPLEMENTATION OF THE PLAN......................... 60

A.    Global Settlement of Claims. ................................................................... 60

B.    Continued Existence and Vesting of Distributable Assets in Post-Effective-
Date Debtors.............................................................................................. 60

C.    Corporate Action by Debtors. .................................................................. 61

D.    Limited Substantive Consolidation. ......................................................... 62

iii

E.    Appointment of the Liquidating Trustee. ............................................................ 63

F.    The Liquidating Trust. ........................................................................................ 63

G.    Rights and Powers of the Liquidating Trustee. .................................................. 64

H.    Fees and Expenses of the Liquidating Trust. ..................................................... 65

I.    Transfer of Beneficial Interests in the Liquidating Trust. .................................. 65

J.    Available Cash; Provision of the Liquidating Trust Expenses............................ 65

K.    Litigation. ........................................................................................................... 66

L.    Dissolution of the Committee.............................................................................. 66

M.    Termination After Five Years and Extension...................................................... 66

SECTION XV. EFFECT OF CONFIRMATION ............................................................ 67

A.    Binding Effect of the Plan. ................................................................................. 67

B.    Vesting of Liquidating Trust Assets in the Liquidating Trust............................. 67

C.    Property Free and Clear. ..................................................................................... 67

SECTION XVI. EXCULPATIONS, INJUNCTIONS, AND RELEASES ..................... 68

A.    Exculpation.......................................................................................................... 68

B.    Releases. .............................................................................................................. 68

C.    Injunction. ........................................................................................................... 70

D.    Post-Confirmation Liability of Post-Effective-Date Debtor Representative
      and Liquidating Trustee....................................................................................... 70

E.    Preservation of Rights of Action. ....................................................................... 71

F.    Preservation of All Causes of Action Not Expressly Settled or Released. ......... 71

G.    No Discharge. ...................................................................................................... 72

SECTION XVII. CONDITIONS PRECEDENT TO CONFIRMATION  AND
CONSUMMATION OF THE PLAN .............................................................................. 72

A.    Conditions to Confirmation of the Plan. ............................................................ 72

B.    Conditions to the Effective Date. ....................................................................... 73

C.    Waiver of Conditions Precedent.......................................................................... 73

SECTION XVIII. RETENTION OF JURISDICTION .................................................... 73

SECTION XIX. MISCELLANEOUS PROVISIONS...................................................... 74

A.    Payment of Statutory Fees / Closing of Chapter 11 Cases. ............................... 74

B.    Revocation of the Combined Plan and Disclosure Statement. ........................... 75

C.    Severability of Plan Provisions. ......................................................................... 75

D.    Exhibits............................................................................................................... 75

E.    Notices................................................................................................................. 75

F.    Reservation of Rights. ........................................................................................ 76

iv

G.    Defects, Omissions and Amendments. ............................................................. 76

H.    Filing of Additional Documents. ...................................................................... 77

I.    Successors and Assigns. .................................................................................... 77

J.    Setoffs and Recoupments. ................................................................................. 77

K.    Tax Exemption. .................................................................................................. 77

L.    Securities Exemption. ........................................................................................ 77

M.    Implementation. ................................................................................................. 78

N.    Record Date. ....................................................................................................... 78

O.    Certain Actions. ................................................................................................. 78

P.    Substantial Consummation. ............................................................................... 78

Q.    Waiver of Fourteen-Day Stay. ........................................................................... 78

R.    Governing Law. .................................................................................................. 79

S.    Entire Agreement. .............................................................................................. 79

SECTION XX. RECOMMENDATION .......................................................................... 79

EXHIBIT A:  CORPORATE CHART

EXHIBIT B:  LIQUIDATION ANALYSIS

## <u>DISCLAIMERS</u>

EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THIS CASE SUPPORTS THE CONFIRMATION OF THE PROPOSED PLAN AND RECOMMENDS CREDITORS VOTE TO ACCEPT THE PLAN AS IS SET FORTH IN GREATER DETAIL IN THE COMMITTEE'S LETTER.

THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT.

CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS. ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND

2

DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTORS.

3

DOCS_LA:349940.16 14039/002

## SECTION I.
## INTRODUCTION

Athenex, Inc. and its affiliated debtors, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors", "Athenex" or the "Company"), hereby propose the following combined disclosure statement and plan of liquidation pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement"). Capitalized terms used in the Combined Plan and Disclosure Statement and not otherwise defined have the meanings ascribed to such terms in Section 3.

Prior to the Petition Date, the Debtors operated as a global oncology-focused biopharmaceutical company dedicated to the discovery, development and commercialization of novel therapies for the treatment of cancer, aiming to develop safer and more efficacious cancer medication. The Debtors commenced the bankruptcy cases after conducting a strategic review and reaching an agreement with their lenders to conduct an expedited, orderly sales process of the Debtors' assets across the primary businesses: Athenex Pharmaceutical Division, Orascovery, and Cell Therapy. During the Chapter 11 Cases, the Debtors have sold, liquidated or otherwise disposed of substantially all of their operating assets, and pursuant to the proposed Plan, the Debtors will complete the wind-down of their business, sell, liquidate or otherwise dispose of their remaining assets, address pending claims, including litigation claims, and make distributions to Creditors as efficiently as possible through the liquidating Plan. The Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases supports the confirmation of the Plan.

Pursuant to the Plan, the Prepetition Lenders will receive all value available for distribution until their claims are paid in full (including all fees, interest and other amounts due and owing under the Prepetition Credit Agreement through the Effective Date) following payment of all Allowed Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims, other than (i) distributions on account of all Allowed Other Secured Claims and (ii) distributions to be made to Holders of Allowed Unsecured Claims pursuant to the settlement reached among the Debtors, the Prepetition Lenders and the Committee (the "Committee Settlement"), which provides for general unsecured creditors to share pro rata from certain assets to be transferred to the Liquidating Trust, comprised of (i) the GUC Fund, (ii) the Trust-Retained Actions, (iii) the China Manufacturing Business Receivable, (iv) 50% of the Cell Therapy Division Net Sale Proceeds, (v) 100% of the Orascovery Milestone Payment to the extent triggered, and (vi) cash available for distribution to the Liquidating Trust pursuant to the Excess Proceeds Waterfall. The Committee Settlement also provides that the Prepetition Lenders will waive the Prepetition Lenders Deficiency Claim, if any, against the estates, and ensure appropriate budgeting to make sure that all administrative and priority claims are accounted for so that the assets of the Liquidating Trust will be solely for the benefit of Holders of Allowed Unsecured Claims.

The Plan provides for the Post-Effective-Date Debtor(s) and a Liquidating Trust, the latter of which is created solely for the benefit of Holders of Allowed Unsecured Claims, to liquidate, collect, sell, or otherwise dispose of the remaining assets of the Debtors' estates (the "Estates") (including, without limitation, certain causes of action), if and to the extent such assets were not previously monetized to Cash or otherwise transferred or disposed of by the Debtors prior to the

1

Effective Date, and to distribute all net proceeds to Creditors generally in accordance with the priority scheme under the Bankruptcy Code and the Plan. There will be no distributions to Holders of Interests.  In a Chapter 7 proceeding, absent the Prepetition Lenders' consent and agreement, the Debtors believe that general unsecured creditors would receive no distribution on account of their claims.  The Plan further provides for the limited substantive consolidation of the Debtors' Estates solely for the purposes of voting on the Plan by the Holders of Claims and making Distributions to Holders of Claims.

The Debtors submit that the Combined Plan and Disclosure Statement and/or notice thereof will be distributed to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code; Rules 2002, 3016, and 3017 of the Federal Rules of Bankruptcy Procedure; and the Court's order conditionally approving the Combined Plan and Disclosure Statement [Docket No. 498].  The Combined Plan and Disclosure Statement and the exhibits hereto include a discussion of:  (i) the nature and history of the Debtors' business and liabilities; (ii) events during the Chapter 11 Cases; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan.  The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtors to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, if any, the Debtors expressly reserve the right to alter, amend, or modify the Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times, before substantial consummation thereof.

***Please read the Combined Plan and Disclosure Statement, the exhibits, other supporting materials, and any appropriate ballot carefully and follow the instructions set forth below and on the appropriate ballot to vote on the Combined Plan and Disclosure Statement. The Debtors believe that the Combined Plan and Disclosure Statement provides the best method of maximizing the recoveries for the holders of Claims against the Debtors. Therefore, the Debtors recommend that all creditors who are entitled to vote should vote in favor of the Combined Plan and Disclosure Statement. As noted above, the Official Committee of Unsecured Creditors in the Chapter 11 Cases supports confirmation of the Plan.***

Unless otherwise specified, all section or exhibit references in the Combined Plan and Disclosure Statement are to the respective section in, or exhibit to, the Combined Plan and Disclosure Statement, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained herein.  The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in

2

a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

## SECTION II.
## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT <u>SOLICITATION AND CONFIRMATION DATES AND DEADLINES</u>

### A. <u>Summary of Classification and Treatment of Claims and Interests.</u>

All Claims against or Interests in the Debtors, other than Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are classified for purposes of voting and distributions under the Combined Plan and Disclosure Statement. A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| **Unclassified:** Administrative Claims, estimated to total approx. $1,250,000  **Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash payable by the Debtors or Post-Effective-Date Debtors, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or Post-Effective-Date Debtors, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. | Unimpaired | No |
| **Unclassified:** Priority Tax Claims, estimated to total approx. $200,000 | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, the Debtors or Post-Effective-Date Debtors shall pay each holder of an Allowed Priority Tax | Unimpaired | No |

3

| Class | Treatment | Status | Entitled to Vote? |
|-------|-----------|--------|-------------------|
| **Estimated Recovery: 100%** | Claim, from Available Cash, the full unpaid amount of such Allowed Priority Tax Claim on the earliest of the following dates: (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Allowed Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. | | |
| Class 1: Priority Non-Tax Claims, estimated to total approx. $0 - $100,000 <br><br> **Estimated Recovery: 100%** | The Debtors or Post-Effective-Date Debtors shall pay, from Available Cash, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Debtors or Post-Effective-Date Debtors shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity. | Unimpaired | No |
| Class 2: Prepetition Lenders Secured Claims, estimated amount $45,394,000 <br><br> **Estimated Recovery: 100%** | The Holders of Class 2 Claims shall (i) receive payment of all Available Cash on the Effective Date after payment in full of all Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims, and if applicable, Other Secured Claims, and the funding of the Wind-Down Budget and any reserves pursuant to the Plan and (ii) retain their Liens on the applicable Collateral (consisting of Distributable Assets, but excluding any Liquidating Trust Assets) until such Collateral is disposed of or released, and the net proceeds of such disposition, after payment of or reserve for all Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and, if applicable, Other Secured Claims, shall be paid by the Debtors or Post-Effective-Date Debtors to such Holder to the maximum extent possible in satisfaction and release of such Allowed Class 2 Claims, on or as soon as practicable after the Effective Date or as otherwise agreed between the Holder of such Claims and the Debtors or Post-Effective-Date Debtors, subject to the terms of the Plan. The Holders of Class 2 Claims shall not participate in | Impaired | Yes |

DOCS_LA:349940.16 14039/002

| Class | Treatment | Status | Entitled to Vote? |
|-------|-----------|--------|-------------------|
| | recoveries from the Liquidating Trust on account of any unsecured Prepetition Lenders Deficiency Claims, which Claims are waived. In the event there are unused funds remaining in the Wind-Down Budget upon the winding down of the Debtors or remaining in any reserves funded pursuant to the Plan following satisfaction of all Allowed Claims on account of which such reserves were established, such funds shall be made available for distribution to Holders of Class 2 Claims to the extent that such claims have not been paid out in full, and then as otherwise provided pursuant to the Plan. | | |
| Class 3: Other Secured Claims, estimated amount $0.00 **Estimated Recovery: 100%** | Except to the extent previously paid in full, at the option of the Debtors or Post-Effective-Date Debtor(s), one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its Collateral until such Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such Collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim (subject to any applicable intercreditor rights or obligations); (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or Post-Effective-Date Debtor(s), the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the Collateral securing the Creditor's Other Secured Claim (subject to any applicable intercreditor rights or obligations) shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim. | Unimpaired | No |
| Class 4: Unsecured Claims, estimated amount $60,000,000 **Estimated Recovery: 5.0%** | Holders of Class 4 Claims shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims, which entitle the Beneficiaries thereof to a Pro Rata share of any net proceeds of the Liquidating Trust Assets. Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, except as may | Impaired | Yes |

5

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| | be expressly provided otherwise, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date. | | |
| Class 5: Intercompany Claims, estimated amount $29,000,000<br><br>**Estimated Recovery: 0%** | In full and final satisfaction of all Allowed Intercompany Claims, on the Effective Date, such Claims shall be, at the option of the Debtors or the Reorganized Debtors, either reinstated, adjusted, converted to equity, otherwise set off, settled, distributed, or contributed, or canceled, released, or discharged without any distribution on account of such Claims. | Impaired | No |
| Class 6: Intercompany Interests<br><br>**Estimated Recovery: 0%** | In full and final satisfaction of the Intercompany Interests, on the Effective Date, all Intercompany Interests shall be, at the option of the Debtors or the Reorganized Debtors, either reinstated, set off, settled distributed, contributed, merged, diluted cancelled, released or otherwise addressed or eliminated and receive no distribution under the Plan. | Impaired | No |
| Class 7: Interests<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Class 7 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist. | Impaired | No |

## B. Important Dates and Deadlines

| Event | Proposed Date[2] |
|---|---|
| Voting Record Date | July 28, 2023 |
| Solicitation Commences | August 4, 2023 |
| Deadline to file Plan Supplement | August 25, 2023 |
| Voting Deadline | September 1, 2023 at 4:00 p.m. |
| Combined Plan and Disclosure Statement Objection Deadline | September 1, 2023 at 4:00 p.m. |
| Deadline to File Voting Tabulation Affidavit | September 7, 2023 at 4:00 p.m. |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement | September 8, 2023 |
| Confirmation Hearing | September 12, 2023 at 1:00 p.m. |

---

[2] All times noted are in prevailing Central Time.

## SECTION III.
## DEFINED TERMS

As used in the Combined Plan and Disclosure Statement, capitalized terms not otherwise defined have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

"Administrative Claim" means a Claim for an expense of administration of the Chapter 11 Cases arising under Sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates; (b) the value of any goods received by the Debtors within 20 days before the Petition Date to the extent that goods were sold to the Debtors in the ordinary course of the Debtors' business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; (f) administrative claims that were timely filed prior to the Administrative Expense Bar Date; and (g) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

"Administrative Expense Bar Date" means the applicable last date, at 5:00 p.m. Central time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date. **The Administrative Expense Bar Date shall be thirty (30) days after the Effective Date.**

"Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtors, the Post-Effective-Date Debtor(s), the Liquidating Trustee or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been filed and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtors and approved by the Bankruptcy Court, or (z) the Post-Effective-Date Debtor(s) or Liquidating Trustee, as applicable; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by Debtors in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed or Disallowed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the applicable rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan. For the purpose of determining distributions pursuant to the Plan, allowance under subsections (a) and (b) only is applicable once any of the following occur (1) before the Claims Objection Deadline, the Debtors, the Post-Effective-Date Debtor(s), or the Liquidating Trustee, as applicable, determine not to object to the Claim, (2) the Claims

7

Objection Deadline passes without an objection being filed, or (3) after the Debtor, the Post-Effective-Date Debtor(s), or the Liquidating Trustee timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.

"Allowed Claim" or "Allowed … Claim" means a Claim that has been Allowed.

"Available Cash" means the aggregate amount of all Cash held by the Debtors on the Effective Date, excluding any Cash used to fund the GUC Fund.

"Avoidance Actions" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

"Ballots" mean the ballots upon which the Holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

"Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq*. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General and Local Rules of the Bankruptcy Court.

"Bar Date" means, as applicable, the General Claims Bar Date, the Administrative Expense Bar Date, or any other applicable deadline to file Claims referenced in the Plan.

"Bar Date Order" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 314], which established the General Claims Bar Date and certain other deadlines and procedures.

"Beneficiaries" means holders of Allowed Unsecured Claims in Class 4 entitled to receive Liquidating Trust Interests under the Plan, whether or not such Claims were Allowed on the Effective Date.

"Business Day" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

"Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

"Causes of Action" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtors and/or the Estates (unless the context expressly states that such Causes of Action belong to another Entity) against Creditors, insiders, and/or any other Persons or Entities, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date.

"Cell Therapy Division Net Sale Proceeds" means the net proceeds of the Debtors' sale, transfer and/or other disposition (if any) of the Debtors' Cell Therapy platform and related assets.

"Chapter 11 Cases" means the Chapter 11 cases commenced when the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the Petition Date, being administered under Case No. 23-90295 (DRJ).

"China Manufacturing Business Receivable" means the Debtors' interests in that certain $5.6 million receivable payable by Chongqing Comfort Pharmaceutical Inc. as assignee of TiHe Capital (Beijing) Co. Ltd. to non-debtor affiliates of the Debtors, Athenex API Limited (Hong Kong) and Athenex Pharmaceuticals (China) Limited (Hong Kong), in connection with the Debtors' 2022 sale of equity interests in Chongqing Taihao Pharmaceutical Co. Ltd., Athenex Pharmaceuticals (Chongqing) Limited, and other China-based affiliates.

"Claim" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors, including, but not limited to: (a) any right to payment from the Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claimant" means the Holder of a Claim.

"Claims Agent" means Epiq Corporate Restructuring, LLC, which was appointed as the Debtors' claims, noticing, and balloting agent.

"Claims Objection Deadline" means, with respect to all Claims other than Professional Fee Claims, (a) 120 days after the Effective Date, or (b) such other period as may be fixed by an order of the Bankruptcy Court for objecting to Claims upon request of the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable.

"Class" means a category of Holders of Claims or Interests, as set forth in Article IX of the Plan.

"Collateral" means any property or interest in property of the Debtors' Estates that is subject to a valid and enforceable Lien to secure a Claim.

9

"Combined Plan and Disclosure Statement" means this Plan and Disclosure Statement, as modified and/or amended from time to time, which shall be in form and substance reasonably acceptable to the Prepetition Agent.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

"Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Section 17 hereof having been (a) satisfied or (b) waived pursuant to Section 17.

"Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Prepetition Agent.

"Consummation" or "Consummate" means the occurrence of the Effective Date.

"Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

"Creditor" means any Holder of a Claim against the Debtors as specified in Section 101(10) of the Bankruptcy Code.

"Debtors" means Athenex, Inc. and its affiliated debtors and debtors and debtors-in-possession in the Chapter 11 Cases.

"Debtor/Estate Release" has the meaning set forth in Section 16.B.1 hereof.

"Debtor/Estate Releasors" has the meaning set forth in Section 16.B.1 hereof.

"Cash Collateral Orders" means, collectively, the Interim Cash Collateral Order and Final Cash Collateral Order.

"Disallowed Claim" means a Claim, or any portion thereof, that has been disallowed by a Final Order or by other agreement of a Claimant, any Claim that is listed by the Debtors in the Schedules as zero or as disputed and as to which no Proof of Claim has been timely filed, or any Claim that is deemed disallowed pursuant to the terms of the Plan.

"Disclosure Statement" means the portion of this Combined Plan and Disclosure Statement that satisfies the disclosure requirements of section 1125 of the Bankruptcy Code.

"Disputed" means, with respect to any Claim or Interest, any Claim or Interest: (a) listed on the Schedules as unliquidated, disputed, or contingent and as to which no Proof of Claim has

10

been filed; or (b) as to which the Debtors, the Post-Effective-Date Debtors, the Liquidating Trustee, or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trustee in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

"Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of any deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim that is not a Disallowed Claim that is scheduled by the Debtors in the Schedules as disputed, contingent, or unliquidated and as to which no Proof of Claim has been timely filed; or (iii) any Claim that is not a Disallowed Claim that is not listed in the Schedules and as to which no Proof of Claim has been timely filed. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

"Disputed Claim Reserve" has the meaning set forth in Section 12.8 hereof.

"Distributable Assets" means any and all real or personal property of the Debtors of any nature, as of the Effective Date, that are not Liquidating Trust Assets (including the Available Cash) and any and all proceeds of the foregoing.

"Distributions" means the distributions of Cash to be made in accordance with the Plan and the Liquidating Trust Agreement.

"Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

"Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

"Effective Date" means the date selected by the Debtors, after consultation with the Prepetition Agent and the Committee, which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 17 hereof have been satisfied, unless waived by the Debtors, in consultation with the Prepetition Agent. Within five (5) business days after the Effective Date, notice of the Effective Date shall be filed with the Bankruptcy Court by the Post-Effective-Date Debtors.

"Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code and, where applicable, the Committee.

"Estate-Retained Actions" means all Causes of Action of the Estates as of the Effective Date that are not Trust-Retained Actions, including, but not limited to those Causes of Action that shall be set forth in the Plan Supplement.

"Estates" means the estates of the Debtors in the Chapter 11 Cases created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Excess Proceeds" means any Cash amounts available for distribution on account of the Prepetition Lenders Exit Fee.

"Excess Proceeds Waterfall" means, if there are Excess Proceeds, then (i) 2/3 of such Excess Proceeds shall be distributed to the Prepetition Lenders and (ii) 1/3 of such Excess Proceeds shall be distributed to the Liquidating Trust, *provided* that the Prepetition Lenders shall be entitled to payment in full of the Prepetition Lenders Exit Fee to the extent there is sufficient Excess Proceeds.

"Exculpated Parties" has the meaning set forth in Section 16.1 hereof.

"Final Cash Collateral Order" means the *Final Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Term Loan Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 275], entered by the Court in the Chapter 11 Cases.

"Final Decree(s)" means the decree contemplated under Bankruptcy Rule 3022.

"Final Distribution" means the last payment to Holders of Allowed Claims in accordance with the provisions of the Plan and/or the Liquidating Trust Agreement.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

"General Claims Bar Date" means July 21, 2023, at 5:00 p.m. prevailing Central Time, which was the general deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims against the Debtors that arose prior to the Petition Date.

"Governmental Unit" means the United States; State; Commonwealth, District, Territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under Chapter 11), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

"GUC Fund" means $1,000,000 in Cash, which Cash may be used by the Liquidating Trustee to make distributions to Holders of Allowed Class 4 Claims (excluding the Prepetition Lenders Deficiency Claims in Class 4 of the Prepetition Lenders, which claims will be waived by the Prepetition Lenders), in accordance with the Plan and Liquidating Trust Agreement. The GUC Fund also may be used by the Liquidating Trustee to fund the administration of the Liquidating Trust pursuant to the Plan and Liquidating Trust Agreement, including payment of Liquidating Trust Expenses. The GUC Fund will be held by the Liquidating Trust and administered by the Liquidating Trustee.

12

"Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"Indemnified Parties" has the meaning set forth in Section 16.4 hereof.

"Initial Distribution Date" means the Effective Date, or as soon as practicable thereafter when the initial Distribution shall be made to the Holders of Allowed Claims, as determined by the Post-Effective-Date Debtor and/or the Liquidating Trustee, as applicable.

"Insider" means an insider of the Debtors, as defined in Section 101(31) of the Bankruptcy Code.

"Insurance Policies" means all insurance policies maintained by the Debtors as of the Petition Date, specifically including, but not limited to, director and officer insurance policies.

"Interest" means any equity interest in the Debtors including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time, but not an Intercompany Interest.

"Intercompany Claim" means any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor.

"Intercompany Interest" means, other than an Interest in Athenex, Inc., any Interest in one Debtor held by another Debtor.

"Interim Cash Collateral Order" means the *Interim order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Term Loan Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 60], entered by the Court in the Chapter 11 Cases.

"Interim Fee Order" means the Order of the Court [Docket No. 397] establishing certain procedures for the interim compensation and reimbursement of expenses of Professionals in the Chapter 11 Cases.

"Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

"Liquidation Proceeds" means any Cash or other consideration paid to or realized by the Debtors, the Post-Effective-Date Debtor(s), or the Liquidating Trustee, as applicable, upon the collection, sale, transfer, assignment, or other disposition of the Distributable Assets or the Liquidating Trust Assets, as applicable.

"Liquidating Trust" means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

"Liquidating Trust Agreement" means the agreement, substantially in the form included in the Plan Supplement governing the Liquidating Trust (which form shall be reasonably acceptable to the Committee and the Debtors), as it may be subsequently modified from time to time.

"Liquidating Trust Assets" means the assets held in the Liquidating Trust comprised of (i) the GUC Fund, (ii) the Trust-Retained Actions, (iii) the China Manufacturing Business Receivable, (iv) 50% of the Cell Therapy Division Net Sale Proceeds (if any), (v) the Orascovery Milestone Payment (to the extent triggered), (vi) Cash available for distribution to the Liquidating Trust pursuant to the Excess Proceeds Waterfall, and (vii) Residual Estate Assets.

"Liquidating Trust Assets Account" means an interest-bearing bank account or money-market account to be established and held in trust by the Liquidating Trustee on or after the Effective Date for the purpose of holding any Cash that constitutes a Liquidating Trust Asset. The Liquidating Trust Assets Account will be initially funded with the GUC Fund.

"Liquidating Trust Expenses" means any fees, costs, and expenses incurred by the Liquidating Trustee or the Liquidating Trust from and after the Effective Date.

"Liquidating Trust Interests" means the non-transferable interests in the Liquidating Trust, distributions of which will be made to the Beneficiaries of the Liquidating Trust.

"Liquidating Trustee" means the Person selected by the Committee (which Person is reasonably acceptable to the Debtors), whose identity will be disclosed in form of the Liquidating Trust Agreement to be included in the Plan Supplement, to act as trustee of the Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, or such successor appointed as the trustee in accordance with the Liquidating Trust Agreement.

"Litigation" means the interest of the Estates, the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trust, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trust, as applicable, except to the extent concerning any Released Parties. Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to Sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code; (ii) for the turnover of property to the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trust, as applicable; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trust, as applicable; (iv) for compensation for damages incurred by the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trust; and (iv) equitable subordination actions against Creditors.

"Litigation Recovery" means any Cash or other property received by the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trust, as applicable, from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest, and punitive damages, whether recovered by way of settlement, execution on judgment, or otherwise. If any Litigation is pursued on a contingent-fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

14

"Orascovery Milestone Payment" means that certain $5,000,000 milestone payment to be paid by the Purchaser (as defined in the Orascovery Sale Order) to the Debtors pursuant to the Orascovery Sale Order and the Purchase Agreement (as defined in the Orascovery Sale Order), subject to the terms and conditions set forth in said documents.

"Orascovery Sale Order" means the *Order (I) Authorizing (A) the Sale of Orascovery Assets Free and Clear of Liens, Claims, and Encumbrances and the Assumption and Assignment of the Assumed Contracts and (B) the Debtors to Enter into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 316].

"Person" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

"Petition Date" means May 14, 2023, the date on which the Debtors filed their respective voluntary Chapter 11 petitions.

"Plan" means the portion of this Combined Plan and Disclosure Statement that constitutes the chapter 11 plan for the Debtors.

"Plan Documents" means the Plan, the Disclosure Statement, the Plan Supplement, the Liquidating Trust Agreement, any plan support letters, or other documents or pleadings filed by the Debtors relating to the Plan, each of which shall be in form and substance reasonably acceptable to the Prepetition Agent.

"Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

"Plan Supplement" means the pleading or pleadings identified in the Plan or Disclosure Statement for filing with the Bankruptcy Court not later than five (5) Business Days prior to the Plan Objection Deadline, which shall include certain exhibits and schedules to the Plan, as well as documents, agreements, and instruments evidencing and effectuating the Plan, each of which shall be in form and substance reasonably acceptable to the Prepetition Agent.

"Post-Effective-Date Debtor(s)" means the Debtor(s) from and after the Effective Date.

"Post-Effective-Date Debtor Representative" means the person or any successor thereto appointed by the Debtors under the Plan. The initial Post-Effective-Date Debtor Representative will be disclosed in the Plan Supplement.

"Prepetition Agent" means Oaktree Fund Administration, LLC in its capacity as Administrative Agent under the Prepetition Credit Agreement.

"Prepetition Agent Professionals" means Sullivan & Cromwell LLP and Bracewell LLP, each as counsel to the Prepetition Agent in connection with the Chapter 11 Cases.

"Prepetition Credit Agreement" means that certain Credit Agreement and Guaranty, dated as of June 19, 2020 (as amended, restated, or otherwise modified from time to time), by and among

15

the Debtors, the Prepetition Agent, and the Prepetition Lenders, together with all other documentation executed in connection therewith, including without limitation, the Security Documents (as defined in the Prepetition Credit Agreement).

"Prepetition Lenders" means the lenders party to the Prepetition Credit Agreement and any successor(s) thereto, in their capacity as lenders thereunder.

"Prepetition Lenders Deficiency Claim" means any unsecured deficiency Claim of the Prepetition Lenders in relation to the Prepetition Lenders' Secured Class 2 Claim.

"Prepetition Lenders Exit Fee" means the exit and prepayment fees due and payable to the Prepetition Lenders under the Prepetition Credit Agreement.

"Prepetition Lenders Secured Claims" means the Secured Claims of the Prepetition Lenders and the Prepetition Agent arising from, under or in connection with the Prepetition Credit Agreement.

"Priority Non-Tax Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

"Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

"Professional" means an Entity: (a) employed pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

"Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to Sections 330, 331, or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

"Proof of Claim" means a proof of claim filed pursuant to Section 501 of the Bankruptcy Code or any order of the Bankruptcy Court, together with supporting documents.

"Record Date" has the meaning set forth in Section 19.15 hereof.

"Rejection Bar Date" means the last date for any Entity whose claims arise out of the Bankruptcy Court approved rejection of an executory contract or unexpired lease to file a proof of claim for damages related to such rejection. The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Court order other

than the Confirmation Order, the date provided by an order approving the rejection, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is thirty (30) days after the Effective Date.

"Related Persons" means, subject to any exclusions expressly set forth in the Plan, with respect to a specific Person, said Person's successors and assigns, and as applicable, its current and former shareholders, affiliates, subsidiaries, employees, agents, officers, directors, managers, trustees, partners, members, professionals, advisors, attorneys, financial advisors, and accountants, solely in their respective capacities as such; provided, however, that Related Persons shall not include shareholders of Athenex, Inc.

"Released Parties" means, collectively, (a) the Debtors; (b) the Committee and the individual members thereof in their capacity as such; (c) the Prepetition Agent in its capacity as such; (d) the Prepetition Lenders in their capacities as such; and (e) each of such Entities' Related Persons.

"Releasing Parties" has the meaning set forth in Section 16.2(c) hereof.

"Residual Estate Assets" has the meaning set forth in Section 14.J hereof.

"Schedules" means the respective schedules of assets and liabilities and statements of financial affairs filed by the Debtors pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

"Secured Claim" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under Sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

"Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Post-Effective-Date Debtor or the Liquidating Trust, as applicable, makes a distribution to any Holders of Allowed Administrative, Secured, Priority, or Unsecured Claims.

"Specified D&O Causes of Action" consists of Causes of Action of the Debtors and/or the Estates against any director or officer that was not a director or officer as of the Petition Date and any Causes of Action of the Debtors and/or the Estates against the non-Debtor named individual directors and officers in the following pending actions relating to acts that arose prior to the Petition Date: *In re Athenex, Inc. Securities Litigation*, Case No. 21-cv-337 (W.D.N.Y.) and *Wonnell v. Lau, et al.*, Case No. 21-00817 (D. Del.); *provided, however*, that Specified D&O Causes of Action shall not include any action taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets, or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan.

17

"Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on, or with respect to such assessments.

"Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtors.

"Third Party Release" has the meaning set forth in Section 16.B hereof.

"Trust-Retained Actions" means all Avoidance Actions, all commercial tort claims, and all Causes of Action against third parties, including Specified D&O Causes of Action, except (a) Estate-Retained Actions and (b) those subject to the releases and exculpation set forth in Section 16.B hereof, including but not limited to the Debtor-Estate Release. The Liquidating Trust shall have the sole authority, standing and discretion to control, pursue, enforce, prosecute, monetize, and collect upon the Trust-Retained Actions; provided, however, that with respect to the Specified D&O Causes of Action, the Liquidating Trust shall not be permitted under any circumstances to collect any recovery from the personal assets of the applicable individual directors or officers.

"Unimpaired Claim" means an unimpaired Claim within the meaning of Section 1124 of the Bankruptcy Code.

"Unsecured Claim" means any Claim against the Debtors or Estates that is not a Secured Claim, an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Prepetition Lenders Secured Claim, or an Intercompany Claim.

"U.S. Trustee" means the Office of the United States Trustee for Region 7 (Southern District of Texas).

"Voting Instructions" means the instructions for voting on the Plan contained on the Ballots.

"Voting Record Date" means the date as of which the identity of Holders of Claims is set for purposes of determining the Entities entitled to receive and vote on the Plan.

"Wind-Down Budget" means the budget for any fees, costs, and expenses incurred by the Post-Effective Date Debtor from and after the Effective Date, as such budget shall be approved by, and further amended with the approval of the Prepetition Agent and in consultation with the Liquidating Trustee.

18

## SECTION IV.
## BACKGROUND

**A.** **General Background.**

    1.  Introduction.

As of the Petition Date, the Debtors were a global oncology focused biopharmaceutical company dedicated to the discovery, development and commercialization of novel therapies for the treatment of cancer, aiming to develop safer and more efficacious cancer medication. The Debtors' mission was to improve the lives of cancer patients by creating more effective, safer and tolerable treatments. The Company successfully brought to market its innovative drug, Klisyri®, for patients with actinic keratosis.

In February 2021, the Company received notice from the Food and Drug Administration that its new drug application for Oral Paclitaxel for the treatment of metastatic breast cancer would not be approved without new clinical trials. As a result, the Company's ability to attract new equity investments and capital was materially impaired. Since then, the Company worked tirelessly to secure financial capital and new business to support its operations, while at the same time implementing tough decisions designed to retain value for its stakeholders. These efforts included, for example (and as discussed in further detail below), selling the Company's interest in its Dunkirk, New York manufacturing facility in February 2022, monetizing its future revenue streams from its only FDA-approved drug product in June 2022 under the RIPA arrangement, divesting its equity interests in its Chinese manufacturing operations in November 2022, and raising approximately $30 million in a public securities offering in August 2022. The Company also requested and obtained numerous consents, waivers, and extensions on certain covenants under the Prepetition Credit Agreement from certain funds managed by or affiliated with Oaktree Capital Management, L.P. with respect to their outstanding secured funded indebtedness. The Company also implemented reductions in force in the Spring of 2022 and again in December 2022 in an effort to reduce operating expenses and extend its cash runway heading into 2023.

Despite the Debtors' extensive prepetition efforts to address their liquidity challenges, it became clear that the Company would breach the minimum liquidity covenant under the Prepetition Credit Agreement and would be unable to continue as a going concern without an immediate and substantial infusion of capital. Since March 2023, the Debtors and their advisors engaged in active and arms-length discussions with the Prepetition Agent with respect to a number of strategic options to address its financial and liquidity challenges, including considering several strategic alternatives for the sale or merger of the Company and its key business segments, engaging in a robust marketing process, divesting core and non-core assets, and undertaking cost-saving measures, including a further reduction in force immediately before the Petition Date to extend their cash runway. However, the Debtors determined that those strategic alternatives were not viable outside of the protections of a chapter 11 proceeding. As a result, and due to the declining liquidity situation, the Debtors determined that filing their chapter 11 cases would be their best alternative for maximizing value and recoveries for the Debtors' creditors and other stakeholders.

For over twenty (20) months prepetition, the Debtors engaged in extensive discussion for the sale of their key business segments: Athenex Pharmaceutical Division, LLC ("APD"), Athenex Pharma Solutions, LLC ("APS"), Cell Therapy, and Orascovery. The Company continued negotiations with potential buyers postpetition, resulting in certain asset sales discussed below. In connection with the bankruptcy filing, the Prepetition Agent consented to the Debtors' use of its cash collateral in the Chapter 11 Cases pursuant to the terms of the Cash Collateral Orders to fund an orderly liquidation process to continue the sale process.

    2.   Debtors' Business and Operations.

The Company is a clinical-stage biopharmaceutical company focused on the discovery, development and commercialization of next-generation products for the treatment of cancer. Specifically, the Company was focused on an innovative cell therapy platform based on natural killer T ("NKT") cells (a lymphocyte, a type of white blood cell), which influence diverse immune responses. Within the immune system, NKT cells have an important function, acting among the first cells in response to either infection or stress in the tissues. NKT cells have unique biology that has potential advantages over current T cell and NK cell-based technologies, including, with respect to the treatment of solid tumors, by naturally homing in on tumors and reversing immunosuppressive tumor microenvironments, and reducing the frequency and severity of toxicity commonly caused by CAR-T cell therapies.

Founded in 2003, the Company's operations included two business segments: (1) the Oncology Innovation Platform, dedicated to the research and development of the Company's proprietary drugs, including small molecules and cell therapy, and (2) the Commercial Platform, focused on the sales and marketing of its specialty drugs and the market development of its proprietary drugs, through APD.[3]

The Company had research, product formulation, clinical development and regulatory affairs capabilities primarily in the United States, with its research and development facilities largely concentrated in Buffalo, New York. As of the Petition Date, the Company's offices and facilities consisted of: (i) its corporate headquarters located in Buffalo, New York, where the Company occupied approximately 51,000 square feet of the Conventus Center for Collaborative Medicine, which included approximately 16,000 square feet of a formulation testing and chemistry lab under a lease; (ii) an approximately 26,500 square foot facility in Clarence, New York under a lease that provided the Company's manufacturing of Tirbanibulin (the Company's US FDA approved medication for the treatment of actinic keratosis on the face or scalp); (iii) approximately 15,000 square feet of office space in the Woodfield Preserve Office Center in Schaumberg, Illinois under a lease that served as the headquarters of the Company's Commercial Platform; (iv) approximately 1,300 square feet of office space in Cranford, New Jersey under a lease, which served as the Company's clinical research headquarters; and (v) various leased offices or facilities in Hong Kong and Latin America.

---

[3]     The Company's third segment, the Global Supply Chain Platform, which had provided a stable supply of active pharmaceutical ingredients for the Company's clinical and commercial efforts, was sold or otherwise discontinued during 2022.

DOCS_LA:349940.16 14039/002

As of March 31, 2023, the Company had approximately 175 full-time employees and 8 part-time employees in the areas of research and development and laboratory operations, manufacturing activities, and selling, general and administrative functions. As of March 31, 2023, approximately 93% of the Company's personnel were located in the U.S. and approximately 7% were located in Asia, Latin America and Europe, in addition to various independent consultants and contractors used by the Company to assist with its operations. None of the Company's employees are represented by a labor union or covered by a collective bargaining agreement.

Prepetition, the Company derived its consolidated revenue primarily from (i) the sales of generic injectable products by its Commercial Platform (APD); and (ii) licensing and collaboration projects conducted by the Company's Oncology Innovation Platform, which generated revenue in the form of upfront payments, milestone payments, and payments received for providing research and development services for the Company's collaboration projects and for other third parties. Product sales for the year ended December 31, 2022 were reported as $90.9 million, an increase of $22.4 million, or 33%, as compared to $68.5 million reported for the year ended December 31, 2021. The Company reported that license fees and other revenue decreased to $11.9 million for the year ended December 31, 2022, from $26.9 million reported for the year ended December 31, 2021, a decrease of $14.9 million, or 56%.

For the years ended December 31, 2022 and 2021, the Company reported net losses of $104.4 million and $202.0 million, respectively, and reported an accumulated deficit of $1,016.8 million as of December 31, 2022. Substantially all of the Company's operating losses resulted from costs incurred in connection with its research and development programs and from selling, general and administrative expenses associated with its operations.

3. Corporate/Equity Structure

A simplified organizational chart for the Company, including certain non-Debtor and foreign affiliates, is attached hereto as **Exhibit A**.

Athenex was originally formed under the laws of the state of Delaware in November 2003 under the name Kinex Pharmaceuticals, LLC. In December 2012, Athenex was converted from a limited liability company to a Delaware corporation, Kinex Pharmaceuticals, Inc. In August 2015, the name was changed to Athenex, Inc. The Debtors are six affiliated companies that are all wholly-owned subsidiaries of Athenex, Inc. or indirectly wholly-owned subsidiaries in the case of Cell Medica, Inc. d/b/a Kuur Therapeutics, a Texas corporation. In addition, the Debtors have thirty one (31) affiliates who are not Debtors in these Chapter 11 Cases that are primarily foreign affiliates and interests in one special purpose vehicle (the SPV) discussed further herein.

On August 20, 2021, the Company entered into a sales agreement with SVB Leerink LLC, in connection with the offer and sale of up to $100,000,000 of shares of the Company's common stock, par value $0.001 per share, in an at-the-market offering (the "ATM Offering"). During the year ended December 31, 2021, the Company raised net proceeds of $1.1 million by selling 38,142 shares of common stock for an average price of $29.80 per share under that sales agreement. During the year ended December 31, 2022, the Company raised net proceeds of $9.4 million by selling 1,263,251 shares of common stock for an average price of $7.40 per share under the sales agreement.

In August 2022, the Company completed an underwritten public offering in which it sold 1,766,667 shares of common stock, common warrants to purchase up to 2,000,000 shares of common stock at a price of $20.00 per share, and pre-funded warrants to purchase up to 233,334 shares of common stock at a price of $0.02 per share. The shares of common stock, together with the common warrants, were sold at $15.00 per share and accompanying common warrant, and the pre-funded warrants, together with the common warrants, were sold at $14.98 per pre-funded warrant and accompanying common warrant. The Company received net proceeds of $28.1 million, after deducting discounts, commissions, and offering expenses. The Company used the net proceeds from this offering to fund ongoing clinical development and for working capital and other general corporate purposes.

As of the Petition Date, the Company's common stock was listed on Nasdaq under the symbol "ATNX."

As set forth in the Company's Form 10-k for 2022, as of December 31, 2022, the Company's executive officers and directors (including the Company's co-founder, Dr. Johnson Lau) beneficially owned approximately 8.8% of the Company's outstanding common stock in the aggregate; and Perceptive Advisors LLC and its affiliates ("Perceptive") owned approximately 14.6% and IP Group PLC owned approximately 5.9% of the Company's outstanding common stock.

4.   Debt Structure

As of the Petition Date, the Debtors' primary long term debt obligations consisted of an outstanding principal amount of approximately $41,875,000 plus interest, fees and other costs due to the Prepetition Lenders under the Prepetition Credit Agreement. As of the Petition Date, the Debtors estimate that they have approximately $30 million of outstanding accounts payable owed to various trade vendors and suppliers.

a)   Prepetition Credit Agreement with Oaktree

Athenex entered into the Prepetition Credit Agreement dated as of June 19, 2020 with the Prepetition Lenders to borrow up to $225 million in five tranches with a maturity date of June 19, 2026, bearing interest at a fixed annual rate of 11.0%. The first tranche of $100 million was drawn by Athenex prior to June 30, 2020, with the proceeds used in part to repay in full the outstanding loan and fees under Athenex's credit agreement with Perceptive. The second and third tranches of $25 million each were drawn by Athenex prior to December 31, 2020. The additional debt tranches amounting to an aggregate of $75 million were subject to the approval of Oral Paclitaxel in the treatment of mBC; as discussed herein, the Company decided to stop pursuing regulatory approval in the U.S. and thus such additional financing became unavailable. In connection with the Credit Agreement, Athenex granted warrants to Oaktree to purchase an aggregate of up to 908,393 shares of Athenex common stock.

Athenex's obligations under the Prepetition Credit Agreement are guaranteed by certain Debtor subsidiaries, and secured (as are the related guarantees) by (i) pledges of the equity interests

in all of the Debtors' subsidiaries (as well as the equity interests in certain non-Debtor subsidiaries) and (ii) a security interest in substantially all of the Debtor obligors' tangible and intangible assets.

Pursuant to several amendments of the Prepetition Credit Agreement, the Company made certain prepayments and payments of other fees and costs to Oaktree. As of the Petition Date, the outstanding principal balance was reduced to $41.875 million.

Beginning in March 2023, the Company received three notices of certain alleged defaults and reservations of rights from Oaktree related to the Credit Agreement, which were disputed by the Company. Upon the occurrence of any Event of Default, Oaktree would have had the right to accelerate all amounts outstanding under the Prepetition Credit Agreement.

b) Revenue Interest Purchase Agreement

On June 21, 2022, Athenex and ATNX SPV, LLC (the "SPV"), an 80% owned subsidiary of Athenex, entered into a revenue interest purchase agreement ("RIPA") with the affiliates of Sagard Healthcare Partners ("Sagard") and certain funds managed by Oaktree Capital Management, L.P. ("Oaktree Purchasers" and together with Sagard, the "Purchasers") for the sale of revenues from U.S. and European royalty and milestone interests in Klisyri® (tirbanibulin) for an aggregate purchase price of $85 million (the "Purchase Price"). Of the total Purchase Price, *inter alia*, $5 million was placed into escrow to be paid to the Company upon the satisfaction of certain manufacture and supply milestones for Klisyri prior to December 31, 2025 and $52.5 million was used to pay down the Prepetition Credit Agreement. The remaining net proceeds after deducting transaction expenses and debt repayments were available for the Company's operations.

In connection with this transaction, the Company formed the SPV and transferred its interest in the License and Development Agreement dated December 11, 2017 with Almirall S.A. ("Almirall") relating to Klisyri® and certain related assets (the "Almirall License Agreement") to the SPV. The Oaktree Purchasers and Sagard each owned a 10% equity interest in the SPV. Pursuant to the RIPA, the SPV sold to the Purchasers its right to the revenue to be received in respect of certain royalties and certain milestones under the Almirall License Agreement. The SPV retained the right to receive 50% of certain of the milestone payments under the Almirall License Agreement if those milestones are achieved, and 50% of the royalties to be paid under the Almirall License Agreement for sales of Klisyri®, once net sales of Klisyri® exceed a specific dollar amount.

On or about May 2, 2023, the Company directors designated by the Purchasers notified the Debtors by letter of the alleged defaults by Athenex under the SPV operating agreement.

5. Operational Segments and Recent Business Transactions

a) Athenex Pharmaceutical Division, LLC

Prepetition, the Company conducted commercial sales of multisource injectable pharmaceutical products through Athenex's wholly owned subsidiary, Athenex Pharmaceutical Division, LLC ("APD"). APD developed and sourced pharmaceutical products through agreements with key partners utilizing a global partner network, including MAIA Pharmaceuticals,

among many others. In addition, APD manufactured its own pharmaceutical products and certain co-developed products through a supply agreement with Maiva Pharma Private Limited.

APD's critical care products covered a broad range of therapeutic products that were relied upon ultimately by doctors and patients. As of December 31, 2022, APD marketed 39 products with 74 SKUs. APD primarily marketed its products to acute hospital group purchasing organizations in the United States such as pharmaceutical wholesalers, which supplied to integrated healthcare networks, clinics, and directly to physicians. For the year ended December 31, 2022, the products sold through APD's three largest wholesalers in the U.S. accounted for more than 90% of its total revenue. Customers also ordered products online directly from APD through a product portal. APD's products were warehoused and distributed through a third-party logistics provider, Eversana Life Science Services, LLC, located in Memphis, Tennessee.

In connection with exploring strategic alternatives, the Debtors began a formal marketing process with an investment banking firm in September 2021 for the proposed sale, merger, or other disposition of APD and APS. Since that time, for close to twenty months prepetition, the Debtors actively marketed those businesses and reached out to more than 100 parties for APD, as well as, to a lesser extent APS. As discussed below, the Debtors sold their APD related assets and reached a settlement relating to the APS assets during the Chapter 11 Cases.

b) Orascovery

Prepetition, Athenex R&D LLC and its subsidiaries ("Orascovery") developed small molecule oral chemotherapy treatments for neoadjuvant breast cancer and solid tumors, including Oral Paclitaxel discussed above. In 2022, the Company decided to place a hold on pursuing regulatory approval in the U.S. of Oral Paclitaxel in the treatment of mBC, and to discontinue the Orascovery platform apart from Oral Paclitaxel. Postpetition, the Debtors implemented a vigorous marketing process for the potential sale or other transaction of the Orascovery segment and related assets of the Debtors. As discussed below, the Debtors obtained Court approval of the sale of the Orascovery assets.

c) Cell Therapy

Prepetition, Kuur Therapeutics Inc. and its subsidiaries ("Cell Therapy") developed biologic and cell therapies for the treatment of high risk neuroblastoma, lymphoma and leukemia, advanced HCC, and genetically driven epithelial cancers.

On May 4, 2021, Athenex entered into an Agreement and Plan of Merger (the "Kuur Merger Agreement") with Kuur Therapeutics, Inc. (formerly known as Cell Medica) ("Kuur"), whereby Athenex acquired 100% of the outstanding shares of Kuur (the "Kuur Merger"). Under the terms of the Kuur Merger Agreement, Athenex's wholly owned subsidiary, Athenex Pharmaceuticals LLC, merged with and into Kuur, with Kuur surviving as a wholly owned subsidiary of Athenex. Kuur was a leading developer of "off-the-shelf" CAR-NKT cell immunotherapies for the treatment of solid and hematological malignancies. Pursuant to the Kuur Merger Agreement, an upfront fee of $70 million was paid to Kuur shareholders and its former employees and directors, comprised primarily of Athenex's common stock. Additionally, Kuur shareholders and its former employees and directors are eligible to receive up to $115 million of

24

milestone payments, which could be paid, at Athenex's sole discretion, in either cash or additional common stock of Athenex (or a combination of both). Through the acquisition of Kuur, the Company acquired rights to intellectual property and other assets to further the development of the Company's cell therapy platform.

Although there were regulatory issues (including a prior clinical testing hold by the FDA), the Company made significant progress on its Cell Therapy platform, which represented a departure from more commonly used methods for cancer treatment. Postpetition, the Debtors implemented a robust marketing process for the potential sale or other transaction with the Cell Therapy platform and related assets of the Debtors. However, to date, there is no viable offer for the Cell Therapy assets, and pursuant to the Plan, the Liquidating Trust Assets include a 50% share of any Cell Therapy Division Net Sale Proceeds (if any).

d) Athenex Pharma Solutions, LLC

Debtor Athenex Pharma Solutions, LLC (APS) had certain obligations to manufacture and provide Klisyri® to Almirall pursuant to the Supply Agreement dated December 11, 2017 (as amended, the "Almirall Supply Agreement"). Almirall, in turn, markets Klisyri® pursuant to a licensing agreement, under which Almirall is required to pay royalties and make milestone payments, subject to certain terms and conditions. Previously, the active pharmaceutical ingredient for Klisyri® was manufactured through certain of the Debtors' subsidiaries in China. However, the manufacturing process was uneconomic, and the Debtors sold their Chinese manufacturing operations as discussed further herein. APS, Almirall, and the parties to the RIPA engaged in extensive, arms-length negotiations concerning the resolution of the Almirall Supply Agreement and related matters. As discussed below, the parties reached a global settlement which was approved by the Bankruptcy Court.

B. **Prepetition Asset Sales and Other Transactions**

Commencing in early 2022, the Company made significant progress on its strategy to monetize or dispose of non-core assets, to extend the Company's cash runway into 2023 as the Company pivoted to focusing on its cell therapy platform. During 2022, the Company executed a number of actions and transactions to transform Athenex into a leaner, cell therapy-focused company, including the following:

● *Tirbanibulin Manufacturing:* During 2022, the Company received approximately $11 million from the sale of its interests in the Tirbanibulin manufacturing business in China, and expects to receive up to an additional $5.6 million during the first half of 2023 (the China Manufacturing Business Receivable, which has been assigned to the Liquidating Trust pursuant to the terms of the Plan). Specifically, in November 2022, the Company completed the sale of its equity interests in its China subsidiaries, including Chongqing Taihao Pharmaceutical Co. Ltd. and Athenex Pharmaceuticals (Chongqing) Limited, to Chongqing Comfort Pharmaceutical Inc. as assignee of TiHe Capital (Beijing) Co. Ltd.

● *Sterile Compounding Business:* Commencing in the fourth quarter of 2022 and continuing during the first quarter of 2023, the Company undertook the wind-down process of its 503B sterile compounding business operated out of the Clarence, New York facility. APS had

25

manufactured products under Section 503B of the Compounding Quality Act within the Federal Food, Drug, and Cosmetic Act and supplied sterile injectable drugs to hospital pharmacies across the United States.

● *Dunkirk Facility:* During the first quarter of 2022, the Company received approximately $40 million upon the sale of its leasehold interest in the manufacturing facility in Dunkirk, New York and certain related assets (the "Dunkirk Facility") to ImmunityBio, Inc. The Dunkirk Facility had been constructed in connection with the Company's agreement with Fort Schuyler Management Corporation, a not-for-profit corporation affiliated with the State of New York, for a medical technology research, development, innovation, and commercialization alliance. The Dunkirk Facility transaction closed in February 2022, and approximately $27.4 million, inclusive of principal, fees, and accrued interest, was paid to Oaktree under the Prepetition Credit Agreement including the Third Amendment thereto.

## C. Events Leading to the Bankruptcy Filings.

   a) Debtors' Liquidity Issues and Challenging Business Environment.

Since its formation, the Company relied for funding on, as discussed above, a combination of public and private securities offerings, secured loans, and public-private partnerships, and to a lesser extent, revenues from operations and grants. The Company historically devoted most of its financial resources to research and development, including non-clinical development activities and clinical trials, and only one of the product candidates that the Company had developed was commercialized. The Company did not generate substantial revenue from product sales.

One of the Company's product candidates, Oral Paclitaxel, a chemotherapy medication, had been in development since 2011. In February 2021, the Company received a Complete Response Letter (CRL)[4] from the FDA regarding the Company's New Drug Application for Oral Paclitaxel for the treatment of metastatic breast cancer, and the FDA's concerns of safety risk to patients and uncertainty over results. Following the Company's receipt of the CRL, the Company paused pursuing regulatory approval for Oral Paclitaxel monotherapy in the U.S. and paused development on the Company's other Orascovery product candidates.

In the several months before the Petition Date, the Debtors' liquidity situation worsened. As discussed above, commencing in early March 2023, the Debtors and Oaktree engaged in negotiations regarding a potential consensual resolution and the maximization of the value of the Debtors for the benefit of all stakeholders. Immediately before the Petition Date, the Debtors reduced their workforce by more than 70%, leaving remaining approximately 40 full-time and 30 part-time employees in the Debtors' accounting, finance and operations departments.

Overall, the Debtors, in addition to being in a fiercely competitive industry (the biopharmaceutical industry and the oncology subsector), faced significant liquidity and funding issues, together with other business setbacks discussed herein, which developments led or contributed to the Debtors' chapter 11 filings.

---

[4] A CRL indicates that the FDA has conducted a complete review of the data in a submission and subsequently found that it cannot approve the application in its present form.

D. **Chapter 11 Goals**

Prepetition, the Debtors and their advisors worked to prepare for and develop various strategic alternatives, including undertaking a robust marketing process or processes, which had been ongoing for several months prior to the filing of the Chapter 11 Cases. As part of such efforts, Nicholas Campbell was appointed as the Debtors' CRO, and the Debtors engaged MERU and other advisors. As discussed, certain significant transactions were agreed upon or closed prepetition. However, in light of the Company's liquidity constraints, the Debtors were unable to continue such processes out of court, and filed the cases to further explore additional transactions on a postpetition basis. As discussed below, the Debtors obtained approval of several asset sales and other transactions, and pursuant to the Plan, the Debtors will proceed with an orderly liquidation of their remaining assets.

## SECTION V.
## THE CHAPTER 11 CASES

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases.

A. **First Day and Other Early Relief.**

In order to facilitate the Chapter 11 Cases, minimize disruption to the Debtors' affairs, and preserve the value of the Estates, the Debtors filed motions with the Bankruptcy Court on or shortly after the Petition Date seeking certain relief (and obtained such relief by order of the Bankruptcy Court), including, without limitation:

(a)     authority to honor and pay certain prepetition workforce compensation including for independent contractors and commissions, expenses and other related obligations, subject to certain caps, which was granted pursuant to an order entered on May 16, 2023 [Docket No. 61];

(b)     authority to pay obligations to state Medicaid authorities based on products sold in particular states, franchise taxes, and various licensing fees owed to state authorities, in the ordinary course of business, which was granted pursuant to an order entered on May 16, 2023 [Docket No. 64];

(c)     authority to continue using the Debtors' existing cash management system and the provision of other related relief, which was granted pursuant to an interim order entered on May 16, 2023 and a final order entered on June 15, 2023 [Docket Nos. 62 & 274];

(d)     authority to maintain and administer the Debtors' customer-related programs and honor certain prepetition obligations related thereto, which was granted pursuant to an interim order entered on May 25, 2023 [Docket No. 133];

(e)     authority to pay in the ordinary course certain prepetition claims of the Debtors' third-party service providers, common carriers, contract carriers, freight brokers, shippers, truckers, and warehouses, which was granted pursuant to an interim order entered on May 16, 2023 [Docket No. 66];

(f)     approval of certain procedures in relation to the common stock of Athenex, Inc. to protect the potential value of the Debtors' carryforwards of consolidated net operating losses and certain other tax benefits for use during the Chapter 11 Cases and in connection with any post-emergence disposition of assets of the Debtors, which were granted pursuant to orders entered on May 16, 2023 [Docket No. 65] and on June 15, 2023 [Docket No. 273];

(g)     approval of adequate assurance procedures for utility providers, which was granted pursuant to an order entered on May 16, 2023 [Docket No. 63];

(h)     approval of certain procedures for the Debtors to redact from any Court filing, including the consolidated list of creditors and Schedules, the home addresses of individual creditors including employees, independent contractors, and former employees, which motion was granted pursuant to an order entered on May 16, 2023 [Docket No. 68];

(i)     approval of the continue their ordinary course netting and setoff practices with respect to APD customers, which motion was granted pursuant to an order entered on May 25, 2023 [Docket No. 133]; and

(j)     the appointment of Epiq Corporate Restructuring, LLC as the claims and noticing agent in the Chapter 11 Cases [Docket Nos. 3 & 30].

## B. <u>Cash Collateral Relief.</u>

The Debtors filed a motion [Docket No. 8] requesting approval of the Debtors' use of cash collateral in accordance with the agreed-upon budget and the provision of adequate protection to the Prepetition Lenders.  Without immediate access to cash collateral, the repercussions to the Debtors' restructuring efforts would have been catastrophic and likely irreparable, ending the Debtors' ability to maximize value for the benefit of all stakeholders.  The interim order entered on May 16, 2023 [Docket No. 60] approved, among other things, the provision of superpriority administrative claims, adequate protection replacement liens on existing collateral and liens on unencumbered assets to the extent of any diminution of value other than avoidance actions.  The final order entered on June 15, 2023 [Docket No. 275] provided for liens on avoidance action proceeds.  The cash collateral orders also approved certain required milestones, including milestones for the sale of the Debtors' assets.

## C. <u>Key Employee Incentive Program & Key Employee Retention Plan.</u>

The Debtors filed a motion seeking approval of a key employee incentive plan (KEIP) and a key employee retention plan (KERP) which applied to thirteen non-insider employees essential to the success of the Chapter 11 Cases.  Given that the Debtors had recently laid off more than 70 percent of the workforce and still needed to accomplish multiple transactions over a short timeframe, the Debtors needed the KEIP (with total bonuses of $803,000) and KERP (with payments equivalent to 20% of the participant's base salary, totaling potentially $309,000) to be able to retain and properly incentivize the key individuals, as they assist the Debtors in their operations, in pursuing and closing expedited sale transactions, and in preserving and maximizing value for all stakeholders. The Bankruptcy Court approved the KEIP and KERP pursuant to an order entered on June 15, 2023 [Docket No. 272].

### D. **Global Settlement Relating to Debtor Athenex Pharma Solutions, LLC.**

The Debtors filed a motion under Bankruptcy Rule 9019 to obtain approval of a global settlement (the "Settlement Agreement") by and among Debtors APS and Athenex, Almirall, S.A. and Almirall LLC f/k/a Aqua Pharmaceuticals LLC (collectively, "Almirall"), Sagard Healthcare Royalty Partners, LP ("Sagard") as Administrative Agent and acting on behalf of the Purchasers (as defined in the 2022 Revenue Interest Purchase Agreement ("RIPA")), and Oaktree Fund Administration, LLC as the Administrative Agent under the Prepetition Credit Agreement. Debtor APS manufactures and provides Klisyri (a prescription medicine used on the skin to treat actinic keratosis) to Almirall pursuant to a supply agreement. Almirall, in turn, markets Klisyri pursuant to a licensing agreement under which Almirall is required to pay royalties and make milestone payments to Athenex subject to certain terms. Prepetition, as discussed above, Athenex sold its royalty income stream and rights to receive milestone payments under the licensing agreement to non-Debtor ATNX SPV, LLC ("SPV"), an 80% owned subsidiary of Athenex pursuant to the RIPA. As discussed in the Debtors' motion, historically, APS has operated at a net loss under the supply agreement and conveyed to Almirall its desire to reject and terminate the supply agreement. After many months' negotiations, the parties reached the Settlement Agreement, pursuant to which, among other things, Almirall will buy from APS its existing inventory on hand consisting primarily of the specialized raw material Tirbanibulin (used for Klisyri); the Debtors will continue to manufacture and supply 23 lots of Klisyri to Almirall for a 3-4 months period, and Almirall will reimburse the Debtors for a significant portion of the carry and attendant costs of the production (including retention bonuses for employees), after which the parties' supply relationship will be terminated; the Debtors will transfer their 80% equity interest in the SPV (of little or no value) to the Purchasers in exchange for a waiver by the Purchasers of their claims against Athenex; and the estates are anticipated to receive substantial net funds (estimated at approximately $1.9 million) as a result of the transactions contemplated under the Settlement Agreement. The Bankruptcy Court approved the Settlement Agreement pursuant to an order entered on June 27, 2023 [Docket No. 350].

The Debtors may seek a separate sale for the remaining assets of APS after completion of their obligations under the Settlement Agreement, which motion, if any, will be filed by a separate sale motion.

### E. **Bidding/Auction Procedures for Sale of Debtors' Assets.**

On the Petition Date, the Debtors filed a motion [Docket No. 17] for the approval of certain bidding/auction and sale procedures and authority to sell substantially all of their assets, other than the assets of APS, which were not being marketed for sale at the time (discussed further below)). As discussed in the motion, the Debtors were willing to entertain all viable proposals for the entire company, certain segments or divisions, or lot bids on assets (including inventory) held by the Debtors (excluding any APS assets). The Court entered an order on May 22, 2023 [Docket No. 113] approving the procedures subject to certain revisions, including revisions proposed by the Committee [Docket No. 239].

In accordance with approved procedures, the Debtors proceeded with their marketing and sale process, and further extended the bid deadline and auction after consultation with the

applicable Consultation Parties as defined in the Bid Procedures [Docket No. 199]. The Debtors' and their advisors' efforts culminated with:

(i) designation of a stalking horse bidder and approval of the sale of the Debtors' Orascovery business to C-MER Specialty Group Limited or its assignee Health Hope Pharma Limited (the "Orascovery Stalking Horse Buyer") [Docket No. 316], free and clear of liens, claims and encumbrances, for $2,500,000 subject to the provisions of the parties' Stalking Horse Agreement, provided further that the Debtors will receive a $5 million milestone payment (with such payment being assigned and transferred to the Liquidating Trust pursuant to the terms of the Plan) if Net Sales of Oraxol (as these capitalized terms are defined in the motion) reach $10,000,000 (the "Orascovery Sale");

(ii) after receipt of several Qualified Bids and an Auction that lasted approximately eleven hours with several rounds of overbidding, approval of the sale of substantially all of the assets of APD (other than the Oaktree Purchased Assets) to Sagent Pharmaceuticals [Docket No. 351], free and clear of liens, claims and encumbrances, for $14,000,000, subject to adjustment pursuant to the parties' Asset Purchase Agreement with respect to inventory, plus assumption of not less than $7,000,000 of cure liabilities, with a commitment to cure $1,540,705 of section 503(b)(9) liabilities arising under certain specified contracts (the "Sagent Sale"); and

(iii) approval of the sale of certain APD assets –all of APD's accounts and notes receivable and all causes of action specifically pertaining to the collection of the foregoing, and all credits, claims for refunds, deposits for the benefit of third parties, prepaid expenses, and rights of setoff, recoupment, reimbursement, indemnity and contribution relating to the purchased assets (the "Oaktree Purchased Assets") [Docket No. 352] – for a credit bid of $20,000,000 subject to adjustment pursuant to the parties' Asset Purchase Agreement (the "Oaktree Sale").

The Sagent Sale closed on June 30, 2023 [Docket No. 372]. The Orascovery Sale closed on July 7, 2023. The Oaktree Sale closed on July 28, 2023 [Docket No. 475].

The Debtors may seek a separate sale of their Cell Therapy business, which purchase agreement, if any, will be put on file and subject to further approval of the Bankruptcy Court.

### F. Foreign Non-Debtor Affiliates Wind-Down

The Debtors filed a motion [Docket No. 499] to wind down certain of their non-debtor affiliates based outside of the U.S. and to authorize the Debtors to take certain steps in aid of those efforts including through (i) the cancellation of intercompany indebtedness in the case of Athenex Pharmaceuticals (China) Limited, Athenex API Limited, and Comprehensive Drug Enterprises Limited, (ii) the transfer of their interest in a Hong Kong joint venture in the case of Axis Therapeutics Limited, and (iii) the sale to the Orascovery Stalking Horse Buyer of the Debtors' interests in the following subsidiaries for $25,000: Athenex Euro Limited and its wholly owned subsidiary, Athenex Belgium; Comprehensive Drug Enterprises Limited and its wholly-owned

direct and indirect subsidiaries; and Debtor Athenex, Inc.'s 10% interest in Nuwagen Limited.  The Court entered an order granting partial relief approving the Small Subsidiaries Transfer (as defined in the motion) on July 26, 2023 [Docket No. 464].

## G.  Rejection of Certain Premises Leases.

The Debtors filed a motion [Docket No. 201] to reject certain leases for closed premises – Debtors' leased premises in Cranford, New Jersey and Schaumburg, Illinois– and related relief. The Bankruptcy Court entered an order on July 7, 2023 granting the motion. [Docket No. 392]

## H.  Formation of the Committee.

On or about May 25, 2023, the U.S. Trustee formed the Committee, comprised of Ingenus Pharmaceuticals, LLC; GenScript Probio USA, Inc.; Istituto Biochimico Italiano; and Praxgen Pharmaceuticals LLC.

## I.  Retention of Professionals.

The Debtors filed applications or motions, as applicable, to employ certain professionals, including Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel in the Chapter 11 Cases (approved by Court order [Docket No. 395], Nicholas K. Campbell, MERU, LLC, as Chief Restructuring Officer [Docket No. 394], Harter Secrest & Emery LLP as special corporate counsel [Docket No. 391], Cassel Salpeter & Co. as investment banker [Docket No. 396], and to utilize ordinary course professionals [Docket No. 393].

The Committee retained as its counsel, McKool Smith PC and Porzio, Bromberg & Newman, P.C., and as its financial advisors Emerald Capital Advisors, which retention applications are pending with the Bankruptcy Court.

## J.  Debtors' Schedules and Statements of Financial Affairs.

The Debtors filed with the Court their respective Schedules and Statements of Financial Affairs, as may be amended from time to time [Docket Nos. 297 - 308].

## SECTION VI.
## CONFIRMATION AND VOTING PROCEDURES

## A.  Confirmation Hearing.

On August 1, 2023, the Court entered an order conditionally approving the Combined Plan and Disclosure Statement (the "Conditional Approval and Procedures Order") for solicitation purposes only and authorizing the Debtors to solicit the Combined Plan and Disclosure Statement. The Confirmation Hearing has been scheduled for **September 12, 2023, at 1:00 p.m. (prevailing Central Time)** to consider (a) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors, in consultation with the Prepetition Agent, without further notice, except for an announcement of

31

the adjourned date made at the Confirmation Hearing or by filing a notice with the Court.

### B.   Procedures for Objections.

Any objection to final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Plan and Disclosure Statement must be made in writing and filed with the Court by no later than **September 1, 2023, at 4:00 p.m. (prevailing Central Time)**. **Unless an objection is timely filed and served, it may not be considered by the Court at the Confirmation Hearing.**

### C.   Requirements for Confirmation.

The Court will confirm the Combined Plan and Disclosure Statement only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation in the Chapter 11 Cases is that the Combined Plan and Disclosure Statement be:  (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Combined Plan and Disclosure Statement "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible.  The Court must also find that:

(a)   the Combined Plan and Disclosure Statement has classified Claims and Interests in a permissible manner;

(b)   the Combined Plan and Disclosure Statement complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

(c)   the Combined Plan and Disclosure Statement has been proposed in good faith.

The Debtors believe that the Combined Plan and Disclosure Statement complies, or will comply, with all such requirements.

### D.   Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Combined Plan and Disclosure Statement divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class.  The Combined Plan and Disclosure Statement creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, Unsecured Claims, and Interests.  The Debtors believe that the Combined Plan and Disclosure Statement's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

32

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with such standard. If the Court finds otherwise, however, it could deny confirmation of the Combined Plan and Disclosure Statement if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined Plan and Disclosure Statement.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Combined Plan and Disclosure Statement only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Combined Plan and Disclosure Statement has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Court may find that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Combined Plan and Disclosure Statement, to make such permissible modifications to the Combined Plan and Disclosure Statement as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Plan and Disclosure Statement.

**EXCEPT AS SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual

Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Combined Plan and Disclosure Statement to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The Court must find, however, that a number of statutory tests are met before it may confirm the Combined Plan and Disclosure Statement. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Combined Plan and Disclosure Statement, or do not vote to accept the Combined Plan and Disclosure Statement, but who will be bound by the provisions of the Combined Plan and Disclosure Statement if it is confirmed by the Court.

### E. **Impaired Claims or Interests.**

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Combined Plan and Disclosure Statement and receiving a payment or Distribution under the Combined Plan and Disclosure Statement may vote to accept or reject the Combined Plan and Disclosure Statement. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims not Impaired by the Combined Plan and Disclosure Statement are deemed to accept the Combined Plan and Disclosure Statement and do not have the right to vote on the Combined Plan and Disclosure Statement. The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote. Finally, the holders of Claims or Interests whose Claims or Interests are not classified under the Combined Plan and Disclosure Statement are not entitled to vote on the Combined Plan and Disclosure Statement.

Under the Combined Plan and Disclosure Statement, Holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 3 (Other Secured Claims) are Unimpaired and, therefore, not entitled to vote on the Combined Plan and Disclosure Statement and are deemed to accept the Combined Plan and Disclosure Statement. Holders of Claims in Class 2 (Prepetition Lenders Secured Claims) and Class 4 (Unsecured Claims) are Impaired and entitled to vote on the Plan. Holders of Claims and Interests in Classes 5 (Intercompany Claims), 6 (Intercompany Interests) and 7 (Interests) will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement and, therefore, are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote.

**ACCORDINGLY, BALLOTS FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE BEING PROVIDED TO HOLDERS OF CLAIMS IN CLASSES 2 AND 4.**

### F.  Confirmation without Necessary Acceptances; Cramdown.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  Here, because holders of Interests in Class 7 are deemed to reject the Combined Plan and Disclosure Statement, the Debtors will seek confirmation of the Combined Plan and Disclosure Statement from the Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Class 7 is entitled to receive any property under the Combined Plan and Disclosure Statement.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class.  Based upon their understanding of existing case law, the Debtors do not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

a.  <u>Secured Creditors</u>.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

b.  <u>Unsecured Creditors</u>.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c.  <u>Interests</u>.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Combined Plan and Disclosure Statement satisfy the absolute priority rule, where required.

### G. **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement). Because the Combined Plan and Disclosure Statement proposes a liquidation of all of the Debtors' remaining assets, for purposes of this test, the Debtors have analyzed the ability of the Post-Effective-Date Debtors to meet their obligations under the Combined Plan and Disclosure Statement. Based on the Debtors' analysis and their existing cash on hand, the Post-Effective-Date Debtors and the Liquidating Trust will have sufficient assets to accomplish their tasks and satisfy their obligations under the Combined Plan and Disclosure Statement. Therefore, the Debtors believe that the liquidation pursuant to the Combined Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code.

### H. **Best Interests Test and Liquidation Analysis.**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to a case under chapter 7 (the "Liquidation Analysis"), which is attached hereto as **Exhibit B**. In this case, the Debtors have sold, monetized and/or otherwise disposed of most of their assets as discussed further above; the Debtors' remaining assets will be collected, liquidated or otherwise dealt with by the Debtors, the Post-Effective-Date Debtors, or the Liquidating Trustee (as applicable). Further, the $1,000,000 GUC Fund and the other Liquidating Trust Assets will be made available to general unsecured creditors pursuant to the Plan, which amounts likely would be distributed to the Prepetition Lenders and would not be available for general unsecured creditors

36

of the Debtors in a Chapter 7 proceeding. The Prepetition Lenders also have agreed, subject to the terms of the Plan, to waive their deficiency claims against the Debtors and not share in any distributions from the Liquidating Trust. Based upon the Debtors' current projections, Holders of Allowed Administrative, Priority, and Other Secured Claims will be paid in full under the Plan, while Holders of Prepetition Lenders Secured Claims and Unsecured Claims will receive less than full payments. *See* **Exhibit B** (Liquidation Analysis) attached hereto.

If the Chapter 11 Cases were converted to a Chapter 7 proceeding, first and foremost, the Estates would not have the benefit of the aforementioned Liquidating Trust Assets, including the $1,000,000 GUC Fund, to provide a recovery for general unsecured creditors under the Plan, and thus, general unsecured creditors would likely receive no recovery in a Chapter 7 proceeding. Further, the Debtors' estates would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors in the Chapter 11 Cases. The Debtors contemplate an orderly administration and winding down of the Estates by parties that are already familiar with the Debtors, their remaining assets and affairs, and their creditors and liabilities. Such familiarity will allow the Post-Effective-Date Debtors and the Liquidating Trust to complete liquidation of the remaining assets (including prosecution of the applicable Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee. Additionally, the Estates would suffer additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estates (including the prosecution of the applicable Causes of Action). Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estates.

Based upon the foregoing and **Exhibit B** (Liquidation Analysis) attached hereto, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases.

## I.  <u>Eligibility to Vote on the Combined Plan and Disclosure Statement.</u>

Unless otherwise ordered by the Court, only holders of Allowed Claims in Class 2 and Class 4 may vote on the Combined Plan and Disclosure Statement. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Plan and Disclosure Statement, you must hold an *Allowed* Claim in Class 2 or Class 4, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

## J.  <u>Solicitation Package / Release Opt-Out.</u>

All holders of Allowed Claims in Class 2 and Class 4 will receive a Solicitation Package. The Solicitation Packages will contain: (i) the Combined Plan and Disclosure Statement; (ii) the Conditional Approval Order and Procedures Order; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot, including voting instructions and a box to check for Holders of Class 4 Unsecured Claims to opt out of being a Releasing Party in connection with the Debtors' release and the third-party releases contained in Section 16(b); and (v) such other materials as the Court may direct or

approve or that the Debtors deem appropriate, in consultation with the Prepetition Agent and Committee.

All other Creditors and parties in interest not entitled to vote on the Combined Plan and Disclosure Statement will receive only a copy of the notice of Confirmation Hearing.

Copies of the Combined Plan and Disclosure Statement shall be available on the Claims and Balloting Agent's website at https://dm.epiq11.com/case/athenex/info. Any creditor or party-in-interest can request a hard copy of the Combined Plan and Disclosure Statement be sent to them by regular mail by calling the Claims and Balloting Agent at 1-888-601-3094 (toll-free) or +1 503-433-8501 (international) during regular business hours or by email at tabulation@epiqglobal.com.

### K. **Voting Procedures, Voting Deadline, and Applicable Deadlines.**

The Voting Record Date for determining which holders of Claims in Classes 2 and 4 may vote on the Combined Plan and Disclosure Statement is July 28, 2023.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Balloting Agent by either (a) mailing the Ballot to the Claims and Balloting Agent at the following address: Athenex, Inc., c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422; or (b) uploading the Ballot on the Claims and Balloting Agent's online balloting platform at https://dm.epiq11.com/case/athenex/info. Instructions for casting a Ballot will be available on the Claims and Balloting Agent's website.

Ballots must be submitted electronically, or the Claims and Balloting Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **September 1, 2023 at 4:00 p.m. (prevailing Central Time)**. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Claims and Balloting Agent receives your original paper Ballot. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Plan and Disclosure Statement.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR PROCEDURES FOR VOTING ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT BY (I) TELEPHONE AT 1-888-601-3094 (TOLL-FREE) or +1 503-433-8501 (INTERNATIONAL) OR (II) EMAIL AT tabulation@epiqglobal.com. THE CLAIMS AND**

**BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**L. Acceptance of the Combined Plan and Disclosure Statement.**

If you are a holder of a Claim in Classes 2 or 4, your acceptance of the Combined Plan and Disclosure Statement is important. In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement. At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtors urge that you vote to accept the Combined Plan and Disclosure Statement.

**SECTION VII.**
**CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES**

**A. Certain Risk Factors to be Considered.**

THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION.

**B. The Combined Plan and Disclosure Statement May Not Be Accepted.**

The Debtors can make no assurances that the requisite acceptances of the Combined Plan and Disclosure Statement will be received, and the Debtors may need to obtain acceptances of an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Combined Plan and Disclosure Statement.

**C. The Combined Plan and Disclosure Statement May Not Be Confirmed.**

Even if the Debtors receive the requisite acceptances, there is no assurance that the Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Plan and Disclosure Statement. Even if the Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory

39

requirements for confirmation had not been met. As is described in greater detail in Section 6.3, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. While, as more fully set forth Section 6, the Debtors believe that the Combined Plan and Disclosure Statement complies with or will comply with all such requirements, there can be no guarantee that the Court will agree.

Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Plan and Disclosure Statement.

### D. Distributions to Holders of Allowed Claims Under the Combined Plan and Disclosure Statement May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Combined Plan and Disclosure Statement are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### E. Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As is described in greater detail in Section 6.D, the Debtors believe that the classification of Claims and Interests under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance the Court will reach the same conclusion.

To the extent that the Court finds that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed, the Debtors would seek to (i) modify the Combined Plan and Disclosure Statement to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Combined Plan and Disclosure Statement, by changing the composition of such Class and the vote required for approval of the Combined Plan and Disclosure Statement. There can be no assurance that the Court, after finding

40

that a classification was inappropriate and requiring a reclassification, would approve the Combined Plan and Disclosure Statement based upon such reclassification. Except to the extent that modification of classification in the Combined Plan and Disclosure Statement requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Combined Plan and Disclosure Statement by any holder of Claims pursuant to this solicitation will constitute a consent to the Combined Plan and Disclosure Statement's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Combined Plan and Disclosure Statement only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Combined Plan and Disclosure Statement provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with the requirement of equal treatment. To the extent that the Court finds that the Combined Plan and Disclosure Statement does not satisfy such requirement, the Court could deny confirmation of the Combined Plan and Disclosure Statement. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined Plan and Disclosure Statement and could increase the risk that the Combined Plan and Disclosure Statement will not be consummated.

### F. Failure to Consummate the Combined Plan and Disclosure Statement.

Although the Debtors believe that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### G. The Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Section 16.B, will be granted. Failure of the Court to grant such relief may result in a plan that differs from the Combined Plan and Disclosure Statement or the Plan not being confirmed.

### H. Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the monetization of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

### I. Certain U.S. Federal Income Tax Consequences.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income

41

tax purposes) of Claims.  The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Combined Plan and Disclosure Statement.  This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies;  S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)).  Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code (generally property held for investment).  This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.  A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Plan and Disclosure Statement.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

42

### J.  Tax Consequences for U.S. Holders of Certain Claims.

Generally, a holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the holders of certain Claims, including Unsecured Claims in Class 4, will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors.

### K.  Tax Consequences in Relation to Liquidating Trust.

As of the Effective Date, the Liquidating Trust will be established for the benefit of the holders of Allowed Unsecured Claims. The tax consequences of the Plan in relation to the Liquidating Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among holders of Unsecured Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable

income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the holders of Allowed Unsecured Claims are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries thereof could materially vary from those discussed herein.

In general, each creditor who is a Beneficiary of the Liquidating Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Beneficiary in satisfaction of its Allowed Unsecured Claim, and (ii) such Beneficiary's adjusted tax basis in such Claim. The "amount realized" by a Beneficiary will equal the sum of cash and the aggregate

44

fair market value of the property received by such party pursuant to the Plan (such as a Beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust). Where gain or loss is recognized by a Beneficiary in respect of its Allowed Unsecured Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Unsecured Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a Beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any Beneficiary will be allocated first to the original principal portion of the Beneficiary's Allowed Unsecured Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Unsecured Claims followed by the transfer of such assets by such holders to the Liquidating Trust. Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The Liquidating Trust's taxable income will be allocated to the Beneficiaries in accordance with each such Beneficiary's Pro Rata share. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability

DOCS_LA:349940.16 14039/002

but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

## L. **Information Reporting and Withholding.**

In connection with the Combined Plan and Disclosure Statement, the Debtors will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Combined Plan and Disclosure Statement will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Plan and Disclosure Statement.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Plan and Disclosure Statement. Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to Distributions made pursuant to the Combined Plan and Disclosure Statement, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Plan and Disclosure Statement would be subject to these regulations and require disclosure on the holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER**

OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

## M. Releases, Exculpations, and Injunctions.

This Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

## N. Alternatives to the Combined Plan and Disclosure Statement.

If the requisite acceptances are not received or the Combined Plan and Disclosure Statement is not confirmed and consummated, the theoretical alternatives to the Combined Plan and Disclosure Statement would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases. The Debtors do not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what is provided by the Combined Plan and Disclosure Statement.

If the Combined Plan and Disclosure Statement is not confirmed, then the Debtors or any other party in interest could attempt to formulate a different plan. The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7. At this time, the Debtors do not believe that there are viable alternative plans available to the Debtors.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtors' remaining assets in accordance with the priorities established by the Bankruptcy Code. As discussed above and indicated in the Liquidation Analysis, the Debtors believe that the Combined Plan and Disclosure Statement provides a better outcome for holders of Claims than a chapter 7 liquidation would provide.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases also could be dismissed. Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtors and their assets, likely to the detriment of other creditors. While it is impossible to predict precisely what would happen in the event the Chapter 11 Cases are dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtors' assets among creditors as provided in the

Combined Plan and Disclosure Statement. Thus, the vast majority of creditors, including general unsecured creditors, could expect to receive less in the dismissal scenario than they would receive under the Combined Plan and Disclosure Statement.

## SECTION VIII.
## UNCLASSIFIED CLAIMS

### A. Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified for purposes of voting or receiving Distributions. Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the holders thereof are not entitled to vote on the Combined Plan and Disclosure Statement.

### B. Administrative Claims.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash payable by the Debtors or Post-Effective-Date Debtor(s), without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or Post-Effective-Date Debtor(s), as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtors, the Post-Effective-Date Debtor(s), the Estates, the Liquidating Trust, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

### C. Professional Fees.

Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses **no later than forty-five (45) days after the**

48

**Effective Date**.  All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.  For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

Upon approval of the fee applications by the Bankruptcy Court, the Debtors or Post-Effective-Date Debtor(s) shall pay Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date, plus reasonable fees for services rendered, and actual and necessary costs incurred, in connection with the filing, service and prosecution of any applications for allowance of Professional Fees pending on the Effective Date or filed and/or served after the Effective Date, plus post-Effective Date fees approved by the Post-Effective-Date Debtor(s).

**D.  Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Debtors or Post-Effective-Date Debtor(s) shall pay each holder of an Allowed Priority Tax Claim, from Available Cash, the full unpaid amount of such Allowed Priority Tax Claim on the earliest of the following dates:  (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Allowed Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

**SECTION IX.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

**A.  Summary of Classification.**

The provisions of this Section IX govern Claims against and Interests in the Debtors.  Any Class that is vacant will be treated in accordance with Section IX.C below.

The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Combined Plan and Disclosure Statement.  A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Prepetition Lenders Secured Claims | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | No (presumed to reject) |
| 6 | Intercompany Interests | Impaired | No (presumed to reject) |
| 7 | Interests | Impaired | No (presumed to reject) |

**B. Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Combined Plan and Disclosure Statement, nothing under the Combined Plan and Disclosure Statement shall affect the rights of the Debtors, the Post-Effective-Date Debtor(s), or the Liquidating Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**C. Vacant and Abstaining Classes.**

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined Plan and Disclosure Statement for purposes of voting to accept or reject the Combined Plan and Disclosure Statement and for purposes of determining acceptance or rejection of the Combined Plan and Disclosure Statement by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**SECTION X.**
**TREATMENT OF CLAIMS AND INTERESTS**

**A. Class 1—Priority Non-Tax Claims.**

(a) <u>Classification</u>. Class 1 consists of all Priority Non-Tax Claims.

(b) <u>Treatment</u>. The Debtors or Post-Effective-Date Debtor(s) shall pay, from Available Cash, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Debtors or Post-Effective-Date Debtor(s) shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

(c) <u>Impairment and Voting</u>. Class 1 is Unimpaired. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

DOCS_LA:349940.16 14039/002

## B. **Class 2—Prepetition Lenders Secured Claims.**

(a)      <u>Classification</u>.  Class 2 consists of the Prepetition Lenders Secured Claims.

(b)      <u>Treatment</u>.  The Holders of Class 2 Claims shall (i) receive payment of all Available Cash on the Effective Date after payment in full of Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims, and the funding of the Wind-Down budget and any reserves pursuant to the Plan and (ii) retain their Liens on the applicable Collateral (consisting of Distributable Assets, but excluding any Liquidating Trust Assets) until such Collateral is disposed of or released, and the net proceeds of such disposition, after payment of or reserve for all Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and, if applicable, Other Secured Claims, shall be paid by the Debtors or Post-Effective-Date Debtors to such Holders to the maximum extent possible in satisfaction and release of such Allowed Class 2, on or as soon as practicable after the Effective Date or as otherwise agreed between the Holders of such Claims and the Debtors or Post-Effective-Date  Debtors, subject to the terms of the Plan.  The Holders of Class 2 Claims shall not participate in recoveries from the Liquidating Trust on account of the Prepetition Lenders Deficiency Claims, which Claims will be waived by the Prepetition Lenders.  In the event there are unused funds remaining in the Wind-Down Budget upon the winding down of the Debtors or remaining in any reserves funded pursuant to the Plan following satisfaction of all claims on account of which such reserves were established, such funds shall be made available for distribution to Holders of Class 2 Claims to the extent such claims have not been paid out in full, and then as otherwise pursuant to the Plan

(c)      <u>Impairment and Voting</u>.  Class 2 is Impaired, and the Holders thereof are entitled to vote on the Plan.

## C. **Class 3—Other Secured Claims.**

(a)      <u>Classification</u>.  Class 3 consists of all Other Secured Claims.  For purposes of distributions under the Plan, each Holder of an Other Secured Claim in Class 3 is considered to be in its own separate subclass within Class 3 (*i.e.*, Class 3A, Class 3B, *etc.*), and each such subclass is deemed to be a separate Class for purposes of the Plan.

(b)      <u>Treatment</u>.  Except to the extent previously paid in full, to the extent any Other Secured Claims exist, at the option of the Debtors or Post-Effective-Date Debtor(s), one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its Collateral until such Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such Collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim (subject to any applicable intercreditor rights or obligations); (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or Post-Effective-Date Debtor(s), the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the Collateral securing the Creditor's Other Secured Claim (subject to applicable subordination and intercreditor rights and obligations) shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim.

51

(c)     _Impairment and Voting_.  Class 3 is Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### D.  Class 4—Unsecured Claims.

(a)     _Classification_.  Class 4 consists of all Unsecured Claims.  Class 4 includes the Prepetition Lenders Deficiency Claims, but such Claims have been waived by the Prepetition Lenders.

(b)     _Treatment_.  Holders of Class 4 Claims shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims, which entitle the Beneficiaries thereof to a Pro Rata share of the GUC Fund and a Pro Rata Share of any net proceeds of the remaining Liquidating Trust Assets.  Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, except as may be expressly provided otherwise, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(c)     _Impairment and Voting_.  Class 4 is Impaired, and the Holders thereof are entitled to vote on the Plan.

### E.  Class 5—Intercompany Claims.

(a)     _Classification_.  Class 5 consists of all Intercompany Claims.

(b)     _Treatment_.  In full and final satisfaction of all Allowed Intercompany Claims, on the Effective Date, such Claims shall be, at the option of the Debtors or the Reorganized Debtors, either reinstated, adjusted, converted to equity, otherwise set off, settled, distributed, or contributed, or canceled, released, or discharged without any distribution on account of such Claims.

(c)     _Impairment and Voting_.  Holders of Interests are deemed to have rejected the Plan, and are not entitled to vote.

### F.  Class 6—Intercompany Interests.

(a)     _Classification_.  Class 6 consists of all Intercompany Interests.

(b)     _Treatment_.  In full and final satisfaction of the Allowed Intercompany Interests, on the Effective Date, all Allowed Intercompany Interests shall, at the option of the Debtors or the Reorganized Debtors, either reinstated, set off, settled distributed, contributed, merged, diluted cancelled, released or otherwise addressed or eliminated and receive no distribution under the Plan.

(c)     _Impairment and Voting_.  Holders of Intercompany Interests are deemed to have rejected the Plan, and are not entitled to vote.

### G. Class 7—Interests.

(a)    Classification.  Class 7 consists of all Interests.

(b)    Treatment.  There shall be no Distribution on account of Class 7 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist.

(c)    Impairment and Voting.  Holders of Interests are deemed to have rejected the Plan, and are not entitled to vote.

### SECTION XI.
### DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS

### A. Distribution Dates.

The Post-Effective-Date Debtor(s) and the Liquidating Trustee, as applicable, shall make Distributions to Holders of Claims.  Subject to the terms of the Plan and the Liquidating Trust Agreement, the Post-Effective-Date Debtor(s) and the Liquidating Trustee, as applicable, may, in their sole discretion, make a full or partial Pro Rata Distribution to the Holders of Claims on the Initial Distribution Date or a Subsequent Distribution Date.

### B. Subsequent Distributions.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, for Distribution on any Subsequent Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any Distribution.

### C. Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date.  The Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.  In making any Distribution with respect to any Claim, the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, as of the Distribution Record Date.

53

### D. **Manner of Cash Payments Under the Plan or Liquidating Trust Agreement.**

Cash payments made pursuant to the Plan or Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, or by wire transfer from a domestic bank, at the sole option of the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable. Any and all Distributions and/or written communications pertaining to Distributions shall be made to Creditors or Beneficiaries at each Creditor or Beneficiary's respective address listed in the Claims Register unless the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, receives a written change of address form from a Creditor or Beneficiary consistent with the terms of the Plan or the Liquidating Trust Agreement, as applicable.

### E. **Time Bar to Cash Payments by Check.**

Distribution checks issued to Creditors or Beneficiaries shall be null and void if not negotiated within **ninety (90) days** after the date of issuance thereof. The Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall not reissue any check except upon directly receiving a request in writing from the Creditor or Beneficiary that was originally issued such check within **one-hundred and eighty (180) days** of the disbursement of the Distribution. If the 180-day period elapses without the Creditor requesting the check be reissued, the unresponsive holder's Distribution shall be deemed unclaimed property as provided in the Plan or the Liquidating Trust Agreement, as applicable. The foregoing notwithstanding, **ninety (90) days** after the final Distribution under section 1194 of the Bankruptcy Code, the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall stop payment on any check remaining unpaid, the corresponding Distribution shall be deemed unclaimed property, and all unclaimed property shall be redistributed in accordance with the provisions of the Plan or the Liquidating Trust Agreement.

### F. **Liquidating Trust Assets Account.**

Unless otherwise provided in the Confirmation Order, the Liquidating Trust Assets Account shall be invested by the Liquidating Trustee in a manner consistent with the objectives of Section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of discretion. The Liquidating Trustee shall have no obligation or liability to Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of any financial institution where such funds are held.

### G. **Tax Identification Numbers.**

The Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, may require any Creditor or Beneficiary to furnish its taxpayer identification number as assigned by the Internal Revenue Service by submitting a Form W-8, Form W-9, or other form completed in writing to the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, and may condition any Distribution to any Creditor or Beneficiary upon receipt of such completed form. If a Creditor or Beneficiary does not timely provide the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, with its taxpayer identification number in the manner and by the deadline established by the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable—to be not less than

**forty-five (45) days** from the service of the request to the Creditor or Beneficiary for its tax identification information—then the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, may set aside the holder's Distribution for a period of **one-hundred-and-eighty (180) days** following service of the request. If the Creditor or Beneficiary of the Distribution set aside provides the information in the manner requested in the 180-day period, the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall disburse the set aside Distribution, without interest, to the Creditor or Beneficiary. However, if the Creditor or Beneficiary fails to provide the requested information within the 180-day period, then the unresponsive Creditor's Distribution or Beneficiary's Distribution shall be irreversibly deemed "unclaimed property" and redistributed to the other Creditors or Beneficiaries in accordance with the provisions of the Plan or the Liquidating Trust Agreement, as applicable.

## SECTION XII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND REDISTRIBUTIONS

### A. No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed. Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

### B. Resolution of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to the Plan and the Liquidating Trust Agreement, the Post-Effective-Date Debtor(s), in consultation with the Liquidating Trustee, or the Liquidating Trustee with respect to General Unsecured Claims, as applicable, shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims. The costs of pursuing the objections to Claims shall be borne by the Post-Effective-Date Debtor(s) from Distributable Assets or the Liquidating Trustee from Liquidating Trust Assets, as applicable. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, elects to withdraw any such objection or the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, and the Claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

### C. Authority to Object to, Settle, and Resolve Claims.

The Liquidating Trustee shall have sole authority to object to and compromise, settle, or otherwise resolve any Unsecured Claims. Reclassifying Claims not asserted as Unsecured Claims as Unsecured Claims shall require the consent of the Liquidating Trustee or an order of the Bankruptcy Court. Likewise, the Debtors or Post-Effective-Date Debtors, as applicable, in consultation with the Liquidating Trustee, shall have sole authority to object to and compromise, settle, or otherwise resolve any Claims that are not Unsecured Claims. And reclassifying Claims

asserted as Unsecured Claims as Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and/or Other Secured Claims shall require the consent of the Debtors or Post-Effective-Date Debtors, as applicable, or an order of the Bankruptcy Court. Prior to filing any claim objection to reclassify secured, administrative, or priority claims as Unsecured Claims or compromising, settling or otherwise resolving an asserted secured, administrative, or priority claim that result in an Allowed Claim of greater than $100,000, the Post-Effective-Date Debtors shall provide prior notice to the Liquidating Trust.

### D. Objection Deadline.

All objections to Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by order of the Bankruptcy Court.

### E. Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtors, and (b) after the Effective Date, the Post-Effective-Date Debtor(s), in consultation with the Liquidating Trustee, or the Liquidating Trustee, as applicable, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Post-Effective-Date Debtor(s), or the Liquidating Trust has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors, the Post-Effective-Date Debtor(s), or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdraw, or resolved by any mechanism of the Bankruptcy Court.

### F. Disallowance of Claims.

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all proofs of claim filed after the Bar Date shall be treated as a Disputed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Effective Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed; *provided however*, that such Claims' status as disputed shall not prohibit payment of such Claims after complete payment and satisfaction of all timely Allowed Unsecured Claims and payment of Liquidating Trust expenses.

On the Confirmation Date, any Claim that is scheduled by the Debtors in the Schedules as disputed or listed at zero and as to which no Proof of Claim has been timely filed (or deemed timely filed by Final Order entered by the Bankruptcy Court) shall be deemed a Disallowed Claim.

Any Claims held by Entities from which property is recoverable under Sections 542, 543,

550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Post-Effective-Date Debtor(s) or the Liquidating Trust, as applicable, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtors hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Debtors, the Post-Effective-Date Debtor(s), or Liquidating Trust.

### G. Claims Register

At the Effective Date or as soon after as practicable, the Debtors' Claims Agent shall file a complete copy of the Claims Register into the docket of the Chapter 11 Cases. After the Effective Date, the Liquidating Trustee shall be responsible for maintaining a register of Beneficiaries' interests in the Liquidating Trust which shall be commensurate with the Holders' Allowed Unsecured Claims as reported in the Claims Register. The Liquidating Trustee shall be entitled to initially rely on the Claims Register as reported in the Claim's Agent's filing on the Effective Date for all purposes as an accurate ledger of the status, amount, and class of all Unsecured Claims. The Liquidating Trustee may engage a claims agent (including the Debtors' Claims Agent) to continue to maintain and update the Claims Register throughout the administration of the Liquidating Trust, and such claims register may serve as the Liquidating Trustee's register of beneficial interests held by Beneficiaries.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Post-Effective-Date Debtor(s), or the Liquidating Trustee, as applicable, without an objection filed and without further notice to or action, order, or approval of the Bankruptcy Court.

### H. Reserve Provisions for Disputed Claims.

Before making any Distribution, the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Post-Effective-Date Debtor(s), in consultation with the Liquidating Trustee, or the Liquidating Trustee, as applicable (the "Disputed Claim Reserve"). On each Distribution date after the Effective Date in which the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, makes Distributions to Holders of Allowed Claims, the Post-Effective-Date Debtor(s), in consultation with the Liquidating Trustee, or the Liquidating Trustee, as applicable, shall retain on account of Disputed Claims an amount the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, estimates is necessary to fund the Pro Rata Share of such Distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Post-Effective-Date Debtor(s), in consultation with the Liquidating Trustee, or the Liquidating Trustee, as applicable.

DOCS_LA:349940.16 14039/002

The Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall hold property in the Disputed Claim Reserve in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed.  Each Disputed Claim Reserve shall be closed and extinguished by the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan.  Upon closure of a Disputed Claim Reserve, all Cash or other property held in that Disputed Claim Reserve shall revest in and become unrestricted property of the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable.  All funds or other property that vest or revest in the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, pursuant to this paragraph shall be used to pay by the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, in accordance with the Plan and the Liquidating Trust Agreement.

Except as expressly set forth in the Plan, none of the Debtor, the Post-Effective-Date Debtor(s), or the Liquidating Trustee shall have any duty to fund any Disputed Claim Reserve except from the Distributable Assets or the Liquidating Trust Assets, as applicable.

## I.  *De minimis* Distributions, Rounding.

Notwithstanding anything herein to the contrary, the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall not be required to make: (i) partial Distributions or payments of fractions of dollars or (ii) a Distribution if the amount to be distributed is or has an economic value of less than one hundred dollars ($100).  Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions.

## J.  Unclaimed and Undeliverable Distributions.

If any Distribution to a Creditor or Beneficiary is returned to the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, as undeliverable or is unclaimed, no further Distributions to such Creditor or Beneficiary shall be made unless and until the Creditor or Beneficiary claims the missed Distribution by timely notifying the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, in writing of its current address along with any other information necessary to make the Distribution to the Creditor or Beneficiary in accordance with this Plan, the Liquidating Trust Agreement, and applicable law. If the Creditor or Beneficiary provides the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, with its current address and such other information necessary to make the Distribution within **one-hundred and eighty (180) days** of the original disbursement, the missed Distribution shall be made to the Creditor or Beneficiary as soon as is practicable, without interest. However, if any Distribution that is undeliverable or otherwise unclaimed is not claimed within **one-hundred-and-eighty (180) days** of the original disbursement, such Distribution shall be deemed "unclaimed property" under Bankruptcy Code section 347(b) and forfeited, and the forfeiter shall consequentially lose his status as a Creditor or Beneficiary of the Post-Effective-Date Debtor(s) or the Liquidating Trust, as applicable. After the 180-day period to claim property has elapsed, the unclaimed property or interests in property shall revert to the Post-Effective-Date Debtor(s) or the Liquidating Trust, as applicable, for redistribution to Creditors or Beneficiaries or other disposition in accordance with the terms of the Plan and the Liquidating Trust Agreement; the Claim to such unclaimed property or interest in property shall be forever barred, expunged, and deemed

Disallowed; and the holder of said claim deemed Disallowed shall be enjoined from receiving any Distributions under this Agreement and from asserting such Disallowed Claim against the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable.

The Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, may, in their sole discretion, attempt to determine a Creditor's or Beneficiary's current address or otherwise locate a Creditor or Beneficiary, but nothing in this Plan or the Liquidating Trustee Agreement shall require the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, to do so.

### K. <u>Books and Records and Vesting of Privileges.</u>

The Debtors shall transfer complete electronic copies of their books and records relating to the Liquidating Trust Assets, subject to appropriate restrictions on privileged matters, regardless of original form, manner or media, to the Liquidating Trustee on the Effective Date, in a form accessible and viewable by the Liquidating Trustee. The Debtors shall provide any and all digital account information, including passwords, necessary for the Liquidating Trustee to access the Debtors' books and records relating to the Liquidating Trust Assets on the Effective Date.

For the avoidance of doubt, as provided in Section 14.D, on the Effective Date, the attorney-client privilege, the attorney work product doctrine and any similar privilege against disclosure, and all other similar immunities (all together, "Privileges") belonging to the Debtors or the Estates that concern or in any way relate to any of the Liquidating Trust Assets, or that would apply to communications, documents, or records recorded in magnetic, optical, or other form of electronic medium concerning or in any way relating to any Liquidating Trust Assets, shall vest in the Liquidating Trust. The Liquidating Trustee shall have the sole right to waive Privileges that concern or in any way relate to any of the Liquidating Trust Assets or that would apply to communications, documents, or electronic records concerning or in any way relating to any Liquidating Trust Assets. Further, for the avoidance of doubt, the Post-Effective-Date Debtor(s)' right to assert or waive Privileges with regard to the Distributable Assets shall be as provided in Section 14.C.

### SECTION XIII.
### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

### A. <u>Rejection.</u>

Except with respect to: (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, and (ii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject, pursuant to Section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided however,* that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, managers and directors, the Post-Effective-Date Debtor(s), and/or the Liquidating Trust. Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or

is properly characterized as a lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and none of the Debtor, the Post-Effective-Date Debtor(s), or the Liquidating Trust shall bear any liability for costs associated with such matters.

### B. Rejection Claims.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Unsecured Claims.

### C. Insurance Policies.

Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Insurance Policies. To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtors hold or may hold against any Entity, the Debtors shall, to the extent permissible under each Insurance Policy, assign all rights thereunder with respect to such Causes of Action to the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable. All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, shall be treated as proceeds of such Causes of Action for all purposes under the Plan. The Debtors shall take no action to or otherwise impair the Insurance Policies. Nothing herein shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtors or any other Entity.

### SECTION XIV.
### MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Global Settlement of Claims.

Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

### B. Continued Existence and Vesting of Distributable Assets
### in Post-Effective-Date Debtors.

On and after the Effective Date, subject to the requirements of the Plan, the Debtors will continue to exist as the Post-Effective-Date Debtors and shall retain all of the powers of the applicable corporate entities under applicable non-bankruptcy law, and without prejudice to any

right to amend their respective organizational documents, dissolve, merge or convert into another form of business entity, or to alter or terminate their existence, in consultation with the Liquidating Trustee. On the Effective Date, the employment, retention, appointment and authority of all managers, officers, directors, and employees of the Debtors shall be deemed rejected and terminated. The Post-Effective-Date Debtor Representative shall be deemed to have been admitted as the sole director, officer or manager (as applicable) of the Post-Effective-Date Debtors under applicable non-bankruptcy law and shall be authorized to exercise all of the rights and powers of a sole director, officer or manager (as applicable) as provided by the Plan.

The Operating Agreements of Athenex Pharma Solutions, LLC, Athenex Pharmaceutical Division, LLC, and Athenex R&D LLC shall be revised, upon request of the Liquidating Trustee, to: (i) permit an assignment or conveyance of the respective limited liability interests in the LLCs to the Liquidating Trust or such other action as necessary solely to convey standing to the Liquidating Trust to pursue the Trust-Retained Actions, and/or (ii) allow Athenex Pharma Solutions, LLC, Athenex Pharmaceutical Division, LLC, and/or Athenex R&D LLC, at the direction and sole cost of the Liquidating Trust, to pursue the Trust-Retained Actions.

On and after the Effective Date, all Distributable Assets and property of the Debtors and the Estates shall vest in the Post-Effective-Date Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as expressly provided otherwise in the Plan. Neither the occurrence of the Effective Date, nor the effectiveness of this Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of the Debtors or Post-Effective-Date Debtors, which shall continue under the control of the Post-Effective-Date Debtor Representative following the Effective Date subject to the terms of the Plan.

### C. <u>Corporate Action by Debtors.</u>

On the Effective Date, the matters under the Plan involving or requiring any corporate actions of the Debtors, including but not limited to actions requiring a vote or other approval of the board of directors, managers, members, partners, or other equity holders of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the managers, members, directors, or officers of the Debtors.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) the Post-Effective-Date Debtor Representative shall be deemed the sole manager, director, officer and representative (as applicable) of the Debtors to exercise the rights, powers, and authority of the Debtors under applicable provisions of this Plan and bankruptcy and non-bankruptcy law, and (ii) all matters provided under this Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall act as an order modifying the Debtors' organizational documents and operating agreements such that the provisions of this Plan can be effectuated. All corporate governance activities of the Post-Effective-Date Debtors shall be exercised by the Post-Effective-Date Debtor Representative in his or her discretion, subject to the terms of this Plan.

DOCS_LA:349940.16 14039/002

On and after the Effective Date, the Post-Effective-Date Debtor Representative may, in the name of the Debtors or Post-Effective-Date Debtors, take any and all appropriate actions consistent with the Plan without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Post-Effective-Date Debtor Representative may pay all reasonable fees, costs, and expenses of the Post-Effective-Date Debtors without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court up to the amounts set forth in the Wind-Down Budget. All fees and expenses incurred by the professionals retained by the Post-Effective-Date Debtors following the Effective Date shall be paid by the Post-Effective-Date Debtor Representative from the Distributable Assets up to the amounts set forth in the Wind-Down Budget. In the event that the Post-Effective-Date Debtor Representative resigns or is unable to fulfill his or her duties under the Plan, a replacement will be appointed by the Bankruptcy Court upon motion by any party in interest.

Without limiting the foregoing, the Post-Effective-Date Debtor Representative will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan; (2) liquidate the Distributable Assets, in consultation with the Liquidating Trustee; (3) make all Distributions to Creditors, other than Beneficiaries of the Liquidating Trust, in accordance with the Plan; (4) administer the Post-Effective-Date Debtors in accordance with the Plan; (5) establish and administer any necessary reserves for Disputed Claims (other than Unsecured Claims) that may be required, in consultation with the Liquidating Trustee; (6) object to the Disputed Claims (other than Unsecured Claims) and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections, in consultation with the Liquidating Trustee; (7) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to the Distributable Assets; and (8) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtors or the Committee up to the amounts set forth in the Wind-Down Budget.

From and after the Effective Date, (i) the Debtors, for all purposes, shall be deemed to have withdrawn their business operations from any states in which they were previously conducting or are registered or licensed to conduct business operations, and the Debtors shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtors shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

In the event that there are unused funds remaining in the Wind-Down Budget upon the wind-down of the Debtors, such funds shall be made available for distribution pursuant to the Plan. Once all Distributable Assets have been distributed or otherwise disposed of, and the Liquidating Trustee has received five (5) days' notice of same, the Post-Effective-Date Debtors shall be automatically deemed dissolved without any further action.

### D. Limited Substantive Consolidation.

Under the Plan, there shall be limited substantive consolidation of the Debtors' Estates solely for the purposes of voting on the Plan by the Holders of Claims and making Distributions to Holders of Claims. Specifically, on the Effective Date, (i) all assets and liabilities of the Debtors

62

will, solely for voting and Distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims filed or to be filed in the Chapter 11 Cases will be deemed single Claims against all of the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims entitled to Distributions under the Plan shall be entitled to their share of assets available for Distribution to such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Disclosure Statement and Plan) affect the legal and corporate structures of the Debtors.

The Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases for distribution and voting purposes as provided above. Unless an objection to substantive consolidation is made in writing by any Creditor or Interest holder affected by the Plan on or before the applicable objection deadline set by the Court, an order substantively consolidating the Chapter 11 Cases for distribution and voting purposes (which order may be the Confirmation Order) may be entered by the Bankruptcy Court.

Notwithstanding the substantive consolidation herein, substantive consolidation shall not affect the obligation of each and every one of the Debtors under 28 U.S.C. § 1930(a)(6) until a particular case is closed, converted, or dismissed.

### E.  Appointment of the Liquidating Trustee.

The identity of the Liquidating Trustee, who shall be selected by the Committee, will be disclosed in the Plan Supplement. From and after the Effective Date, professionals may be retained by the Liquidating Trustee as set forth in the Liquidating Trust Agreement, without further need for documentation or Bankruptcy Court approval. All fees and expenses incurred by the professionals retained by the Liquidating Trustee following the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Assets in accordance with the Liquidating Trust Agreement.

### F.  The Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (a) administering the Liquidating Trust Assets, (b) prosecuting and/or resolving all Disputed Unsecured Claims, (c) investigating and pursuing any Causes of Action that constitute Liquidating Trust Assets, and (d) making all Distributions to the Beneficiaries provided for under the Plan. The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, and make timely Distributions to the Beneficiaries, and not unduly prolong the

duration of the Liquidating Trust.  Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust.  The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief.  The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Unsecured Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust.  The Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets.  For the avoidance of doubt, after they vest in the Liquidating Trust, the Debtors shall have no interest in or control over the Liquidating Trust Assets or any distributions therefrom to Beneficiaries.

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the Beneficiaries) for all federal income tax purposes.

## G. **Rights and Powers of the Liquidating Trustee.**

The Liquidating Trustee shall be deemed the Estates' representative with respect to the Liquidating Trust Assets in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Liquidating Trust.  Without limiting the foregoing, the Liquidating Trustee will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtors hold or may hold against any Entity that constitute Liquidating Trust Assets; (4) make all Distributions to Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement; (5) administer the Liquidating Trust and pursue Causes of Action that constitute Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement; (6) establish and administer any necessary reserves for Disputed Unsecured Claims that may be required; (7) object to Disputed Unsecured Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (8) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to the Liquidating

64

Trust Assets; and (9) employ and compensate professionals and other agents, including, without limitation, Professionals previously employed by the Debtors or the Committee, in accordance with the Liquidating Trust Agreement or the Plan, *provided however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

Any abatement, interruption, or tolling of the statutes of limitation pertaining to the Liquidating Trust Assets in favor of the Debtors or the Estates shall also apply to the benefit of the Liquidating Trustee; for the avoidance of doubt, the Liquidating Trustee shall be construed to be a "trustee" for purposes of 11 U.S.C. § 108.

### H.  **Fees and Expenses of the Liquidating Trust.**

Subject to payment in full of all Allowed Administrative Claims, and except as otherwise ordered by the Bankruptcy Court, Liquidating Trust Expenses incurred on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

### I.  **Transfer of Beneficial Interests in the Liquidating Trust.**

Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Interests occurring after the Distribution Record Date.

### J.  **Available Cash; Provision of the Liquidating Trust Expenses.**

Available Cash shall be used by the Debtors and Post-Effective-Date Debtor(s) to fund distributions to Creditors (including holders of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims), the GUC Fund, and other payments to be made pursuant to or otherwise consistent with the Plan.  The GUC Fund may be used by the Liquidating Trustee to pay for the expenses of the Liquidating Trust in accordance with the Liquidating Trust Agreement.  In the event that the Post-Effective-Date Debtors have residual Distributable Assets on hand after satisfaction of all obligations and distributions under the Plan, including the payment of all Allowed Secured (including Prepetition Lenders Secured Claims), Administrative, Priority Claims, and winding down of the Debtors, such Distributable Assets, including any net equity value of the Debtors' non-debtor affiliates, shall be contributed to the Liquidating Trust and become GUC Trust Assets (the "Residual Estate Assets").

On or as soon as practicable following the Effective Date, the Liquidating Trust Assets Account shall be opened by the Liquidating Trustee and funded with the GUC Fund, which money shall constitute a Liquidating Trust Asset.  Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery relating to the Liquidating Trust Assets, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and they shall become part of the Liquidating Trust Assets for funding distributions to Creditors.

DOCS_LA:349940.16 14039/002

### K. **Litigation.**

Except as otherwise provided herein and except as to Causes of Action assigned to third parties prior to the Effective Date, all Litigation is retained, vested in the Post-Effective Date Debtors or the Liquidating Trust, as applicable pursuant to the Plan, and preserved pursuant to Section 1123(b) of the Bankruptcy Code. From and after the Effective Date, all Litigation will be prosecuted or settled by the Post-Effective Date Debtors, in consultation with the Liquidating Trustee, or the Liquidating Trustee, as applicable, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as applicable. To the extent any Litigation is already pending on the Effective Date and is a Trust-Retained Action, the Liquidating Trustee, as successor to the Debtors or the Committee (in any derivative capacity or as an intervening party), will continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtors or the Committee pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter.

### L. **Dissolution of the Committee.**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date. Nothing in the Plan shall prohibit or limit the ability of the Debtors' or Committee's Professionals to represent the Post-Effective-Date Debtor(s) or the Liquidating Trustee, as applicable, or to be compensated or reimbursed per the Plan and the Liquidating Trust Agreement in connection with such representation.

### M. **Termination After Five Years and Extension.**

If on the fifth anniversary of the Effective Date the Liquidating Trust has not been previously terminated in accordance with the terms of the Liquidating Trust Agreement because all Liquidating Trust expenses have not been paid and/or all Liquidating Trust Assets have not been distributed, then the Liquidating Trustee shall immediately distribute all Liquidating Trust Assets to the Beneficiaries in accordance with this Plan; immediately thereafter, the Liquidating Trust shall terminate and the Liquidating Trustee shall have no further responsibility in connection therewith except as otherwise set forth in the Liquidating Trust Agreement.

Notwithstanding the foregoing, within 120 days of the expiration of the five-year period, the Liquidating Trustee may file a motion with the Bankruptcy Court requesting an extension of the term of the Liquidating Trust. An extension shall only be granted if the Bankruptcy Court determines that: (i) an extension is necessary to facilitate or complete the recovery on Liquidating Trust Assets and (ii) further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes. For purposes of this Section, a favorable letter ruling from the Internal Revenue Service shall be conclusive proof that further

DOCS_LA:349940.16 14039/002

extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes.

## SECTION XV.
## EFFECT OF CONFIRMATION

### A. Binding Effect of the Plan.

The provisions of the confirmed Plan shall bind the Debtors, the Post-Effective-Date Debtor(s), the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code Section 1146(a).

### B. Vesting of Liquidating Trust Assets in the Liquidating Trust.

Upon the Effective Date, title to all Liquidating Trust Assets shall vest in the Liquidating Trust and shall be retained by the Liquidating Trust for the purposes contemplated under the Plan pursuant to the Liquidating Trust Agreement. Without limiting the generality of the foregoing, all Causes of Action the Debtors hold or may hold against any Entity that constitute Liquidating Trust Assets, Litigation Recoveries that constitute Liquidating Trust Assets, rights to Liquidation Proceeds that constitute Liquidating Trust Assets, and all resulting proceeds of the foregoing shall vest in the Liquidating Trust upon the Effective Date and shall no longer constitute property of the Estates.

### C. Property Free and Clear.

Except as otherwise provided in the Plan or the Confirmation Order, all property that shall vest in the Post-Effective-Date Debtor(s) and the Liquidating Trust, as applicable, shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances of Creditors or Interest Holders, other than as set forth herein, in the Plan or the Liquidating Trust Agreement, and in relevant documents, agreements, and instruments contained in the Plan Supplement. Following the Effective Date, the Post-Effective-Date Debtor(s), in consultation with the Liquidating Trustee, and the Liquidating Trustee, as applicable, may transfer and dispose of any such property, including, without limitation, the Cell Therapy assets, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

67

# SECTION XVI.
## EXCULPATIONS, INJUNCTIONS, AND RELEASES

### A. Exculpation.

The Debtors, the Committee, the members of the Committee, and each solely in their capacities as such (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided however,* that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.

### B. Releases.

    1. Debtor Related Releases.

        a) Debtor/Estate Release of Released Parties.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors, the Post-Effective-Date Debtor(s), and the Estates (collectively, the "Debtor/Estate Releasors") shall release (the "Debtor/Estate Release") each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the Orascovery Sale, the Sagent Sale, the Oaktree Sale, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or**

other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence; *provided however*, the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtors. Notwithstanding anything to the contrary herein, the Debtor/Estate Release does not release the Trust-Retained Actions, which includes the Specified D&O Causes of Action. The Specified D&O Causes of Action shall be limited to the recoveries from the proceeds of any applicable Insurance Policies. The Liquidating Trust shall not be permitted under any circumstances to collect any recovery from the personal assets of the applicable directors and officers.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.

     b)  Third Party Release.

On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, each Released Party and each Claimant (collectively, the "Releasing Parties") who (i) is not Impaired under the Plan or (ii) is entitled to vote on the Plan and, in either case of the foregoing items (i) and (ii), who does not elect to "opt-out" of this release by marking the appropriate box on such Releasing Party's respective Ballot or opt-out form, for themselves and their respective Related Persons (in each case in their capacity as such), shall release (the "Third Party Release") each Released Party, and each of the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Orascovery Sale, the Sagent Sale, the Oaktree Sale, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective

Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence; *provided however*, the foregoing Third Party Release shall not release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.

### C. Injunction.

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Post-Effective-Date Debtor(s), the Liquidating Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Post-Effective-Date Debtor(s), the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the Post-Effective-Date Debtor(s), the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Post-Effective-Date Debtor(s), the Estates, or the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors, the Post-Effective-Date Debtor(s), or the Liquidating Trust under the Plan.

### D. Post-Confirmation Liability of Post-Effective-Date Debtor Representative and Liquidating Trustee.

The Post-Effective-Date Debtor Representative and Liquidating Trustee, together with their respective consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent, fraudulent, or which constitute willful misconduct (in each case, liability shall be subject to determination by final order of a court of competent jurisdiction). However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, fraud, or willful misconduct. In addition, the Post-Effective-Date Debtors, the Liquidating Trust, and the Estates

70

shall, as applicable and to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Post-Effective-Date Debtors, the Liquidating Trust, and the Estates or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Post-Effective-Date Debtors, the Liquidating Trust, and the Estates. To the extent the Liquidating Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses. All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

### E.  **Preservation of Rights of Action.**

Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Trust-Retained Action that the Debtors hold or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust, while all Estate-Retained Actions shall vest in the Post-Effective-Date Debtors.

Except as otherwise provided in the Confirmation Order, after the Effective Date, the Post-Effective-Date Debtors, in consultation with the Liquidating Trustee, and the Liquidating Trustee, as applicable, shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Estates hold or may hold against any Entity, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as applicable, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.

Liquidating Trust Assets and recoveries therefrom shall remain the sole property of the Liquidating Trust for the ratable benefit of the Beneficiaries of the Liquidating Trust, and holders of Unsecured Claims shall have no direct right or interest in to any such Liquidating Trust Assets or recovery therefrom.

The court-appointed lead plaintiff in *In re Athenex, Inc. Securities Litigation*, Case No. 21-cv-337 (W.D.N.Y.) maintains that the claims asserted in said action are not Specified D&O Causes of Action that are property of the Debtors and/or their Estates.

### F.  **Preservation of All Causes of Action Not Expressly Settled or Released.**

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or or any Final Order (including the Confirmation Order), the Debtors, the Post-Effective-Date Debtors, and the Liquidating Trustee expressly reserve such retained Cause of Action for later adjudication by the Post-Effective-Date Debtors and the Liquidating Trustee, as applicable (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtors may be

71

Case 1-23-90056-FC Document 636 Filed 02/05/2023 Page 174 of 191

presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, Collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Debtors, the Post-Effective-Date Debtors, and the Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtors are defendants or interested parties against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtors or a transfer of money or property of the Debtors, or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Post-Effective-Date Debtors and the Liquidating Trustee, as applicable, subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtors have identified any potential claim or Cause of Action against such Entity herein or in the Disclosure Statement.

### G. No Discharge.

Nothing contained in the Combined Plan and Disclosure Statement shall be deemed to constitute a discharge of the Debtors under Bankruptcy Code section 1141(d)(3).

## SECTION XVII.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

### A. Conditions to Confirmation of the Plan.

Confirmation of the Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, in consultation with the Prepetition Agent: (i) the Bankruptcy Court shall have approved this Combined Disclosure Statement and Plan in form and substance reasonably acceptable to the Prepetition Agent and the Committee as it pertains to the Committee Settlement; (ii) the Debtors shall have determined, in consultation with the Committee, that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan)

DOCS_LA:349940.16 14039/002

Allowed Administrative Claims, Non-Tax Priority Claims, Priority Tax Claims, and GUC Fund in full (or in such lesser amount as may be agreed to by the applicable Claimant); and (iii) the Confirmation Order to be presented to the Bankruptcy Court at the Confirmation Hearing shall be reasonably acceptable to the Prepetition Agent and the Committee as it pertains to the Committee Settlement.

### B. Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, in consultation with the Prepetition Agent: (i) a Confirmation Order in form and substance reasonably acceptable to the Debtors, the Prepetition Agent, and the Committee as it pertains to the Committee Settlement shall have been entered by the Bankruptcy Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the Liquidating Trust shall have been created pursuant to the terms of the Plan, the Liquidating Trustee shall have been appointed by order of the Bankruptcy Court (which may be the Confirmation Order), and the Liquidating Trust Agreement shall have been executed by the Liquidating Trustee; (iii) the GUC Fund shall have been fully funded and released to the Liquidating Trustee upon the Effective Date; (iv) all reasonable and documented professional fees and expenses of Prepetition Agent Professionals shall have been paid in full; and (v) all other actions and documents determined by the Debtors to be necessary to implement the Plan shall have been effected and executed.

### C. Waiver of Conditions Precedent.

To the fullest extent permitted by law, the conditions to the Effective Date set forth in Section 17.B may be waived or modified in whole or in part at any time in writing by the Debtors, after consulting with the Prepetition Agent and Committee without leave from or an order of the Court.

### SECTION XVIII.
### RETENTION OF JURISDICTION

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

(a)     To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, or any controversy as to the classification of a Claim in a particular Class under the Plan;

(b)     To administer the Plan, the Post-Effective-Date Debtor(s), the Liquidating Trust, the Liquidating Trust Assets and the proceeds thereof;

(c)     To estimate or liquidate any Disputed Claims;

(d)     To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in

73

connection with the Litigation; *provided however*, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

(e)     To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

(f)     To hear and determine any and all applications by Professionals for an award of on account of any Professional Fee Claims;

(g)     To enable the Liquidating Trustee, as applicable, to commence and prosecute any Litigation which may be brought after the Effective Date;

(h)     To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document, or instrument contemplated by the Plan;

(i)     To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

(j)     To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(k)     To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(l)     To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding pursuant or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable; and

(m)     To close the Chapter 11 Cases when the administration of the Chapter 11 Cases has been completed.

## SECTION XIX.
## MISCELLANEOUS PROVISIONS

### A.  Payment of Statutory Fees / Closing of Chapter 11 Cases.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or as soon as practicable thereafter, by the Debtors or Post-Effective-Date Debtor(s).  Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law and the Post-Effective-Date Debtor(s) shall continue to file reports to show the calculation of such fees based on distributions made by the Post-Effective-Date Debtor(s) until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code or the Post-Effective-Date Debtor(s) are deemed dissolved pursuant to the terms hereof.

74

As of the Effective Date, all of the Debtors cases other than Athenex, Inc. (the "Lead Case") shall be automatically deemed closed.

The Post-Effective Date Debtors may seek to close the Lead Case upon thirty (30) days' notice to the Liquidating Trustee. If the Liquidating Trust has not yet been dissolved by that time, the Liquidating Trustee at its option, may seek to keep the Lead Case open for a longer period of time so long as the Liquidating Trust agrees to pay any Post-Effective Date quarterly U.S. Trustee fees that may have otherwise been incurred by the Post-Effective-Date Debtors.

**B. Revocation of the Combined Plan and Disclosure Statement.**

The Debtors reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement at any time on or before the Confirmation Date, in consultation with the Prepetition Agent and the Committee. If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

**C. Severability of Plan Provisions.**

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**D. Exhibits.**

All exhibits attached to the Combined Plan and Disclosure Statement and the Plan Supplement are, by this reference, hereby incorporated herein. The Debtors reserve the right to make non-substantive changes and corrections to such Exhibits in advance of the Confirmation Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

**E. Notices.**

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

Counsel for Debtors:

Pachulski Stang Ziehl & Jones LLP
Michael D. Warner, Esq.
Maxim B. Litvak, Esq.
Benjamin L. Wallen, Esq.
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
mwarner@pszjlaw.com; mlitvak@pszjlaw.com; bwallen@pszjlaw.com

Richard M. Pachulski, Esq.
Debra I. Grassgreen, Esq.
Shirley S. Cho, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
rpachulski@pszjlaw.com; dgrassgreen@pszjlaw.com; scho@pszjlaw.com

## F.  Reservation of Rights.

Neither the filing of the Combined Plan and Disclosure Statement nor any statement or provision contained in the Combined Plan and Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Combined Plan and Disclosure Statement nor any statement contained in the Combined Plan and Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

## G.  Defects, Omissions and Amendments.

The Debtors may, in consultation with the Prepetition Agent and the Committee, and with the approval of the Bankruptcy Court and without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan.  The Plan may be altered or amended before or after Confirmation as provided in Section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, and in consultation with the Prepetition Agent and the Committee, so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with Section 1125 of the Bankruptcy Code.  The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation, in

consultation with the Prepetition Agent and the Committee, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the Plan, as modified, complies with Bankruptcy Code Sections 1122 and 1123, the Debtors have complied with Bankruptcy Code Section 1125 and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under Bankruptcy Code Section 1129.

**H.  Filing of Additional Documents.**

The Debtors shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**I.  Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

**J.  Setoffs and Recoupments.**

The Post-Effective-Date Debtor(s) or the Liquidating Trust may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtors, the Post-Effective-Date Debtor(s), the Liquidating Trust, or the Estates, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Post-Effective-Date Debtor(s), the Liquidating Trust, or the Estates, against such Holder.

**K.  Tax Exemption.**

Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an  instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Post-Effective-Date Debtor(s) and the Liquidating Trustee, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Post-Effective-Date Debtor(s) or the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**L.  Securities Exemption.**

To the extent the Liquidating Trust Interests are deemed or asserted to constitute securities, the Liquidating Trust Interests and the issuance and distribution thereof shall be exempt from Section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws

77

requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, Section 1145 of the Bankruptcy Code.

### M. Implementation.

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

### N. Record Date.

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be the voting record date established by the Bankruptcy Court in the order conditionally approving the Disclosure Statement or such other date as the Bankruptcy Court may set.

### O. Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of directors, members, managers or other Interest Holders of the Debtor under the Plan, including, without limitation, (i) the Distribution of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without any requirement of further action by the directors, members, managers or other Interest Holders of the Debtors, irrespective of whether the Confirmation Order specifically authorizes any such action.

Effective upon the Effective Date, the Debtors' formation documents shall be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under Section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Post-Effective-Date Debtor(s) shall be authorized to cancel, annul, and extinguish all Interests.

### P. Substantial Consummation.

On the Effective Date, the Plan shall be deemed substantially consummated under Bankruptcy Code Sections 1101 and 1127(b).

### Q. Waiver of Fourteen-Day Stay.

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

78

## R.  **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

## S.  **Entire Agreement.**

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**SECTION XX.**
**RECOMMENDATION**

The Debtors strongly recommend that all creditors receiving a Ballot vote in favor of the Plan.  The Debtors believe that the Plan is in the best interests of creditors.  The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

**FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.  THE DEBTORS, WITH THE SUPPORT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. CENTRAL TIME ON SEPTEMBER 1, 2023.**

Dated: August 1, 2023

Respectfully submitted,

ATHENEX, INC. AND ITS DEBTOR AFFILIATES

*/s/ Nicholas K. Campbell*
Nicholas K. Campbell
Chief Restructuring Officer

79

**EXHIBIT A**

**Corporate Chart**



Case 23-90605 Document 635 Filed in TXSB on 06/08/23 Page 125 of 131

# **EXHIBIT B**

## **Liquidation Analysis**

# LIQUIDATION ANALYSIS

### A.    Introduction

The Debtors, together with their advisors, have prepared this hypothetical Liquidation Analysis in connection with the *Combined Disclosure Statement and Plan of Liquidation of Athenex, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time and including all exhibits and supplements thereto, the "Plan" or "Disclosure Statement" or "Plan and Disclosure Statement," as applicable) for purposes of evaluating whether the Plan meets the often-called "best interests test" under Bankruptcy Code section 1129(a)(7). That section requires that a debtor's plan provide each holder of a claim or interest who does not vote in favor of the plan with property of a value, as of the effective date of the plan, that is at least as much as the value the holder would receive in a hypothetical case under chapter 7 of the Bankruptcy Code. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and Disclosure Statement.

### B.    Limitations and Key Assumptions

**THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THE PLAN AND DISCLOSURE STATEMENT AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.**

The Debtors prepared the illustrative Liquidation Analysis with the assistance of their financial advisor, MERU. The Liquidation Analysis contains numerous estimates, including estimated Allowed Claims based upon a review of the Debtors' financial statements and filed claims to account for estimated liabilities as necessary. The Liquidation Analysis does not contemplate a sale of the Debtors' businesses on a going concern basis. The Liquidation Analysis includes estimates for Claims as part of the Chapter 11 Cases which could be asserted and allowed in a chapter 7 liquidation, including unpaid Administrative Claims from the Chapter 11 Cases and chapter 7 administrative claims such as chapter 7 trustee fees. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and interests under the Plan. The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a chapter 11 plan absent a liquidation, certain of which may not be included herein. Examples of these kinds of claims include various potential rejection damages claims arising from the rejection of executory contracts or leases, unpaid Administrative Claims from the Chapter 11 Cases, and other contingent and unknown claims. Some of these claims could be significant and may be entitled to priority in payment over General Unsecured Claims. **THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management team and their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management team. Accordingly, there can be no guarantees that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future, at which time circumstances

may exist which cannot presently be predicted. The Liquidation Analysis should be read in conjunction with the Plan and Disclosure Statement in its entirety, as well as the notes and assumptions set forth below.

The Debtors recognize that there are other potential alternatives that could occur in a hypothetical chapter 7 liquidation not presented in the Liquidation Analysis, including alternatives that would give rise to reduced and delayed creditor recoveries.

**THE DEBTORS RESERVE THEIR RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.**

### A.    Basis of Presentation

The Liquidation Analysis represents an estimated recovery for all creditors of the Debtors based upon a hypothetical liquidation of the Debtors, as if a chapter 7 trustee ("Trustee") was appointed by the Bankruptcy Court presiding over the Debtors' Chapter 11 Cases to convert assets into cash for distribution to creditors. The analysis assumes an orderly liquidation of substantially all the Debtors' operations (including majority owned non-Debtor affiliates) beginning September 22, 2022 (the "Conversion Date"). The Liquidation Analysis is premised on the assumption that the Debtors enter chapter 7 on the Conversion Date and that the Trustee continues to implement the same wind-down plan that the Debtors initiated during the Chapter 11 Cases. Further, the Debtors assume that the Committee settlement under the Plan whereby Allowed General Unsecured Claims will receive a distribution from Litigation Trust Assets will be unavailable in a chapter 7 case. In a chapter 11 scenario, the Committee settlement is ascribed a value of $1.0 million, but the gross value of the Committee settlement may be even higher given that the Liquidating Trust Assets are comprised of not only cash of $1.0 million, but interests in other assets that constitute the Liquidating Trust Assets, which value is not yet known.

The Debtors assume a liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code, with a Trustee appointed to manage the bankruptcy estates. The Trustee would be responsible for liquidating the Debtors' assets in a manner intended to maximize the recovery to creditors. Asset sale proceeds resulting from the liquidation process would be reduced by the expenses of the liquidation process prior to distributing such proceeds to any holders of allowed claims. The three major components of the process are as follows:

- Generation of cash proceeds from the sale of assets;
- Costs and post-conversion operational cash flow related to the liquidation process, such as personnel retention costs, estate wind down costs, severance costs, and Trustee and professional fees; and
- Distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

If litigation becomes necessary to resolve claims asserted in a chapter 7, distributions to creditors may be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the liquidation proceeds available to creditors. The effects of this potential delay on the value of distributions under the Liquidation Analysis have not been considered in this analysis.

Except as otherwise noted herein, the Liquidation Analysis is based on the projected balance sheets of the Debtors as of the Conversion Date. Several asset values were adjusted on a pro forma basis to the Conversion Date. For certain other assets, historical balance sheet amounts, unless otherwise noted herein, are intended to be a proxy for actual balances on the Conversion Date.

## B.   Notes to Liquidation Analysis

    i.   <u>Dependence on Assumptions</u>.  The Liquidation Analysis is based on several estimates and assumptions that are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such liquidation and actual results could vary materially and adversely from those contained herein.

    ii.   <u>Additional Claims in a Liquidation</u>. The liquidation itself may trigger certain obligations and priority payments that otherwise would not be due in the ordinary course of business or would otherwise not exist under a chapter 11 plan. These priority payments must be paid in full before any distribution of proceeds to Holders of General Unsecured Claims or Existing Equity Interests. The liquidation would likely prompt certain other events to occur, including the immediate rejection of executory contracts and unexpired leases, defaults under agreements with vendors and customers, the exercise of set-off rights by creditors, and acceleration of severance obligations. Such events, if triggered, would subject the Debtors' chapter 7 estates to additional claims.  While these claims are estimated in this Liquidation Analysis, such amounts are highly uncertain and subject to material change.

    iii.   <u>Litigation Claims</u>. The Liquidation Analysis does not attribute any value to potential litigation claims that may belong to the Debtors' estates, including any claims to recover potentially avoidable preferential and/or fraudulent transfers.

    iv.   <u>Chapter 7 Liquidation Costs</u>. It is assumed that a period of three to four months would be required to complete the liquidation of the Debtors' estates.  The fees and operating expenses incurred during the chapter 7 process are included in the estimate of chapter 7 Administrative Claims and Trustee Expenses. In addition, there are liquidation costs associated with most of the Debtors' assets.  Costs of liquidation are displayed as a reduction to gross liquidation proceeds.

    v.   <u>Claim Estimates</u>. Claims are estimated as of the Conversion Date based on management and its advisors' current projections.

## C.   Detailed Assumptions[1]

    a.   <u>Cash & Cash Equivalents</u>. The Debtors estimate 100% realization on projected unrestricted Cash and cash equivalents as of the Conversion Date, based on the most recent Approved Budget pursuant to the Final Cash Collateral Order.  Cash and cash equivalents include any remaining proceeds of the Debtors' anticipated as of the Conversion Date.

    b.   <u>Accounts Receivable</u>.  The Debtors' accounts receivable relating to APD were sold under the Oaktree Sale.  The accounts receivable reflected on the Liquidation Analysis relate to anticipated amounts to be received from the APS business as of the Conversion Date.

    c.   <u>Prepaid Expenses</u>. Prepaid expenses include a variety of prepayments such as rent, equipment and software maintenance, insurance and security deposits at Athenex, Inc.  Prepayments were analyzed by type and recoveries vary based on potential counterclaims and, in the case of insurance, length of term remaining and associated cancellation provisions. The Debtors assumed that select insurance prepayments pertaining to Athenex Inc. may be partially recoverable. All other prepayments the Debtors have assumed zero recoverability or that

---

[1] Please refer to the exhibit with footnote references contained in the "Notes" column.

DOCS_LA:350018.5 14039/002       3

deposits/prepayments would be offset against the Debtors' liabilities and no amount would be recovered.

d.  <u>Fixed Assets</u>. Property and equipment includes a variety of asset types, some of which are assumed not to have any realizable value. Leased assets and assets securing financings are assumed to have been immediately returned to the lessors or secured parties upon the Conversion Date. The value for fixed assets with realizable value has been estimated by assuming that the Debtors would receive approximately half of what they could in a Chapter 7 liquidation scenario versus a standard sale process.

e.  <u>Investments</u>.  Investments in non-Debtor subsidiaries includes advances to and equity investments by the Debtors in non-debtor subsidiaries. The Debtors estimate that claims at non-debtor subsidiaries resulting from a wind-down of those entities will result in zero equity value available to Debtor entities.

f.  <u>Non Current Assets</u>. Largely pertains to various non-cash right-of-use lease assets that were recorded for accounting purposes at the time of lease signature. Overall liquidation value has been assumed to be zero for these assets.

g.  <u>Goodwill & Intangible Assets (Net of Depreciation)</u>.  Intangible assets include intellectual property, customer lists, IP addresses, internally developed technology, and goodwill. It is assumed that these intangible assets have low recoverable value compared to the net book value carried on the Debtors' books and records and hence 0% recoverability has been assumed in the Chapter 7 liquidation scenario

h.  <u>Liquidator/ Investment Banking Fees</u>.  The estimated fees of the Debtors' investment banker, Cassel, Salpeter & Co. have been assumed based on existing closed and pending sales transactions. Actual investment banking fees sought and approved in the final fee application, which has not been filed, may be greater than amounts shown in this scenario due to results of pending sales.

i.  <u>Estate Wind-Down Costs</u>. Wind-down costs reflect the estimated cost of achieving recoveries on the Debtors' assets, such as personnel and other operational costs.

j.  <u>Professional Fees</u>. It is assumed that the Trustee's professionals would incur fees and costs learning to become familiar with the Debtors' assets.

k.  <u>Chapter 7 Trustee Fees</u>. The Liquidation Analysis assumes that the Trustee would be compensated in accordance with the guidelines of Bankruptcy Code section 326.

l.  <u>Administrative Claims</u>. Administrative claims have been estimated at $1,250,000 based on post-petition accounts payable outstanding as of the date of the filing of this Liquidation Analysis along with estimates for accounts payable not yet entered into Debtors' systems, outstanding 503(b) claims, and a contingency for other potential administrative claims.

m.  <u>Priority Tax Claims</u>. The estimated amount is based on the Debtors' management team estimates of what will be due for 2022.  Estimated income tax payments pertain to income taxes across multiple states.

n.  <u>Priority Non-Tax Claims</u>. We assume that there will be minimal priority non-tax claims.

o.  <u>Prepetition Lenders Secured Claims</u>. The Prepetition Lenders Secured Claim amount of $45,393,707 (gross) is based on data provided by the Agent to the Prepetition Lenders, and includes exit fee and interest amounts. The Balance owed as of the Conversion Date assumes that the Oaktree Sale closes at a $14,979,722 credit bid amount and takes into account the $24,500,000 of paydowns that have occurred on a post-petition basis. The Balance owed as of the Conversion Date also assumes that $893,776 and $3,345,209 of interest and principal, respectively, are repaid to Agent on the closing date of the Oaktree Sale. This model assumes that the $1,675,000 exit fee owed to the Agent is paid on the Conversion Date.

p.  <u>Other Secured Claims</u>. Based on the Almirall settlement agreement, the RIPA claim amount is zero.

q.  <u>Unsecured Claims</u>.  The estimated amounts are based upon accounts payable as of the Petition Date on the Debtors' books and records, less amounts asserted on account of contracts that have been assumed and cured in connection with the APD sale to Sagent Pharmaceuticals, plus an estimated reserve amount to account for additional filed and contingent claims, such as rejection damages claims.  No specific value has been assessed to any potential litigation claims.

r.  <u>Intercompany Claims</u>.  Intercompany claims amounts have been estimated using the Debtors' latest available consolidated financial statements as of March 31, 2023.

## <u>Conclusion</u>

Based on the assumptions outlined herein, the Debtors project after accounting for Chapter 7 Trustee fees and costs, recovery to holders of Unsecured Claims is estimated at $2.37 million or 3.9%.  On the other hand, recovery to Unsecured Claims under the Plan under a Chapter 11 scenario is estimated at $3.0 million, or a recovery rate of 5.0%.  Holders of Intercompany Claims, Intercompany Interests, and Interests are not expected to realize any recoveries in a chapter 7 liquidation or in a Chapter 11.

DOCS_LA:350018.5 14039/002                    5

**Chapter 7 Liquidation Analysis**
*(Figures in '000s)*

| | Est. 9/22/2023 | Potential Recovery | | | | | |
|---|---|---|---|---|---|---|---|
| | | Recovery Estimate % | | | Recovery Estimate $ | | |
| | Net Book Value | Low | Midpoint | High | Low | Midpoint | High |
| **Gross Liquidation Proceeds:** | | | | | | | |
| Cash | $ 8,275 | 100.0% | 100.0% | 100.0% | $ 8,275 | $ 8,275 | $ 8,275 |
| Restricted cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Accounts Receivable | 120 | 0.0% | 12.5% | 25.0% | - | 15 | 30 |
| Inventory | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expense | 8,965 | 0.0% | 0.9% | 1.8% | - | 82 | 163 |
| Fixed Assets | 1,640 | 0.0% | 8.6% | 17.2% | - | 283 | 283 |
| Investments | 411 | 0.0% | 0.0% | 0.0% | - | - | - |
| Non Current Assets | 4,506 | 0.0% | 0.0% | 0.0% | - | - | - |
| Goodwill & intangibles (net of depreciation) | 65,528 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 89,446 | 9.3% | 9.7% | 9.8% | $ 8,275 | $ 8,654 | $ 8,751 |
| **Less: Liquidation Adjustments** | | | | | | | |
| Liquidator / Investment banking Fees | | | | | $ (1,136) | $ (1,150) | $ (1,150) |
| Estate Wind-Down Costs | | | | | (900) | (900) | (900) |
| Professional Fees | | | | | (750) | (750) | (750) |
| Ch. 7 Trustee Fees | | | | | (248) | (260) | (263) |
| Total Liquidation Adjustments | | | | | $ (3,035) | $ (3,060) | $ (3,063) |
| **Net Liquidation Proceeds Available for Distribution to Creditors (excl. Litigation Claims)** | | | | | $ 5,241 | $ 5,594 | $ 5,688 |

| | Liquidation | % Recovery | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|
| | Balance | Low | Midpoint | High | Low | Midpoint | High |
| **LESS: ADMINSTRATIVE EXPENSES (POST-PETITION)** | | | | | | | |
| Administrative Claims | 1,250 | 100.0% | 100.0% | 100.0% | 1,250 | 1,250 | 1,250 |
| Remaining Amount Available for Distribution | | | | | 3,991 | $ 4,344 | $ 4,438 |
| **LESS: PRIORITY CLAIMS** | | | | | | | |
| Priority Tax Claims | 200 | 100.0% | 100.0% | 100.0% | 200 | 200 | 200 |
| Priority Non-Tax Claims | 100 | 100.0% | 100.0% | 100.0% | 100 | 100 | 100 |
| Remaining Amount Available for Distribution | | | | | $ 3,691 | $ 4,044 | $ 4,138 |
| **LESS: SENIOR SECURED LOAN** | | | | | | | |
| Prepetition Lenders Secured Claims** | 1,675 | 100.0% | 100.0% | 100.0% | 1,675 | 1,675 | 1,675 |
| Remaining Amount Available for Distribution | | | | | $ 2,016 | $ 2,369 | $ 2,463 |
| **LESS: GENERAL UNSECURED CLAIMS** | | | | | | | |
| Other Unsecured Claims | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Unsecured Claims*** | 60,000 | 3.4% | 3.9% | 4.1% | 2,016 | 2,369 | 2,463 |
| Remaining Amount Available for Distribution | | | | | $ - | $ - | $ - |
| **LESS: INTERCOMPANY CLAIMS** | | | | | | | |
| Intercompany Claims | 28,598 | 0.0% | 0.0% | 0.0% | - | - | - |
| Remaining Amount Available for Distribution | | | | | $ - | $ - | $ - |

*Cash amount includes impact of paydown of remaining interest and principal to Oaktree of $4.2M
**$45,394 claim amount has been adjusted for impacts attributed to sales proceeds
***No value has been assessed to any potential litigation claims.

**EXHIBIT 3**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 12, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| ATHENEX, INC., | Case No. 23-90295 (MI) |
| Post-Effective-Date Debtor.[1] | (Jointly Administered) |

## ORDER EXTENDING THE DEADLINE TO OBJECT TO CLAIMS
(Related Docket No. 830)

Upon the joint motion (the "Motion")[2] of Athenex, Inc., the above-captioned post-effective-date debtor (the "Post-Effective-Date Debtor") and Emerald Capital Advisors, in its capacity as the Liquidating Trustee (the "Liquidating Trustee" and together with the Post-Effective-Date Debtor, "Movants") for an order extending the Claims Objection Deadline by 182 days, through and including July 22, 2024, without prejudice to Movants' right to seek additional extension thereof, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtor's claims and noticing agent at https://dm.epiq11.com/athenex.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

upon all of the proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor, IT IS HEREBY ORDERED THAT:

1. The Claim Objection Deadline is hereby extended through and including July 22,

2024.

2. This Court retains jurisdiction with respect to all matters arising from or related

to the implementation or interpretation of this Order.

Signed: February 12, 2024

Marvin Isgur
United States Bankruptcy Judge

2